UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA, )
 )
Plaintiff, )
 )
- v. - ) **12 Civ. 2600 (GBD)**
 )
A 10th CENTURY CAMBODIAN SANDSTONE )
SCULPTURE, CURRENTLY LOCATED AT )
SOTHEBY'S IN NEW YORK, NEW YORK, )
 )
Defendant in rem. )

-------------------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF CLAIMANTS' SOTHEBY'S, INC. AND
MS. RUSPOLI DI POGGIO SUASA'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

  A.  The Statue's History Prior To 1975 .......................................................... 3

  B.  The London Sale in 1975 ............................................................................ 5

  C.  The Planned New York Auction in 2010 ................................................... 6

ARGUMENT ......................................................................................................... 9

  I.  The Government's High Pleading Burden ................................................. 9

  II.  The Government Fails To Adequately Allege That The Statue Was Stolen ................... 11

    A.  The Decrees Do Not Unambiguously Declare Cambodia The Owner
       Of The Statue................................................................................... 12

    B.  The Complaint Does Not Allege Facts Showing Cambodia Has Ever
       Enforced The Colonial Decrees As Vesting Title ........................ 17

    C.  The Government Fails To Allege Particular Facts Showing That The
       Statue Was Taken Without Cambodia's Permission...................... 18

    D.  The Government Has Not Met Its Burden To Plead Facts Showing
       The Statue Was In Cambodia When The Colonial Decrees Were Issued.................. 20

  III.  The Government Has Not Met Its Burden To Plead Facts Showing The
     Statue Remained Stolen When It Was Imported .............................. 22

  IV.  The Complaint Fails To Adequately Allege That Claimants Knew The
     Statue Was Stolen ........................................................................... 25

    A.  The Complaint Alleges No Facts Showing Sotheby's Knew The Statue
       Was Stolen At The Time Of Import ............................................. 25

    B.  The Complaint Fails To Allege The Required Particularized Facts Showing
       Sotheby's Knew The Statue Was Stolen After Import................. 27

CONCLUSION................................................................................................... 29

i

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                            <u>PAGE(S)</u>

*ATSI Commc'n, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).............................................................................3

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).....................................................................................25

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................3

*CIH Int'l. Holdings, LLC v. BT United States, LLC*,
   821 F. Supp. 2d 604 (S.D.N.Y. 2011)........................................................24

*Figueiredo Ferraz Consultoria E Engenharia de
Projeto Ltda. v. Republic of Peru*,
   655 F. Supp. 2d 361 (S.D.N.Y. 2009),
   *rev'd on other grounds*, 665 F.3d 384 (2d Cir. 2011) .................................24

*Gov't of Peru v. Johnson*,
   720 F. Supp. 810 (C.D. Cal. 1989),
   *aff'd,* 933 F.2d 1013 (9th Cir. 1991).......................................16, 17, 20, 28

*Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y.
Dep't of Parks and Rec.*,
   311 F.3d 534 (2d Cir. 2002)..........................................................................4

*Oneida Indian Nation v. New York*,
   691 F.2d 1070 (2d Cir. 1982)........................................................................4

*Third Nat'l Bank v. Impac, Ltd.*,
   432 U.S. 312 (1977).......................................................................................4

*United States v. $22,173.00 in U.S. Currency*,
   No. 09 Civ. 7386(SAS), 2010 WL 1328953 (S.D.N.Y. Apr. 5, 2010).........9

*United States v. $49,000 Currency*,
   330 F.3d 371 (5th Cir. 2003) ........................................................................9

*United States v. $200,255.00 in United States Currency*,
   No. 7:05-CV-27, 2006 WL 1687774 (M.D. Ga. June 16, 2006)................11

*United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg*
   *Account No. 58-400738-1*,
   255 F. Supp. 2d 56 (E.D.N.Y. 2003) ........................................................................22

*United States v. Daccarett*,
   6 F.3d 37 (2d Cir. 1993)...............................................................................................9

*United States v. Davis*,
   648 F.3d 84 (2d Cir. 2011)....................................................................................9, 11

*United States v. Mask of Ka-Nefer-Nefer*,
No. 4:11CV504 HEA, 2012 U.S. Dist. LEXIS 47012 (E.D. Mo. Mar. 31, 2012) ......18, 19

*United States v. McClain*,
   545 F.2d 988 (5th Cir. 1977) ...........................................................12, 14, 15, 20, 26

*United States v. McClain*,
   593 F.2d 658 (5th Cir. 1979) .....................................................................12, 13, 17, 26

*United States v. One Lucite Ball Containing Lunar Material*,
   252 F. Supp. 2d 1367 (S.D. Fla. 2003) ....................................................................23

*United States v. Portrait of Wally*,
   No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002)................10, 22, 23, 24

*United States v. Portrait of Wally*,
   663 F. Supp. 2d 232 (S.D.N.Y. 2009)..........................................................10, 23, 24

*United States v. Schultz*,
   333 F.3d 393 (2d Cir. 2003).................................................................10, 12, 17, 26

*United States v. Turley*,
   352 U.S. 407 (1957).................................................................................................10

## STATUTES

18 U.S.C. § 545................................................................................... *passim*

18 U.S.C. § 981(a)(1)(C) ...............................................................................9, 10, 11

18 U.S.C. § 983(c)(1).........................................................................................11

19 U.S.C. § 1595a(c)........................................................................9, 11, 23, 25

19 U.S.C. § 1595a(c)(1)(A) ...................................................................................9

18 U.S.C. § 2314 ...............................................................................................9, 10, 17, 25

18 U.S.C. § 2315 .............................................................................................10, 11, 17, 25

**RULES**

Fed. R. Civ. P. 44.1 .........................................................................................................24

Supplemental Rule for Admiralty of Maritime Claims and
Asset Forfeiture Actions G(2)(f) ...........................................................................9, 22, 25


**OTHER AUTHORITIES**

Abstract and Delimitation of the Law Respecting the Classification,
    Conservation, and Protection of Historical Monuments (1925) ............................13, 15

Chapman, "The Best Laid Schemes...":  Land-Use Planning and Historic
    Preservation in Cambodia,
    7 Pacific Rim Law & Policy Journal 530 (1998) ...........................................................5

Bruno Dagens, *Angkor: Heart of an Asian Empire* (Sharon AvRutick ed., Ruth
    Sharman trans., Harry N. Abrams, Inc. 1995) (1989) .................................................4, 5

Decree of the Governor General of Indochina on the Conservation of Monuments
    and Objects Having Historical or Artistic Interest (1900) ...................13, 14, 15, 16, 26

## INTRODUCTION

In 1975, the husband of claimant Ms. Ruspoli di Poggio Suasa ("Ms. Ruspoli") bought a 10th century Cambodian sandstone statue (the "Statue") in good faith in an arms-length, open market transaction from a long-established and well-regarded art dealer in London. The couple brought the Statue to their home in Belgium, and it remained on display until it was shipped to New York in 2010 to be sold at auction by claimant Sotheby's, Inc. ("Sotheby's").

The Government's forfeiture complaint does not challenge the good faith of Ms. Ruspoli or her (now deceased) husband. Nonetheless, the Government seeks to seize the Statue from her without compensation. Citing French colonial decrees from the early 1900s, the Government asserts that the Statue belongs to Cambodia, and that its removal from Cambodia rendered it stolen. That assertion ignores the plain language of the relevant decrees, which explicitly and repeatedly recognize private ownership of antiquities. It ignores Cambodia's admission that it is *not* the owner of the Statue's twin, purchased from the *same* London dealer by a prominent Los Angeles museum several years *after* Ms. Ruspoli's husband bought the Statue. It ignores the very archeological records cited in the Complaint, which make clear that the Government cannot show the Statue was still in Cambodia when the decrees were issued. And it ignores well-settled United States law that removal of an antiquity from a foreign state renders the antiquity stolen *only* if the foreign state's law in effect at the time of the removal "clearly and unequivocally" vests ownership of the antiquity to the foreign state, and only if the foreign state actually enforces that law as transferring ownership. *See infra* at 11-22.

