UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| - v. - | ) 12 Civ. 2600 (GBD) |
| | ) |
| A 10th CENTURY CAMBODIAN SANDSTONE | ) |
| SCULPTURE, CURRENTLY LOCATED AT | ) |
| SOTHEBY'S IN NEW YORK, NEW YORK, | ) |
| | ) |
| Defendant in rem. | ) |

------------------------------------------------------------- X

## DECLARATION OF BRIAN DOCTOR QC

**I, Brian Doctor, hereby declare as follows:**

1        I am a barrister, in practice at the English Bar at Fountain Court Chambers, Temple, London EC4Y 9DH. My practice encompasses mainly commercial law. I was appointed Queen's Counsel in 1999. I attach a copy of my CV (Exhibit A). The issues in this Opinion concern primarily the English law of limitation, of which I have extensive experience in both reported cases and advising clients generally.

2        I have been supplied with a copy of the Complaint for Declaratory Relief filed by the United States of America on 4 April 2012, which I have read.

3        I am instructed by Wilmer Hale to prepare and express an Opinion on certain issues of limitation and title, to which I refer in more detail below. I understand that a claim has been brought by the United States of America at the instance of the Cambodian government in connection with a sandstone sculpture which is alleged by the government to have been stolen and brought into the United States contrary to law. The statue had been brought into the

United States in order to be put up for auction by Sotheby's in New York.

4      I have been asked to express an opinion, in English law, on title to the statue as a result of it having been acquired in England by the predecessor of the present owner who consigned it to Sotheby's in 2010. In order to give my advice, I have been asked to assume the following facts:

4.1      The statue originated in Cambodia. The Cambodian government is claiming that the statue was stolen from a site in Cambodia sometime after 1960 but before the end of 1975, and that it belongs to the Cambodian state.

4.2      It was put up for sale in London in 1975 by a well-known and reputable dealer and auction house, Spink.

4.3      The buyer, which I shall call "Company," purchased it from Spink on 30 December 1975 in good faith. I shall call this event, for reasons which appear below and which explain this and subsequent events, "**the First Dealing**".

4.4      At the time of the First Dealing, I am asked to assume that Spink had no good title to the statue.

4.5      Company was a Belgian private company. At the time of the First Dealing, Company was wholly owned by Husband, a resident of Belgium.

4.6      The statue was collected from Spink on 7 January 1976 ("**the Second Dealing**"), and taken to Belgium ("**the Third Dealing**") where it arrived on the following day, 8 January 1976.

4.7      Since that time the statue has remained in the family homes of Husband and his wife, whose name is now Ms Ruspoli di

Poggio Suasa ("Ms Ruspoli"), until it was shipped to Sotheby's in New York in 2010 for the purposes of sale at auction.

4.8      On the death of Husband in 1984, 50% of the shares in the company passed to his wife, Ms Ruspoli. The remaining 50% was bequeathed to various members of Husband's family.

4.9      In 2000, Ms Ruspoli personally acquired ownership of the statue, in a settlement with other family members ("**the Fourth Dealing**"). Since that time she has retained it in her possession in the same location.

5      I have been asked to assume that these facts are true. For the sake of convenience, I have labelled some of these events as "dealings" in numbered order, in order to facilitate easy reference to the particular fact in my discussion below.

**Summary of conclusions**

6      In English law, where a chattel is dealt with in circumstances which would give rise to a cause of action for the tort of conversion, the true owner's title is extinguished, by operation of the law of limitation, after the expiration of 6 years from the cause of action accruing, provided that the defendant was not guilty of fraud or fraudulent concealment in relation to the claimant.

7      The effect of the relevant sections of the applicable English statute is to extinguish the right of the original owner, not merely to bar the remedy (although it obviously has that effect as well). Title in the chattel vests in the person who acquired it from the true owner by the act of conversion, or the person or persons who has in the meantime acquired it from such person.