Nor can the Government show, as it must, that the Statue *remained* stolen at the time of import. Under the English law applicable to the 1975 purchase by Ms. Ruspoli's late husband, even if the Statue was stolen at the time of purchase, Cambodia's failure to make a claim to the

1

Statue within six years of the sale extinguished any title it once had.  That means that the Statue ceased to be stolen (if it ever were) no later than 1981, twenty-nine years before it was imported into the United States.  *See infra* at 22-25.

Finally, the Government must show that either Sotheby's or Ms. Ruspoli *knew* the Statue was and remained stolen.  That would require proof that either Sotheby's or Ms. Ruspoli:

(a) anticipated the unprecedented legal theory advanced by the Government here, notwithstanding its conflict with the plain language of the decrees, the archeological record, Cambodia's enforcement practice, and settled United States law;

(b) did *not* believe Ms. Ruspoli acquired good title via the 1975 London sale, notwithstanding the English law to the contrary, and

(c) believing the Statue to be stolen, nonetheless chose to (i) import the Statue into the United States, openly declaring its age and place of origin on relevant Customs forms, (ii) put the statue on the cover of the auction catalogue Sotheby's circulated around the world, (iii) accurately describe the Statue's documented provenance dating back to 1975 in that catalogue, and (iv) advise Cambodia's Minister of Culture, in writing and *four months* before the auction, of the plan to sell the Statue and the details of the Statue's provenance.

There are no facts alleged in the Complaint that would render any of these assumptions reasonable.  For proof of culpable knowledge the Complaint instead relies entirely on an email that an art historian hired to write a catalogue description of the Statue sent to her Sotheby's contact, describing the Statue as "definitely stolen" because the feet of the Statue's twin (the one Cambodia conceded it did not own) had been found in a ruin in Cambodia.  That legal conclusion did not follow from the facts the art historian cited.  And in any event, subsequent emails incorporated in the Government's complaint show that the art historian shortly thereafter

spoke to Cambodia's Minister of Culture and, based on the information he provided, *corrected* her prior statement, telling Sotheby's that "legally and ethically you can happily sell the piece." *See infra* at 25-29.

In short, the Government's legal theory is inconsistent with United States and foreign law, the very documents cited in the Complaint, and common sense. Sotheby's and Ms. Ruspoli have at all times acted properly and in good faith, and there is no basis for forfeiting the Statue. The Complaint should be dismissed.

## STATEMENT OF FACTS

### A.    The Statue's History Prior To 1975

The Statue stands more than five feet tall and more than three feet wide. It was carved from sandstone about a thousand years ago at the Prasat Chen temple site located at Koh Ker, in the Cambodian province of Preah Vihear. Compl. ¶ 1.[1] It is one of a pair of wrestlers. The other wrestler (the "Companion Statue") has since the 1980s been on display at a prominent museum in Los Angeles. *Id.* ¶¶ 19, 26, 28, 30, 32; Ex. 1 at 65; Ex. 2 at 21; Ex. 3 at 31; Ex. 4.[2]

Koh Ker served as the ancient Khmer capital from 928 to 944 A.D., during the reigns of King Jayavarman IV and his immediate successor. Compl. ¶ 5. In or about 944 A.D., the Khmer capital was moved to Angkor Wat, and Koh Ker was abandoned to the jungle. *Id.*

---

[1] "Compl." refers to the complaint filed by the Government in this case. For purposes of this motion to dismiss, facts are drawn from the government's Complaint and the documents incorporated by reference therein. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007) ("the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn"); *ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (in ruling on motion to dismiss, court may "consider ... documents incorporated into the Complaint by reference"). The incorporated documents are attached as Exhibits 1-4, 6-8, 10-11 hereto. Claimants do not admit the veracity or relevance of the Complaint's allegations.

[2] "Ex." refers to an exhibit to the Declaration of Peter G. Neiman in Support of Claimants' Motion to Dismiss, submitted herewith. Page citations within exhibits refer to the final two digits of the exhibit's Bates number.

Over the next thousand years, Cambodia was repeatedly invaded, and many treasures were carried away.  *See* Ex. 5, Bruno Dagens, *Angkor: Heart of an Asian Empire* 20 (Sharon AvRutick ed., Ruth Sharman trans., Harry N. Abrams, Inc. 1995) (1989) (describing how in 1431, the conquering Thai king "removed the august statues of the Buddha made of gold, silver, bronze, and precious stones, as well as a number of statues of the August Bull and of other animals.").  In due course, Cambodia's invaders themselves suffered their own incursions from other civilizations, allowing statues to travel far from their original location.  *See* Ex. 5, Dagens, *supra*, at 20-21 ("A hundred years [after the Thai invasion of Cambodia in 1431] the Burmese were shrewd enough to do the same: When they conquered Thailand they sacked Ayuthaya, the capital, and in their turn removed a number of Angkor statues.").[3]

In 1863, a treaty established Cambodia as a protectorate of France.  Compl. ¶ 35.  The French "discovered" Cambodia's archeological treasures, including those at Koh Ker, and a large number of sculptures made their way to Europe during the colonial period.  *See, e.g.*, Ex. 5, Dagens, *supra*, at 65 ("Delaporte [a French explorer] returned to France with 'some seventy pieces of sculpture and architecture' that he claimed to have bought, or rather, traded for.").  Indeed, explorers set out on an expedition in 1873 to Cambodia with the specific objective to "visit monuments with a view to bringing statues and other sculptures back to France."  *Id.* at 64; *see also id.* at 68 (describing how Delaporte brought to France heads of statues from a

_____

[3] The Court is permitted to take judicial notice of the Cambodian history set forth herein drawn from Dagens' book, at least so long as that history is undisputed.  *See, e.g., Third Nat'l Bank v. Impac Ltd.*, 432 U.S. 312, 317 (1977) (taking judicial notice of fact that 1873 was the year of a financial panic); *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks and Rec.*, 311 F.3d 534, 540 n.1 (2d Cir. 2002) (taking judicial notice of "history of Lincoln Center set forth" in an "authoritative text"); *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (judicial notice of historical evidence appropriate where "there was no dispute regarding the authenticity of the historical materials or facts used to decide the ultimate issue.").  We do not anticipate that the Government will dispute the historical facts set forth herein drawn from this account.  To the extent it does, the Court need not resolve that dispute in order to rule on this motion.  These historical facts provide relevant context, but are not necessary to any of the arguments for dismissal.

Cambodian temple).  Many antiquities collected by early French tourists ended up in museums like the Trocadéro and the Musée Guimet in France (a major repository for Khmer art); others remained in private collections.  *See id.* at 68.