8      In the rest of this Opinion, for the sake of convenience, I shall refer to Cambodia as "the claimant", in the sense that it claims to own the statue, although I understand that the claim in the New York court is

3

one seeking forfeiture of the statue and is brought by the United States government under the various provisions of the United States Code on the grounds that it is stolen property.

**Conversion**

9       In English law, the tort of conversion consists of *"any act of wilful interference, without lawful justification, with any chattel in any manner inconsistent with the right of another, whereby that other is deprived of the use and possession of it."*[1] The common law on conversion was modified by the Torts (Interference with Goods) Act 1977 ("the 1977 Act") which, inter alia, codified the remedies available in a claim based on conversion.[2] The 1977 Act applies to acts or omissions before it comes into force as well as to later ones, and for the purposes of any limitation enactment, the cause of action shall be treated as having accrued at the time of the act or omission even if proceedings could not have been brought before the commencement of the 1977 Act.[3]

10      "Goods" are defined by section 14(1) of the 1977 Act as including all chattels personal other than things in action or money. Whether under common law, or the 1977 Act, a statue such as the one in contention falls within the meaning of the word "chattel" or "Goods".

---

[1] *MCC Proceeds Inc v Lehman Bros International (Europe)* [1988] 4 All ER 675, 685-6 (Mummery LJ) (excerpted as Exhibit B), adopting a passage in *Salmond and Heuston on the Law of Torts* (21st ed., 1996) 97-98 (attached as Exhibit C). A like definition is provided by *Clerk & Lindsell on Torts* (19th ed., 2006) 17-07 (attached as Exhibit D) and was set out from a prior edition with apparent approval by the Court of Appeal (Henry, Brooke and Rix LJJ) in *Kuwait Airways Corp v Iraqi Airways Co (Nos 4 & 5)* [2002] 2 AC 883, 999 [427] (excerpted as Exhibit E). It is that the tort is constituted by *"an act of deliberate dealing with a chattel in a manner inconsistent with another's right whereby that other is deprived of the use and possession of it."*
[2] The 1977 Act is attached as Exhibit F. The Act introduces a collective description 'wrongful interference with goods' to cover conversion, trespass to goods, negligence resulting in damage to goods or to an interest in goods and any other tort in so far as it results in damage to goods or an interest in goods.
[3] Paragraph 2 of Schedule 2 to the 1977 Act.

11 Under the 1977 Act, the tort of conversion[4] gives rise to a cause of action by the person whose right to possession is invaded, for (a) recovery of the chattel itself from the person in possession, or (b) for damages against any person guilty of converting it. Conversion is the denial of another's right to possession and only the person who is entitled to possession can sue in respect of the conversion. Usually an owner of a chattel would be in possession of it or entitled to possession of it, but if the owner has disposed of his *right to possession*, he cannot sue for conversion.

12 Thus it can be seen from this definition of the tort of conversion that any one of the four "dealings" referred to above could constitute an act of conversion if there was no lawful justification for it and the other requirements of the tort were met.

13 In view of the assumptions I am asked to make, namely, that the assertion in the Complaint about the theft of the statue is correct, and that Spink had no title to sell it and did so without lawful justification and inconsistently with the rights of the claimant to assert its ownership and claim to possession, it must be concluded that the First, Second and Third Dealings constituted acts of conversion by Spink and/or Company which would have given the claimant a right to sue them for recovery of the statue or damages.

14 Conversion is a tort of strict liability[5] and the intentions of the seller or purchaser at the time of the sale and delivery, or the disposer and taker, are irrelevant, as is the knowledge of the true owner.

---

[4] Even if occurring before the 1977 Act came into force on 1 June 1978, provided the action is commenced thereafter.

[5] *Lancashire and Yorkshire Railway Co v MacNicoll* (1918) 118 LT 596 at 598 per Atkin J, and at 597 per Lawrence J (attached as Exhibit G).