In 1939, a French archeologist named Henri Parmentier published the results of his detailed survey of Koh Ker (the "Parmentier Survey") conducted over the prior fifteen years.  *See* Compl. ¶ 15.  The Parmentier Survey—which is incorporated by reference in paragraph 15(a) of the Complaint—devotes five pages to the Prasat Chen temple site.  Ex. 6.  The survey's section on Prasat Chen includes detailed measurements, a map of the site, comments on the various materials used, and descriptions of *other* statues found there.  The survey also describes the *precise* location (the Western Gopura, or pavilion) within the site where the Government asserts the Statue was placed.  But there is no mention of the Statue, a work of considerable size and exquisite craftsmanship.  Nor is there any mention of the Companion Statue, an equally impressive and imposing piece.  Instead, the Parmentier Survey reports that the Western Gopura was already "in complete ruin."  *Id.*

In the 1960s, Cambodia descended into the civil war eventually won by the Khmer Rouge.  All records related to the ownership of land in Cambodia prior to 1974 were destroyed.  *See* Chapman, "The Best Laid Schemes...":  Land-Use Planning and Historic Preservation in Cambodia, 7 Pacific Rim Law & Policy Journal 530, 544 (1998).

**B.     The London Sale in 1975**

At some unknown time the Statue left Cambodia.  Eventually it was brought to London.  A document incorporated by reference in the Complaint indicates that curators, specialists and collectors saw it at Spink & Son Ltd. ("Spink"), a highly-regarded London auction house and

5

dealer established in 1666,[4] in the late 1960s or early 1970s.  Ex. 3.  In December 1975, Ms.

Ruspoli's now-deceased husband purchased the Statue from Spink for £105,000.  It was

thereafter shipped from London to Belgium, and the Statue remained in Ms. Ruspoli's homes in

Belgium, where it was displayed for the next 34 years.  Compl. ¶¶ 16, 21; Ex. 7.

## C.    The Planned New York Auction in 2010

In or about late March 2010, Ms. Ruspoli consigned the Statue for public auction to

Sotheby's.  Compl. ¶ 20.  Sotheby's imported the Statue into the United States, disclosing in the

Customs declaration that the Statue dated to the 10th century and was of Cambodian origin.  *Id.* ¶

22.  On or about April 23, 2010, it arrived in New York City.  *Id.* ¶ 22.

### 1.    The Art Historian Raises A Concern

Sotheby's hired an art historian (the "Art Historian")[5] to draft a description of the Statue

for the auction catalogue and to give a lecture in connection with a preview of the Statue.  *Id.* ¶

24; Ex. 3 at 31.  In connection with these efforts, the Art Historian advised a Sotheby's

representative on June 1, 2010 that she had "been doing a little catch-up research on Koh Ker,

and [did] not think that [Sotheby's] should sell" the Statue at "a public auction."  Ex. 1 at 65.

The Art Historian explained that the "Cambodians ... now have clear evidence that it was

definitely stolen from Prasat Chen."  *Id.*  The Art Historian provided a 2007 report asserting that

the legs of the Companion Statue matched feet found to remain at Prasat Chen, and explained

that because the "two [statues] must have stood close together ... it's pretty clear where they

came from."  *Id.*  Concluding that a sale in these circumstances could lead to "embarrassment,"

and perhaps efforts by the Cambodians to "block the sale," the Art Historian suggested that the

---

[4] *See* http://www.spink.com/about_spink/history.asp.

[5] This is the same person identified in the Complaint (¶ 24) as the "Scholar."

owner might consider offering it to the Cambodian National Museum as a "gesture of good will." *Id.*

### 2.   *The Art Historian Obtains Additional Information And Changes Her View*

Shortly thereafter, however, the Art Historian learned facts that led her to change her view.  As she later recounted in emails to Sotheby's, the Art Historian spoke to Cambodia's Minister of Culture, Hab Touch, who, according to the Art Historian, advised her that his focus was "to stop anything from being exported from Cambodia now, not to go after pieces that left years ago when there were no restrictions."[6]  Ex. 2 at 21.  He also specifically assured her that Cambodia had no intention of seeking to reclaim the Companion Statue.  *Id.* at 18.  Armed with these new facts, which shed considerable light on both Cambodia's enforcement practices and its views of the legal situation governing statues that left "years ago," the Art Historian repeatedly told Sotheby's her view that the piece was "obtained legally" rather than stolen, and that "legally and ethically," Sotheby's could "happily sell" the Statue.  Ex. 1 at 63; Ex. 2 at 21.

### 3.   *Sotheby's Notifies Cambodia Well In Advance of the Planned Auction*

While confirming that Sotheby's could sell the Statue, the Art Historian, however, recommended that Sotheby's *not* notify the Minister of Culture of its plan to do so, explaining that this might raise public relations issues to which the Minister of Culture might feel compelled to respond. Ex. 2 at 18.  Preferring openness to the Art Historian's recommendation to "let sleeping dogs lie," *id.* at 17, Sotheby's rejected that advice.

On November 8, 2010—more than four months before the auction date—Sotheby's advised Cambodia's Minister of Culture, in writing, about its plan to sell the Statue.  Compl. ¶

---

[6] The Art Historian's communications with Cambodia's Minister of Culture Touch, and subsequent change of view, are reflected in a telephone call memorialized in an email incorporated by reference in the Complaint, and in additional emails to Sotheby's that are incorporated by reference in the Complaint. Exs. 1, 2.

30; Ex. 3.  That written notice, incorporated by reference in the Complaint, included the detailed

description of the Statue from the planned auction catalogue, which disclosed that (a) the Statue

dated from the 10th century and came from Koh Ker; (b) that it was a "pair" to the Companion

Statue "in the collection of" the Los Angeles museum and that the two Statues would have

"faced each other"; (c) that both the Statue and the Companion Statue were "introduced into the

auction market by Spink's of London in the late 1960s or early 1970s"; and (d) that the Statue

had been bought by a collector in 1975, several years before the Los Angeles museum purchased

the Companion Statue.  Ex. 3 at 31.

The Cambodian government did not respond.  Compl. ¶ 31.  Accordingly, Sotheby's

distributed its auction catalogue publicly, and went forward with its plan to auction the Statue.

Compl. ¶ 32.

### 4.  *Cambodia's Last-Minute Request That The Statue Be Withdrawn From Auction*

On March 24, 2011, the day of the auction, the Cambodian government wrote to

Sotheby's asking that the Statue not be sold.  Ex. 4.  Cambodia's letter, incorporated by reference

in the Complaint, pointedly did *not* assert that Cambodia *owned* either the Statue or the

Companion Statue and, in fact, expressly acknowledged that the Companion Statue "belongs to"

the Los Angeles museum where it is displayed.  *Id.*  Rather, the letter asserted without legal or

factual support that the Statue "was illegally removed" from Koh Ker, and asked Sotheby's to

"pull the object from sale and to facilitate its return to the Kingdom of Cambodia."  *Id.*

Sotheby's and Ms. Ruspoli voluntarily withdrew the Statue from auction and attempted

to resolve the issue amicably.  Compl. ¶ 33.  With the assistance of Cambodian authorities,

Sotheby's sought for approximately a year to find a benefactor willing to buy the Statue and

donate it to Cambodia.  On April 4, 2012, however, the Government filed this forfeiture

Complaint.


## ARGUMENT

### I.   The Government's High Pleading Burden

Forfeiture complaints are subject to rigorous review.  To survive, the Government's

complaint must "state *sufficiently detailed facts* to support a reasonable belief that the

Government will be able to meet its burden of proof at trial."  Supplemental Rule for Admiralty

or Maritime Claims and Asset Forfeiture Actions ("Supp. Rule") G(2)(f) (emphasis added); *see*

*United States v. $22,173.00 in U.S. Currency*, No. 09 Civ. 7386(SAS), 2010 WL 1328953, at *1

(S.D.N.Y. Apr. 5, 2010); *see also United States v. $49,000 Currency*, 330 F.3d 371, 375 n.8 (5th

Cir. 2003).  This pleading standard is "more stringent than the general pleading requirements [as]

an implicit accommodation to the drastic nature of the civil forfeiture remedy."  *$22,173.00 in*

*U.S. Currency*, 2010 WL 1328953, at *2.  "The particularity-of-pleading requirements in

forfeiture cases provide a 'way of ensuring that the government does not seize and hold, for a

substantial period of time, property to which, in reality, it has no legitimate claim.'"  *United*

*States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993).