**Limitation**

15      At the time that Company acquired the statue (at the sale on 30 December 1975), the provisions of the Limitation Act 1939 ("the 1939 Act")[6] would have been relevant to any claim for conversion arising out of such acquisition by Company. That statute was in force in 1975, and thereafter, until it was replaced by the Limitation Act 1980 ("the 1980 Act")[7] which only came into force on 1 May 1981. Under the 1939 Act, any claim for conversion for the return of the chattel, being a claim in tort, would have become time-barred on 30 December 1981 (six years after the date of the purchase).

16      By section 40(3) read with Schedule 4 of the Limitation Act 1980, the 1939 Act was repealed when the 1980 Act came into force on 1 May 1981.

17      It may be a question open to some doubt, but in my opinion, the 1980 Act applies to any claim commenced *after* it came into force, notwithstanding that a period of limitation was underway under the 1939 Act. My reasoning is that

17.1      The wording of section 2 of the 1980 Act (which I set out below in paragraph 32) seems to suggest that; and

17.2      the 1980 Act was primarily a consolidation of the previous limitation laws, including the 1939 Act, so that time just carried on running in this regard, but as from 1 April 1981 under the new Act. The time period in this respect was exactly the same.

18      However, there may be some doubt about this conclusion arising from section 16(1) of the Interpretation Act 1978 which provides: *"the repeal [of an enactment] does not, unless the contrary intention appears......(c) affect any right, privilege, obligation or liability*

---

[6] Relevant portions are attached as Exhibit H.
[7] Relevant portions are attached as Exhibit I.

*acquired, accrued or incurred after that enactment.*"[8] This may have the effect that the right to claim for conversion which undoubtedly accrued in relation to the First, Second and Third Dealings in England in late 1975 and early 1976, and which right could be exercised within six years of those dates, is not affected by the repeal of the 1939 Act. This argument would have more force and more relevance if the 1980 Act, for example, had reduced the limitation period to, say 3 years so that the claimant would have lost his rights earlier.

19      In my view, the marginally better interpretation is that the 1980 Act applies to actions brought after the date it came into force, at least where the period of limitation has not yet expired by that date. I conclude in so far as it grants the claimant additional rights (as we shall see) it is not affected by the Interpretation Act, which must be read to cover a situation where rights are taken away or abridged.

20      In any event I intend to deal with both Acts, and shall show that the outcome is effectively the same whatever Act applies. I shall start with the position under the 1939 Act.

**The Limitation Act 1939**

21      I have concluded that, on the assumption that what the claimant says is true, the sale on 30 December 1975 constituted an act of conversion by Spink, and the purchase by Company was an act of conversion by it.[9]

22      Section 2 of the 1939 Act provided:

> 2.--(1) The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say:--

---

[8] Relevant portions are attached as Exhibit J.

[9] Halsbury's Laws of England, vol. 45(2), para 549, first sentence (attached as Exhibit K).

(*a*) actions founded on simple contract or on tort;

23     The effect of such section was that the claimant (or owner) had six years in which to bring a claim for conversion against Spink or Company running from 30 December 1975. Time starts to run for the purposes of an action in conversion from the date of conversion even where the claimant is ignorant of the conversion[10] or the identity of the defendant[11]. The fact that the owners did not know about the sale (if they did not) is therefore irrelevant.

24     The same applies to the subsequent acts of conversion: the taking of the chattel from Spink's premises on 7 January 1976 (the Second Dealing), and the export of the statue from the UK and delivery to Belgium on 8 January 1976 (the Third Dealing).