The Complaint identifies three statutory bases for its forfeiture claims:  18 U.S.C. §§ 545

and 981(a)(1)(C), and 19 U.S.C. § 1595a(c).  Compl. ¶¶ 2, 43-50.  All three statutes require proof

that the Statue was stolen, and that Sotheby's or Ms. Ruspoli knew it.

- Section 1595a(c) authorizes forfeiture of property that is *both* "introduced into the
  United States contrary to law" *and* "stolen."  *Id.* at 1595a(c)(1)(A).  "Contrary to law"
  means "illegally, unlawfully, or in a manner conflicting with established law," *United*
  *States v. Davis*, 648 F.3d 84, 89 (2d Cir. 2011), and here the Complaint alleges that
  the import violated 18 U.S.C. § 2314, which prohibits the *knowing* import of stolen
  property.

9

- Section 545 provides for the forfeiture of "merchandise" that is "knowingly import[ed] ... contrary to law."  Again, the Complaint alleges a violation of Section 2314.

- Section 981(a)(1)(C) authorizes forfeiture of property that constitutes or is derived from a violation of certain criminal laws.  The Complaint again alleges a violation of Section 2314, and also alleges a violation of 18 U.S.C. § 2315, which makes it an offense to, among other things, *knowingly* possess stolen property that has been transported in interstate or foreign commerce after being stolen.

An object is "stolen" if it is taken from its owner, without consent, and with the intent to deprive the owner of the rights and benefits of ownership.  *See United States v. Turley*, 352 U.S. 407, 408 (1957); *United States v. Schultz*, 333 F.3d 393, 399 (2d Cir. 2003).  Thus, to establish that the Statute was stolen, the Government would need to prove that Cambodia owned it, and that it was taken from Cambodia without permission and with the intent to deprive Cambodia of its property.

The Government must also prove that the Statue *remained* stolen at the time of import. *See United States v. Portrait of Wally* ("*Wally III*"), No. 99 Civ. 9940, 2002 WL 553532, at *16 (S.D.N.Y. Apr. 12, 2002) ("To state a violation of [the National Stolen Property Act] …, the government must allege not only that Welz stole the painting but also that the painting remained stolen at the time it was imported in 1997."); *United States v. Portrait of Wall* ("*Wally IV*"), 663 F. Supp. 2d 232, 251-52 (S.D.N.Y. 2009) ("To prove *Wally* is subject to forfeiture, the Government … must show that … it remained stolen when shipped to this country.").

While all three theories require proof that Sotheby's or Ms. Ruspoli had culpable knowledge, there are slight differences as to *when* that culpable knowledge must have arisen. The Government's theories under Section 545 and Section 1595a depend on a violation of Section 2314, the law against importing stolen property, and thus require proof that Sotheby's or Ms. Ruspoli knew, *at the time of import*, that the Statue was stolen.  *See* 18 U.S.C. § 2314.  The Government's third theory, under Section 981, also alleges a violation of Section 2315, the law

10

against possessing stolen property, and thus requires knowledge that the Statue was stolen when Sotheby's possessed it in the United States.[7]  *See* 18 U.S.C. §  2315.

The Government's ultimate burden of proof also varies by statute.  On the Section 545 and 981(a)(1)(C) theories, the Government must prove the elements of its forfeiture claim by a preponderance of the evidence.  18 U.S.C. § 983(c)(1); *see also United States v. $200,255.00 in United States Currency*, No. 7:05-CV-27, 2006 WL 1687774, at *2-4 (M.D. Ga. June 16, 2006). With regard to its 19 U.S.C. § 1595a(c) claim, the Government must establish probable cause as to these same elements, and if it does so, the burden shifts to the claimants to establish by a preponderance that the Statue is not subject to forfeiture.  *See Davis*, 648 F.3d at 95-96.

## II.     The Government Fails To Adequately Allege That The Statue Was Stolen

The Government's theory is that Cambodia obtained ownership of the Statue no later than 1900, as the result of a series of French Colonial Decrees, and that the removal of the Statue from Cambodia after 1900 therefore rendered the Statue stolen.  This argument fails because: (1) the Colonial Decrees, on their face, do not "clearly and unequivocally" declare that Cambodia owns the Statue, as United States law requires before removal from a foreign country renders an antiquity stolen; (2) the Complaint does not allege that Cambodia has ever enforced the Decrees as transferring ownership to the State, (3) the Complaint alleges no facts establishing a reasonable belief that the Statue was removed without Cambodia's permission; and (4) the Complaint does not allege sufficient facts to support a reasonable belief that the Statue was still in Cambodia when the Decrees were issued.

-----

[7] Although Section 2315 prohibits knowing possession, rather than importation, of stolen property, the statute only applies to property that was stolen at the time that it crossed a state or national border.  Thus, as with the Government's other theories, to prevail on this theory the Government must show the Statue remained stolen at the time of importation.

A.     **The Decrees Do Not Unambiguously Declare Cambodia The Owner Of The Statue**

Foreign countries have adopted a wide variety of means for protecting and preserving archeological heritage, ranging from outright declaration of national ownership at one extreme, down to substantially more modest limits—such as bars on exports, rights of first refusal, classification systems, limits on transfer, limits on excavation, and the like.  There are three Court of Appeals decisions addressing whether an antiquity removed from a foreign country in violation of such laws constitutes stolen property within the meaning of U.S. law.  All three decisions, *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977) ("*McClain I*"), *United States v. McClain*, 593 F.2d 658, 670 (5th Cir. 1979) ("*McClain II*"); and *United States v. Schultz*, 393, 410 (2d Cir. 2003), reach the same conclusion:  the removal renders the property stolen under United States law only if the foreign law clearly and unambiguously declares the foreign state the owner of the antiquity.

 The decisions reach this conclusion because ownership is the *sine qua non* of theft, and preservation laws, transfer restrictions, registration requirements, and export controls "do not create 'ownership' in the state.  The state comes to own property only when it acquires such property in the general manner by which private persons come to own property, or when it declares itself the owner."  *McClain I*, 545 F.2d at 1002.  *See also United States v. Schultz*, 333 F.2d at 410 (distinguishing between laws "intended to assert true ownership of certain property" and those that "merely ... restrict the export of that property").

The declaration of ownership must be "clear and unequivocal."  *McClain II,* 593 F.2d at 670; *see also Schultz,* 333 F.3d at 402 ("clear and unambiguous").  Due process requires that a foreign ownership law be drafted "with sufficient clarity to survive translation into terms understandable by and binding upon American citizens" and the criminal laws (on which the

Government here bases its forfeiture claims) "cannot properly be applied to items deemed stolen only on the basis of unclear pronouncements by a foreign legislature." *McClain II*, 593 F.2d at 670-71.  Thus, if the foreign law does not unambiguously declare state ownership, that is the end of the analysis, and no expert testimony purporting to clarify or amplify that law can change the result.  *See id.* ("emphatic" expert testimony from multiple witnesses "that Mexico has considered itself the owner of all pre-Columbian artifacts for almost 100 years" insufficient, where written law was ambiguous prior to 1972).  Any other result would put diligent museums, collectors, and sellers in the untenable position of having to look beyond the plain language of foreign laws, and attempt to assess and predict the risk that foreign officials or purported experts might later claim that the laws mean something other than what they say.