25     However, section 3 of the 1939 Act goes further and deals with questions of the title to the chattel:

> 3.--(1) Where any cause of action in respect of the conversion or wrongful detention of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion or wrongful detention takes place, no action shall be brought in respect of the further conversion or detention after the expiration of six years from the accrual of the cause of action in respect of the original conversion or detention.
>
> (2) Where any such cause of action has accrued to any person and the period prescribed for bringing that action and for bringing any action in respect of such a further conversion or wrongful detention as aforesaid has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

26     Section 3(1) has the effect that the claimant had six years from the date of the conversion which is the First Dealing in which to bring a claim for the tort of conversion (i.e. by 30 December 1981), and any

---

[10] *Granger v George* 25 January 1826, (1826) 5 Barnewall and Cresswell 149, 108 E.R. 56 (attached as Exhibit L); *Betts v Metropolitan Police District Receiver* [1932] 2 KB 595 (attached as Exhibit M); *Cartledge and Others Appellants; v E. Jopling & Sons Ltd. Respondents* [1963] A.C. 758, 782-3 (HL) (excerpted as Exhibit N).
[11] *RB Policies at Lloyd's v Butler* [1950] 1 KB 76, 81–82 (attached as Exhibit O).

claim in respect of the conversions in the Second and Third Dealings would also have had to have been brought by that date, and not by the expiration of 6 years from the dates of the later conversions (i.e. 7 and 8 January 1976). Given the small difference between those dates, this would presumably not be of particular significance in this case.

27     However, section 3(2) is of considerable significance. This has the effect that when the claimant's right to bring a claim for conversion of the statue expired on 30 December 1981, the claimant's title to the chattel (assuming it ever had such title) was extinguished. It is important to note that this provision removes title: it does not merely remove the right of action in respect of the conversion.

28     Although section 3(2) only refers to the title of the original owner being established, it follows that title to chattel must vest in the person who acquires the chattel by the act of conversion. There is no express authority for that implication, but it is generally accepted to be the case as can be seen from the Twenty-first Report of the Law Reform Committee (Final Report on Limitation of Actions, 1977)[12] in which it expressed concerned about the fact that under section 3(2) of the 1939 Act the thief or receiver who acquired the chattel by an act of conversion established a valid title to the goods. The discussion at paragraphs 3.4 to 3.6 shows that the Committee accepts that a bona fide purchaser for value would acquire valid title after 6 years, and that even a thief would acquire such title, under the 1939 Act, six years after his theft. It was to avert that latter result that the Committee recommended an amendment to the law which Parliament adopted in passing the 1980 Act and which prevented a thief from ever acquiring valid title by limitation.

---

[12] Relevant portions are attached as Exhibit P.

29      In the present case, therefore, Company would have acquired title to the statue on 30 December 1981 (the expiration of the limitation period which commenced at the date of the First Dealing) even if it had not acquired title by the original purchase.

30      The only exception to the operation of section 3 of the 1939 Act was in section 26 of the 1939 Act which suspended time running for limitation purposes in cases where fraud or fraudulent concealment on the part of the defendant or its agents was alleged. I mention this for the sake of completeness although it is not part of the assumptions I am asked to make.

**The Limitation Act 1980**

31      The Limitation Act 1980 was a consolidation Act which also made some modifications of the law. An additional ground of exception was introduced to remedy what was seen to be a gap in the previous Act, i.e. to prevent a thief from taking advantage of section 3(2) by claiming title to goods which he had stolen. Otherwise, the Act remained the same in so far as it is relevant to the facts of this case.

32      Section 2 of the Act provides:

> **Time limit for actions founded on tort**
>
> An action founded on tort shall not be brought after the expiration of six years from the date on which the cause of action accrued.

33      Section 3 of the 1980 Act is very similar to section 3 of the 1939 Act:

> **3 Time limit in case of successive conversions and extinction of title of owner of converted goods**
>
> (1)   Where any cause of action in respect of the conversion of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion takes place, no action shall be brought in respect of the further conversion

after the expiration of six years from the accrual of the cause of action in respect of the original conversion.

(2)    Where any such cause of action has accrued to any person and the period prescribed for bringing that action has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

34    To all intents and purposes, the provisions of section 3(2) are the same under both Acts, so if the 1980 Act applies rather than the 1939 Act, the title of the claimant was extinguished by it on 30 December 1981. This is the same result as under the 1939 Act.