The Government relies on two French Colonial Decrees—from 1900 and 1925—to support its claim that Cambodia owned the Statue since at least 1900.[8]

The Government's reliance on the 1900 Colonial Decree suggests that its research in this area was, at best, incomplete.  A 1924 report to the French President (attached with translation as Exhibit 9 hereto, but *not* referenced in the Complaint) declared that the 1900 Colonial Decree was *entaché d'une illégalité flagrante*"—that is, "marred by flagrant illegality."  Ex. 9 at 526.

The Court need not consider the impact of this 1924 report to rule on this motion, because neither the 1900 nor 1925 Colonial Decree recites, in the required "clear and

---

[8] The Government makes passing reference to 1913 French legislation and a 1924 French colonial decree, characterizing both as "reaffirming the protections set forth in the 1900 Decree."  Compl. ¶ 37.   Since the Government does not contend that either *added* to the (very modest) protections provided by the 1900 Colonial Decree, it is not necessary to separately analyze these provisions.

unequivocal" fashion, that Cambodia owns this Statue.[9]  According to the Complaint, the 1900

Colonial Decree "established a system of *classifying* certain … property" of "historical or

artistic" significance, which "received additional protections" against the unauthorized

movement, sale, or export of such property "once thus categorized."  Compl. ¶ 37 (emphasis

added).  The Complaint further alleges that "Koh Ker, including Prasat Chen and thus the

[Statue]" was classified in 1925.  *Id.* ¶ 38.  But "classification"—and the restrictions on sale,

transfer and export that may come with it—falls short of the required clear declaration of state

ownership.  *See McClain I*, 545 F.2d at 999-1000 (noting that 1934 Mexican law required

registration of "movable artifacts", but holding that "[o]nly in 1972 ... did the government

declare that all pre-Columbian artifacts were owned by the Republic" and that such a

"declaration of national ownership is necessary before illegal exportation ... can be considered

theft").

Indeed, the 1900 Colonial Decree itself repeatedly recognizes that classification does *not*

imply state ownership.  For example, Article 7 of the 1900 Colonial Decree recites that

"expropriation"—that is, obtaining state ownership—"of a classified immovable property may

not be pursued without prior authorization by the Governor General."  Ex. 8 at Art. 7.  If

"classifying" property in and of itself made that property belong to the state, there would be no

need to separately "expropriate" it.  Similarly, Article 9, which authorizes but does not require

the Governor General to "pursue the expropriation" of "classified monuments," *id.* at Art. 9,

would make no sense at all if classification alone rendered the monument state property.

---

[9] The only copy of the 1900 Colonial Decree is partially illegible, making it quite literally unclear.  Ex. 8,
Decree of the Governor General of Indochina on the Conservation of Monuments and Objects Having
Historical or Artistic Interest (1900) ("1900 Colonial Decree)") at Art. 16.  But there is enough in the
legible portions of the 1900 Colonial Decree to establish that it does not vest ownership of antiquities in
the State.

The Government asserts that the 1925 Colonial Decree "reiterated the earlier protections regarding classification and expanded upon them."  Compl. ¶ 38.  But the 1925 Colonial Decree, like the 1900 Colonial Decree, does not do what is required—clearly and unequivocally vest ownership in the state.  To the contrary, the 1925 Colonial Decree expressly recognizes that private persons may own classified antiquities, for it places on "private persons" the "obligation to ensure the safeguarding and conservation of classified moveable artifacts *of which they are the owners*."  Ex. 10 at Art. 25 (emphasis added).

The 1925 Colonial Decree also authorizes the government to block the sale of an antiquity and to make a pre-emptive bid for it *only if* the government exercised its "right of preemption ... within 15 days."  *Id.* at Art. 24.  Such a narrow right to pre-empt a sale is flatly inconsistent with any notion that the government already *owns* all antiquities.  *See McClain I*, 545 F.2d at 998 (finding that 1930 Mexican law granting government "right of first refusal" did not vest title in the government).

Finally, the 1925 Colonial Decree creates a limited opportunity for the "Royal Government" to "make a claim" to *newly discovered* antiquities, but only by providing "notice" of its claim "within 6 months" of the discovery.  Ex. 10 at Art. 30.  That provision could not apply here, for there is no allegation that that the Statue was "discovered" after 1925, much less that the required claim was made within six months of the discovery.  More fundamentally, the narrow time limit and need for a formal claim makes clear that the 1925 Colonial Decree was not intended to automatically make Cambodia the owner of all "classified" antiquities.

In short, the classification regime described in the 1900 and 1925 Colonial Decrees expressly recognizes private ownership of antiquities, and does not transfer title to the Statue to the state at all, much less clearly and unequivocally.

15

In addition to describing the classification regime, the Government also alleges that the 1900 Colonial Decree "established a baseline level of protection for art and archeology in French Indochina, including Cambodia, by explicitly recognizing that this art and archeology, 'above and below the ground' were part of the 'national domain.'"  Compl. ¶ 37.  The 1900 Colonial Decree, however, contains no such provision.  It instead recites, more narrowly, that "art or archeological objects ... which may exist on or in the soil of immovable properties constituting a part of the national domain ... shall be reserved for the domain."  Ex. 8 at Art. 17.  Far from providing a "baseline level of protection" for *all* art and archeology, as the Government mistakenly suggests (Compl. ¶ 37), this provision does nothing more than declare that certain objects—those which are on property "constituting a part of the national domain"—are themselves part of that domain.  Objects forming part of the national domain are, under the 1900 Colonial Decree, declared to be "inalienable" and "imprescriptable."  Ex. 8 at Art. 12.  But declaring that an object may not be sold by its owner is not the same thing as declaring that the state is the owner of the object.  "Such declarations are concerned with protection and do not imply ownership."  *Gov't of Peru v. Johnson*, 720 F. Supp. 810, 814 (C.D. Cal. 1989), *aff'd*, 933 F.2d 1013 (9th Cir. 1991) (rejecting Peru's claim that statute declaring antiquities "untouchable, inalienable, and inprescriptable" vested title in state).

Moreover, nothing in the 1900 Colonial Decree, or any of the other materials cited by the Government, establishes that Koh Ker, or the Prasat Chen temple within it, was a "part of the national domain," the threshold requirement for the "baseline protection" the Government asserts the 1900 Colonial Decree created.  According to the Complaint, an 1884  "ruling" by the "French Governor" defines the "national domain" to include "structure[s] ... assigned to public service."  Compl. ¶ 36.  Whether the ruins of a temple abandoned a thousand years earlier constitutes a

"structure … assigned to public service," or whether that designation extends only to structures actually being used for public service, and not to ancient ruins, may be an interesting (and challenging) question for colonial legal scholars to resolve.  But the Complaint contains no allegations that it does.  Nor is there any need for dueling expert testimony on the question.  That the Government's position depends on such a nuanced and difficult question is itself decisive, because it means that the tangled web of Colonial Decrees on which the Government relies does not vest ownership in Cambodia with anything approaching the clarity required by *McClain* and *Schultz.*

Because the Colonial Decrees do not clearly and unambiguously declare that Cambodia owns the Statue, as a matter of law the removal of the Statue from Cambodia did *not* render the Statue stolen property within the meaning of 18 U.S.C. §§ 2314 and 2315, the criminal statutes on which all three of the Government's forfeiture theories are based.  *See McClain II*, 593 F.2d at 671; *Schultz*, 333 F.3d at 402.  Accordingly, the Complaint should be dismissed.