35    However, there are two possible exceptions to the effect mentioned above: one relates to cases involving theft, and the other is a more general provision of the Act (section 32) dealing with postponement of the limitation period in cases of fraud, concealment or mistake. This section expanded somewhat the range of exceptional cases which had been referred to in section 26 of the 1939 Act. The assumptions on which I have been asked to express an opinion do refer to the alleged theft of the statue at some time prior to 1975. The assumptions do not include an assumption of fraud, concealment, or mistake, so I simply mention them for the sake of completeness.

**Theft**

36    ·    Section 4 provides in full:

**4  Special time limit in case of theft**

(1)    The right of any person from whom a chattel is stolen to bring an action in respect of the theft shall not be subject to the time limits under sections 2 and 3(1) of this Act, but if his title to the chattel is extinguished under section 3(2) of this Act he may not bring an action in respect of a theft preceding the loss of his title, unless the theft in question preceded the conversion from which time began to run for the purposes of section 3(2).

(2)    Subsection (1) above shall apply to any conversion related to the theft of a chattel as it applies to the theft of a chattel; and, except

as provided below, every conversion following the theft of a chattel before the person from whom it is stolen recovers possession of it shall be regarded for the purposes of this section as related to the theft.

If anyone purchases the stolen chattel in good faith neither the purchase nor any conversion following it shall be regarded as related to the theft.

(3)   Any cause of action accruing in respect of the theft or any conversion related to the theft of a chattel to any person from whom the chattel is stolen shall be disregarded for the purpose of applying section 3(1) or (2) of this Act to his case.

(4)   Where in any action brought in respect of the conversion of a chattel it is proved that the chattel was stolen from the plaintiff or anyone through whom he claims it shall be presumed that any conversion following the theft is related to the theft unless the contrary is shown.

(5)   In this section "theft" includes—

(a)   any conduct outside England and Wales which would be theft if committed in England and Wales;

. . .

and references in this section to a chattel being "stolen" shall be construed accordingly.

37      This section is not a model of clarity, and since it has not been the subject of extensive judicial interpretation, anything said about it must be somewhat tentative, although I believe that its operation in the present set of assumed facts is clear.

38      As its heading states, section 4(1) of the Act introduces a "Special time limit in case of theft". The overall effect of the section is that time does not start running from a particular conversion if the conversion is in fact a theft or "related to a theft". Every conversion after a theft is "related to a theft" until the chattel in question is purchased by someone in good faith. Then time starts to run from that purchase in favour of the purchaser, if it is a conversion.

39      For the sake of clarity, I explain here how I reach these conclusions:

12

39.1      Section 4(3) provides that any cause of action accruing in respect of the theft or any conversion related to the theft of a chattel to any person from whom the chattel is stolen, shall be disregarded for the purpose of applying section 3(1) or (2) of the 1980 Act to his case. This appears to mean that where an action is brought alleging theft "or any conversion related to the theft of a chattel", the defendant cannot rely on section 3(1) or (2) (alleging that the owner has been deprived of his title).

39.2      If therefore the claimant had sued Company for conversion, Company would not have been able to rely on section 3(1) or (2) if it was the thief (which is not alleged) or if its acquisition (the act of conversion) was "related to the theft".

39.3      This latter concept is elucidated in section 4(2) which provides that, *subject to an exception*, every conversion following the theft of a chattel before the person from whom it was stolen recovers possession of it shall be regarded for the purposes of this section as "related to the theft". So the thief, the receiver and any person to whom they donate the goods cannot rely on section 3(1) or (2).

39.4      The exception, however, is in the last sentence of section 4(2) which provides that if anyone purchases the stolen chattel in good faith, neither the purchase, nor any conversion following it, shall be regarded as "related to the theft".[13]

39.5      Thus, Company would have been able to rely on section 2 and section 3(1) and (2) as against the claimant's claim for conversion based on the sale in December 1975 if Company had purchased the statue on that occasion in good faith.

---

[13]  Section 4(4) of the 1980 Act puts the burden of proving that the purchase was not "related to the theft" on the party asserting it because it presumes that any conversion of the chattel after the theft is related to the theft "unless the contrary is shown".