### B.     The Complaint Does Not Allege Facts Showing Cambodia Has Ever Enforced The Colonial Decrees As Vesting Title

While facial clarity is necessary, it alone is not sufficient.  Even an apparently clear foreign law does not vest ownership if the foreign state has not actually enforced its own law as granting it title.  For example, in *Peru v. Johnson,* Peru sought to reclaim antiquities, relying on a law declaring that "artifacts in historical monuments are 'the property of the State' and that unregistered artifacts 'shall be considered to be the property of the State.'"  Finding that "[t]here is no indication in the record that Peru ever has sought to exercise its ownership rights in such property, so long as there is no removal from that country," the Court concluded that the Peruvian laws did not vest title in the state, and dismissed Peru's claims.  *Johnson*, 720 F. Supp. at 814; *cf. Schultz*, 333 F.3d at 402 (stressing the Egyptian government's "active enforcement" in

17

concluding that its laws did vest title).  This rule prevents a country unwilling to take the politically unpopular step of seizing antiquities from its own people from asking this country to do so on its behalf.  It also prevents a country from "rediscovering" laws that have previously not been enforced, thereby unsettling the reasonable expectations that have developed about the meaning of those laws.

Nothing in the Complaint provides the required reasonable belief that the Government will be able to present enforcement evidence here.  The Complaint is silent on whether Cambodia has *ever before*, in *any* context, enforced the Colonial Decrees as granting the state ownership of antiquities.  Emails incorporated by reference in the Complaint reflect that Cambodia's Culture Minister did not intend to seek to reclaim objects that left Cambodia "years ago," ex. 2 at 21, *i.e.*, before Cambodia's 1992 law expressly nationalized antiquities.  Another document incorporated by reference in the Complaint shows that Cambodia recognizes that the Companion Statue— which is similarly situated with regard to the Colonial Decrees cited by the Government— "belongs to" a Los Angeles museum.  Ex. 4.  The failure to allege prior enforcement, and the direct evidence of non-enforcement incorporated in the Complaint, provides an additional reason the Complaint fails to adequately allege that the Statue is stolen.

### C.   The Government Fails To Allege Particular Facts Showing That The Statue Was Taken Without Cambodia's Permission

An essential element in proving that the Statue is stolen is establishing that its removal was without the permission of appropriate government authorities.  The Government has not met its burden of pleading particular facts showing that the removal of this Statue was without permission.

A district court's recent decision in *United States v. Mask of Ka-Nefer-Nefer*, No. 4:11CV504 HEA, 2012 U.S. Dist. LEXIS 47012 (E.D. Mo. Mar. 31, 2012) is instructive.  There,

18

the Government's evidence showed that an Egyptian mask had been in storage at an Egyptian

government storage facility in the 1960s and had disappeared by the early 1970s, before turning

up in the global market in 1998, and there was no record that the mask had been sold or given to

a private party in the intervening years.  Nonetheless, the Court dismissed the Government's

forfeiture complaint for failing adequately to allege that the mask was stolen, holding that "[t]he

Government cannot simply rest on its laurels and believe that it can initiate a civil forfeiture

proceeding on the basis of one bold assertion that because something went missing from one

party in 1973 and turned up with another party in 1998, it was therefore stolen and/or imported

or exported illegally."  2012 U.S. Dist. LEXIS 47012, at *8-9.[10]

In *Ka-Nefer-Nefer,* the Government at least had evidence that the statue was once in the

foreign state's actual possession and that there was no record of a subsequent sale or gift.  Here,

the Government has not alleged that the Statue was ever in the actual possession of the

Cambodian government, and the Government makes no allegation of the absence of gift or sale

records.  Nor, in any event, would the absence of such records be probative, given the passage of

time, the intervening turmoil in Cambodia, and the widespread destruction of property records.

If the inference of theft was unavailable to the Government with regard to a mask that

disappeared from the Egyptian government's storeroom at some unknown point within a single

decade, such an inference surely is unavailable here.  Absent allegations sufficient to support a

reasonable belief that the Government will be able to prove theft of the Statue, the Complaint

must be dismissed.

---

[10] The court recently denied the Government's motion for reconsideration in *Ka-Nefer-Nefer*.  *See* Dkt
#48, No. 4:11CV504 HEA (E.D. Mo. June 1, 2012).

19

### D.    The Government Has Not Met Its Burden To Plead Facts Showing The Statue Was In Cambodia When The Colonial Decrees Were Issued

The Colonial Decrees on which the Government relies are only relevant if the Statue was still in Cambodia after 1900. *See McClain I*, 545 F.2d at 1003; *Johnson*, 720 F. Supp. at 812 ("[I]n order for the plaintiff to recover [artifacts], it must prove that the Government of Peru was the legal owner at the time of their removal from that country.").

The Complaint, however, cites and incorporates powerful evidence that the Statue was *not* in Cambodia at the relevant time. The Parmentier Survey, published in 1939, devotes five pages to a detailed description of the Prasat Chen temple, including the Western Gopura where the Statue supposedly stood, but contains *no* reference at all to the large and imposing stone Statue (or its companion). The only reasonable conclusion is that the Statue was not at Koh Ker when the Parmentier Survey was conducted.

The Complaint does not allege that the Statue was removed from Prasat Chen prior to the Parmentier Survey but was somewhere else in Cambodia after 1900. Instead, the Government stakes its case on the assertion that the Statue was still at the Prasat Chen temple in Koh Ker until at least 1960—an assertion that squarely conflicts with the Parmentier Survey.

Remarkably, the Government alleges that the 1939 Parmentier Survey is actually evidence that the Statue *was* still at Prasat Chen, because the survey contains "no references to looting," which the Government maintains "indicat[es] that such looting did not take place until after 1939." Compl. ¶ 15(a). To the contrary, there is ample evidence of "looting" in the Survey's description of the Western Gopura of Prasat Chen as being "in complete ruin." Ex. 6 at 49. In any event, the Government must plead facts sufficient to make it reasonably likely it will be able to prove at trial that the Statue was in Cambodia after 1900, and it cannot meet that burden by

advancing strained negative inferences from evidence that much more logically and powerfully

suggests the opposite.

The Complaint also points to photographs taken "in the 1950s and 1960s" of the Koh Ker

site and the Prasat Chen temple, which the Government says "show that the massive statuary

located at the Koh Ker temples *generally* remained intact at that time."  Compl. ¶ 15(b).  The

Government has produced in discovery the photographs incorporated in the Complaint—there

are a total of six pictures showing only *four* different statues.[11]  Ex. 11.  Given that the Koh Ker

temple complex (of which Prasat Chen is but one small part) spans several thousand acres, the

presence of four intact statues hardly implies the absence of looting.  In fact, the photographs

(like the cited Parmentier Survey) are evidence that the Statue was *no longer* in Cambodia, for

the Statue is not captured in the photographs.  Moreover, all four of the statues shown in these

photographs are expressly referenced in the Parmentier Survey—confirming the thoroughness of

that survey and the significance of its omission of any reference to the Statue.  The photographs,

far from making it reasonably likely that the Government can demonstrate the Statue was in

Cambodia after 1900, instead are evidence that it was *not*, and certainly do not establish a

reasonable belief that the Government will prove otherwise.