40        Section 4(1) of the Act is very strange. I should explain why it is not
          applicable to the assumed facts of this case. It provides that the right
          of the person from whom a chattel is stolen to bring an action in
          respect of the theft is not subject to the time limits in sections 2 and
          3(1) of the Act. However, it expressly envisages that section 3(2)
          does apply against him since it goes on to state that if such person's
          title is extinguished under section 3(2), he may not bring an action
          in respect of a theft preceding the loss of title, unless the theft in
          question preceded the conversion from which time began to run for
          the purposes of section 3(2).

41        It has been suggested that this must refer to right of the original
          owner (from whom the goods were stolen) to bring an action for
          *damages* (but not recovery of the goods) against the thief or a
          receiver in respect of the theft or conversion related to the theft,
          even though such owner has lost his title, and even if the thief or
          receiver is still in possession of the goods.[14] I agree with that
          conclusion, although it is not relevant to the present case because no
          action in respect of the theft could ever have been brought against
          Company if it acquired the goods by purchase in good faith in
          December 1975.

42        On the assumption that the "theft provisions" of the 1980 Act are
          retrospective, the upshot of these provisions are that if Company
          purchased the statue in good faith from Spink in 1975 (the First
          Dealing), neither that purchase nor any subsequent conversion is
          "related to the theft". If the First Dealing was a conversion, and the
          Second and Third were conversions, then section 4 of the 1980 Act
          does *not* prevent time from having started to run from the date of
          that conversion.

---

[14] McGee, Limitation Periods, Sixth Ed, para 12.007 (attached as Exhibit Q).

43          The result, as under the 1939 Act, is that the claimant's title was
            extinguished in December 1981, and title was acquired by Company
            at that date.

**Equitable claims**

44          The provisions of section 3 of both Limitation Acts, which
            extinguish the title of the true owner, cannot be avoided by a
            claimant adopting the strategy of framing his claim in some
            equitable form of claim, like constructive trust.

45          Prior to the introduction of the 1939 Act, there were few statutory
            provisions applying limitation provisions to equitable remedies.
            However, the courts had already developed a general principle
            whereby limitation periods applicable to legal claims could be
            applied to equitable remedies *by analogy*. This principle was
            statutorily recognised in section 2(7) of the 1939 Act. It was
            preserved by section 36(1) of the Limitation Act 1980.

46          The result of the application of this principle is that all attempts to
            avoid the provisions of the Limitation Acts by pleading equitable
            remedies are unsuccessful: see *Paragon Finance Plc v D B
            Thakerar & Co* [1991] 1 All E R 400;[15] *Coulthard v Disco Club Mix*
            [2000] 1 WLR 707;[16] *UCB Home Loans Corp v Carr* (QBD, 19
            April 2000, official transcript, paragraphs 105 and 111).[17]

47          Accordingly, if the facts giving rise to the claimant's cause of action
            would have given rise to a claim by it for conversion against
            Company, it cannot avoid the consequences of section 3 (if it is
            otherwise applicable) by failing to assert such claim and by framing
            its claims by reference to remedial constructive trusts.

---

[15] Attached as Exhibit R.
[16] Attached as Exhibit S.
[17] Attached as Exhibit T.

**Conflict of laws aspects**

48          The question might be asked whether section 3 of the 1939 Act or
            the 1980 Act would apply to this case even though neither the
            claimant nor Ms Ruspoli are resident in England. I shall also assume
            that Ms Ruspoli was not resident in England in 1975 or thereafter.

49          The rule applied by the English courts is that English law applies to
            torts committed in England. English law has special rules to
            determine whether anyone can claim in England in respect of a tort
            committed abroad, but such rules would be irrelevant in an English
            court where the tort occurred in England. The First, Second and
            Third Dealings all took place in England in the period from 30
            December 1975 to 8 January 1976. If they amounted to the tort of
            conversion, such tort occurred in England.