The only other facts alleged in the Complaint to show the Statue was still in Cambodia at

the relevant time are (1) an assertion that a "new road" built after 1965 "made it easier to access

the Prasat Chen site at Koh Ker," and (2) that the "first known sale [of the Statue] in the art

market ... was in 1975."  Compl. ¶¶ 15(c) and (d).  But even viewed in isolation, these modest

facts do not support a "reasonable" belief that the Government will be able to meet its burden at

trial to show the Statue was in Cambodia after 1900.  Both the new road and the first known sale

---

[11] One picture depicts a structure rather than a statue.  Two other pictures show the same statue, of twin wrestling monkeys.

date are fully consistent with the statue having been out of Cambodia long ago.  The reference to a "new" road providing "easier" access makes clear there was some access to the site via the prior road.  And the absence of a known sale prior to 1975 shows only the limitations of record keeping and is unsurprising given that the importance and value of documenting provenance is a recent phenomenon.  One cannot reasonably infer that an object was looted close in time to the first sale that happens to be "known."

But of course these alleged facts cannot be viewed in isolation.  In assessing whether the facts alleged provide a "reasonable basis" to believe the Government can meet its burden at trial, the Court must consider the "new" road and first "known" sale in light of the documents and photographs incorporated in the Complaint which show the Statue was *not* at Prasat Chen more than thirty years before the new road was allegedly built and nearly forty years before the first known sale allegedly occurred.  Considered in this light, the Complaint does not come close to stating "*sufficiently detailed facts* to support a *reasonable* belief that the government will be able to meet its burden of proof at trial" that the Statue was still in Cambodia after 1900.  *See* Supp. Rule G(2)(f) (emphasis added); *see United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1*, 255 F. Supp. 2d 56, 66 (E.D.N.Y. 2003) (Government must "assert specific facts supporting an inference that the property is in fact subject to forfeiture").  For this reason as well, the Complaint must be dismissed.

## III.   The Government Has Not Met Its Burden To Plead Facts Showing The Statue Remained Stolen When It Was Imported

Even if the Government has pleaded sufficient facts to establish that the Statue's removal from Cambodia constituted theft (which it has not), the Complaint must still be dismissed for the independent reason that the Government has not met its burden of alleging facts showing the Statue *remained* stolen at the time of import.  *See Wally III* at *16 (in forfeiture case,

Government must establish object "remained" stolen at the time of import); *Wally IV*, 663 F.

Supp. 2d at 251-52 (same).

Courts have long recognized that the analysis of whether an allegedly stolen item

"remained stolen" and thus potentially subject to forfeiture requires an inquiry into whether a

holder acquired good title to a previously-stolen item by operation of laws vesting title in a

holder after a period of time.  *See Wally IV*, 663 F. Supp. 2d at 251-52, 262-69; *United States v.*

*One Lucite Ball Containing Lunar Material*, 252 F. Supp. 2d 1367, 1376 (S.D. Fla. 2003).

*Portrait of Wally* involved a valuable painting taken just before World War II from the home of a

Jewish gallery-owner by an individual to whom the gallery-owner was forced to sell her gallery

by Nazi "Aryanization" laws.  *Wally IV*, 663 F. Supp. 2d at 238, 259.  After the war, the painting

was mistakenly restored to a different Jewish family, who sold it to a state-owned art museum.

*Id.* at 241-42.  The museum then traded it to an Austrian collector, who kept it for several

decades in Austria, first as his own property and then at a museum he established, before loaning

it for an exhibition at New York's Museum of Modern Art in the late 1990s.  *Id.* at 243, 245-46.

While in New York, the United States seized the painting and instituted a forfeiture action under

Sections 1595a(c) and 545, alleging that the Austrian museum "imported … [the painting]

knowing it was stolen."  *Id.* at 246.

Addressing the Austrian museum's motion to dismiss, the court acknowledged that

"Austrian law [of prescription] does govern" the question whether the museum had acquired

good title to the painting by the time it was shipped to the United States.  *Wally III*, 2002 WL

553532, at *16.  Moreover, if that law of prescription were satisfied, it would defeat the

forfeiture, since "the government must allege … that the painting remained stolen at the time it

was imported in 1997."  *Id.*; *see also id.* at *19 ("The [museum] is correct in arguing that in order

for property to be considered 'stolen,' the property must rightfully belong to someone other than

the person who has it.").[12]  Similarly, ruling on the parties' cross-motions for summary judgment

several years later, the court analyzed whether the painting "remained stolen" by considering

whether "*Wally* lost its stolen status by operation of Austrian law" in that either the state-owned

Austrian art museum or the Austrian collector acquired title to the painting by prescription.

*Wally IV*, 663 F. Supp. 2d at 262-69.[13]

    In this case, the English law applicable to the 1975 London sale establishes that the

Statue "rightfully belong[s]" to Ms. Ruspoli.  The relevant English law is set forth in the attached

affidavit of Brian Doctor QC ("Doctor Aff.").[14]  As Mr. Doctor explains, under English law

Cambodia had six years from the date of the sale to bring an action asserting its title to the

Statue.  Doctor Aff. ¶ 6.  When it failed to do so, Cambodia's claim "was extinguished," leaving

the purchaser with good title more than two decades before the Statue was imported into the

United States.  *Id.* ¶¶ 6-7.

    Once Cambodia's claim was extinguished, the Statue—to the extent it was ever stolen

property (which the Government has not shown)—ceased to be stolen property as a matter of

---

[12] Ultimately, the court concluded that the government had sufficiently alleged facts that defeat prescription under Austrian law.  A possessor must "belie[ve] that the possession is lawful," whereas the government alleged the collector was aware before he acquired the painting of the heirs' claim to own it (and had even been asked to help recover it), and the state-owned museum was likewise aware of the claim.  *Wally III*, 2002 WL 553532, at *16-18.

[13] The court concluded that there was no genuine issue of material fact entitling the Austrian museum to present the prescription issue to the jury because, it held, no reasonable juror could find the good-faith condition for prescription satisfied.  *Id.* at 263-69.

[14] Under the Federal Rules, the Court may consider "any relevant material" in determining foreign law. Fed. R. Civ. P. 44.1.  Because the determination of foreign law is "treated as a ruling on a question of law," *id.,* the Court may properly make such a determination, and may consider affidavits from foreign lawyers, in the context of a motion to dismiss.  *See CIH Int'l Holdings, LLC v. BT United States, LLC,* 821 F. Supp. 2d 604, 608 n.1 (S.D.N.Y. 2011) ("CIH has submitted to the Court the declaration of ... a Brazilian tax lawyer.  The Court may take judicial notice of the information provided in this declaration and consider it on a motion to dismiss."); *Figueiredo Ferraz Consultoria E Engenharia de Projeto Ltda. v. Republic of Peru*, 655 F. Supp. 2d 361, 368 (S.D.N.Y. 2009) (considering conflicting declarations on Peruvian law in ruling on motion to dismiss), *rev'd on other grounds*, 665 F.3d 384 (2d Cir. 2011).

law.  It follows that the Government has not met its burden of pleading that the Statue was still

stolen at the time of import into the United States twenty-nine years later.  For this reason, the

Complaint must be dismissed.

**IV.    The Complaint Fails To Adequately Allege That Claimants Knew The Statue Was
          Stolen**

The Government bears the burden of alleging sufficient facts to support a reasonable

belief that it will be able to prove at trial that either Sotheby's or Ms. Ruspoli knew that the

Statue was stolen.  *See* Supp. Rule G(2)(f); 18 U.S.C. §§ 545, 2314, 2315; 19 U.S.C. § 1595a(c).

The Complaint makes no such allegation with regard to Ms. Ruspoli, and the allegations as to

Sotheby's are insufficient to meet the Government's burden.

**A.    The Complaint Alleges No Facts Showing Sotheby's Knew The Statue Was
        Stolen At The Time Of Import**

The Rule G pleading standards require the Court to assess the plausibility of the

Government's case in light of the facts alleged.  *Cf.  Ashcroft v. Iqbal*, 556 U.S. 662, 662 (2009)

("a claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged").  Here, the

assertion that Sotheby's imported property it *knew* was stolen is, on its face, wholly implausible.