50          That being so, the provisions of section 2 and 3 the Limitation Act
            1939, and the 1980 Act, in respect of those torts are applicable if the
            claim had been brought in England. It might well have been brought
            in England, because such claim would have lain (for damages)
            against Spink which carries on business in London, where the sale
            took place, and Company could also have been sued in England in
            respect of the tort occurring there.

51          As already stated, time started running for the purposes of limitation
            even if the original owner was completely unaware of the
            conversion or was ignorant of the identity of the defendant. If the
            identity of the original owner and the defendant is completely
            irrelevant, their whereabouts cannot have any relevance.

52          This is all the more so in a case where the limitation provision
            confers and extinguishes title to moveable property which by
            definition can be moved in and out of the country, which can be sold
            or transferred without regard to the residence of its buyers and
            sellers or the location of the chattel. Section 3 was aimed at creating

16

certainty by requiring persons alleging themselves to be the owners of goods to claim possession of their goods which had been the subject of conversion in England within six years, or lose all their rights.

53      I therefore conclude that section 3 would be applicable whether the statue remained in or was taken out of England, and irrespective of the whereabouts of the original tortfeasor at the time or after the act of conversion, so long as the alleged conversion took place in England. The whereabouts of the original owner is completely irrelevant, since, as I have stated, time starts running whether or not such person was aware of the conversion.

## Conclusion

54      Company purchased the statue from Spink in London on 30 December 1975. If Spink did not have good title, Company could not acquire title to the statue at that time. If in fact the sale was an act of wilful interference, without lawful justification, with the chattel in a manner inconsistent with the right of the claimant, that dealing was a conversion of the statue.

55      Such act of conversion gave the claimant or the real owner an immediate right to claim it by an action for the delivery up of the chattel, or to claim damages from those involved in the conversion (both buyer and seller).

56      By operation of either the 1939 Act or 1980 Act, the claimant's right to claim the statue, having accrued on 30 December 1975, became time-barred on 30 December 1981 (six years after the date of the conversion). If the 1980 Act is applicable, the purchase by Company of the statue, in good faith, on 30 December 1975 was an act of conversion which was not related to the original theft, time started running from then, and any claim for recovery of the chattel or damages became time-barred on 30 December 1981.

17

57      No claim was brought against Company before the expiration of the six year limitation period (30 December 1981), and pursuant to section 3(2) of the 1939 Act or the 1980 Act, the claimant lost its title on that date, and Company acquired title to the statue on that date.

58      No subsequent dealing with regard to the statue would have had any effect on the outcome stated in the previous paragraph. Under English law, once title vested in Company on 30 December 1981, whoever acquired the statue from Company after that date would have acquired the title which Company enjoyed by virtue of having acquired it under the Limitation Acts.

**Declaration**

59      In English litigation it is required that an expert witness makes a declaration of compliance with certain Rules of Court.[18] Although these proceedings are not English proceedings, I consider it appropriate to make a declaration in similar terms, which I hereby do.

60      My qualifications are set out in my CV attached hereto. I consider the matters on which I have been requested to express an expert opinion, to fall within my area of expertise.

61      The statutory provisions and authorities on which I rely in making this report are referred to in the text above. True and correct copies of these statutory provisions and authorities are attached to this declaration. Where any matter dealt with is subject to a range of opinion, I, to the best of my knowledge and belief, have sought to indicate this.

---

[18] Part 35 of the Civil Procedure Rules and accompanying Practice Direction and Section H2 of the Commercial Court Guide and Appendix 11 to the Admiralty and Commercial Courts Guide.

62        I have set out all the assumptions which I have relied on. The factual

          assumptions on which my opinion is based are matters which are

          not within my personal knowledge. I therefore cannot comment on

          the reasonableness or unreasonableness, or likelihood or

          unlikelihood, of those factual assumptions.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.


Executed on 1 June 2012
London, United Kingdom

_____
BRIAN DOCTOR QC
Fountain Court

19