Sotheby's, after all, fully and accurately described the Statue to the U.S. Customs Service at the

time it was imported (*see* Compl. ¶ 22), put the Statue on the cover of the auction catalogue it

circulated publicly around the world (*id.* ¶ 32), accurately described the Statue's provenance in

that catalogue (*id.* ¶ 32), and disclosed its intent to sell the Statue to the Cambodian Minister of

Culture months in advance of the planned sale (*id.* ¶ 30).  Those are hardly the acts of a "fence"

knowingly selling stolen loot.

The Government's allegation is made even more implausible when one considers the

complexity of the Government's legal theory.  In order for Sotheby's to have the requisite mental

25

state, it would have to have known at the time of import into the United States that Cambodian law in effect when the Statue was still in Cambodia gave that country title to the Statue.  *See Schultz*, 333 F.3d at 411 (recognizing that mistake as to foreign law would vitiate required intent).  That is, Sotheby's would have had to anticipate that Cambodia and the U.S. Government would take the position that a tangled, unclear patchwork of French colonial texts—no longer anywhere on the code books of the modern nation of Cambodia—decreed the Statue to be state property within the rules set down by *McClain* and *Schultz*.  Yet the Colonial Decrees the Government cites are sufficiently obscure that even the Government has been unable to locate a fully legible version (*see* Ex. 8) of the central decree on which it relies—the 1900 Colonial Decree—which it appears in any event was itself subsequently declared illegal.

There is simply no evidence whatsoever cited in the Complaint that Sotheby's had knowledge of all of these Colonial Decrees, much less that it translated and interpreted them in the strained and novel manner the Government does, but nonetheless chose to import the Statue.  Nor is there any evidence cited in the Complaint that Sotheby's knew or believed the purported fact necessary to making these Colonial Decrees relevant—that the Statue was still in Cambodia when they were issued.  And, there is likewise no evidence that Sotheby's viewed the Statue as remaining stolen after the 1975 sale in London and Cambodia's failure to assert a claim within six years of that sale.

Instead of alleging any evidence showing what it must to survive this motion, the Complaint focuses on a single June 1, 2010 email the Art Historian sent to Sotheby's, expressing her short-

lived concern that the Statue was "definitely stolen" because the feet of the Companion Statue had been found still "*in situ*" at Prasat Chen, and the Statue had likely once stood close nearby.[15]

This email—sent five weeks *after* Sotheby's imported the Statue to New York—cannot support the Government's claim that Sotheby's knew the Statue was stolen when it was imported.  On that question—essential to the Government's import-based theories under Sections 545 and 1595(a)—the Complaint offers no allegations or evidence at all.  That omission, by itself, requires dismissal of the Government's import-based theories.

### B.   The Complaint Fails To Allege The Required Particularized Facts Showing Sotheby's Knew The Statue Was Stolen After Import

That leaves only the Government's theory that Sotheby's possessed the Statue after June 1 knowing it to be stolen.  Because that theory is based on Section 981, the Government bears the burden of proving its case by a preponderance of the evidence.  The June 1 email, however, is insufficient to create the required reasonable basis to believe the Government will be able to meet its burden at trial.  First, the view expressed in the Art Historian's email—that the Statue is "definitely stolen" because the feet of the Companion Statue were found at Prasat Chen—is a *non sequitor* as a legal matter.  As the law set forth above makes clear, knowing the place of origin is but one piece of a complex puzzle necessary to assessing whether an antiquity is stolen in the legal sense.  It is hardly reasonable to think that Sotheby's—which the Complaint alleges (at ¶ 18) had both a Worldwide Compliance Department and a Worldwide Legal Department tasked with dealing with such issues—would have formed its belief about whether this Statue was stolen based on the unsolicited opinion of a free-lance Art Historian who offered no view on such critical questions as *when* the Statue left Cambodia, *who* owned it under Cambodian law at

---

[15] The Complaint alleges that the Statue's feet were also found in Prasat Chen, Compl. ¶ 12, but does not allege that this information was shared with Sotheby's in June 2010.

that time, or *what* was the significance of the 1975 London sale.  And, more importantly, even if

the June 1 email had some modest force standing alone, it is completely undercut when one

considers the subsequent emails incorporated by reference in the Complaint regarding what the

Art Historian said and did shortly thereafter.

   In late June, after traveling to Cambodia and speaking to Cambodia's Minister of Culture,

the Art Historian changed her opinion and *retracted* her concern that the Statue was stolen.  As

the Art Historian's emails to Sotheby's reflect, the Minister of Culture advised her that his focus

was "to stop anything from being exported from Cambodia now, not to go after pieces that left

years ago when there were no restrictions."  Ex. 2 at 21.  He also assured her that Cambodia had

no intention of seeking to reclaim the Companion Statue—a telling fact since (a) the Cambodians

knew the Companion Statue's feet had been found at Prasat Chen, and (b) the Companion Statue

had a similar known provenance, having been sold by Spink several years *after* the Statue.  *Id.*.

This new information both revealed that Cambodia was not actively enforcing the Colonial

Decrees as vesting title, *see Peru v. Johnson*, 720 F. Supp. at 814 (because they did not plan to

attempt to reclaim a work with similar provenance), and undermined any characterization of the

Statue as stolen (since it was removed "years ago when there were no restrictions").  It is hardly

surprising that the Art Historian changed her mind, stating that: "I think that Sotheby [sic] can

therefore go ahead and plan to sell" the Statue, and that she "think[s] that legally and ethically

[Sotheby's] can happily sell the piece."  Compl. ¶ 26.  Repeatedly thereafter, the Art Historian

reiterated via email her view that Sotheby's could lawfully sell the Statue, including: "It was

acquired legally, there should be no problem" and "The piece was legally obtained, so can be

legally sold".  Ex. 2 at 18.

The facts alleged in the Complaint and in the emails incorporated therein overwhelmingly show that Sotheby's acted properly, transparently, and with great care in a politically and culturally sensitive arena.  Sotheby's imported the Statue openly, broadly publicized the sale, and specifically notified Cambodia's Culture Minister.  It had—and has—no knowledge that the Statute was stolen, and the Complaint fails to allege facts sufficient to support a reasonable belief that the Government will be able to show otherwise.

## <u>CONCLUSION</u>

There is surely room for many different good faith views on whether ancient treasures should be collectible and on display at Museums and in the homes of private collectors around the world, or whether some or all should be returned to their country of origin.  But the Government may not seize property by inventing new interpretations of colonial laws long since consigned to dusty archives, while ignoring the archeological record, settled law, and compelling indicia of good faith.  The Government has not alleged sufficient facts to establish a reasonable basis to believe it could meet its burden of proof at trial to show that the Statue was stolen from Cambodia, that it remained stolen at the time of import, and that it was known to be stolen by either Sotheby's or Ms. Ruspoli.  For the reasons set forth above, the Complaint should be dismissed.

Dated: New York, New York
      June 5, 2012

Respectfully submitted,

_____

Peter G. Neiman
Janet R. Carter
WILMER CUTLER PICKERING HALE AND
    DORR LLP
399 Park Avenue
New York, NY  10022
Telephone: (212) 230-8800
Facsimile: (212) 230-8888


Brian R. Michael
WILMER CUTLER PICKERING HALE AND
    DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 443-5374
Facsimile: (213) 443-5400

*Counsel for Claimants Sotheby's, Inc. and Ms.
Ruspoli di Poggio Suasa*