# Exhibit B

PREET BHARARA
United States Attorney for
the Southern District of New York

By:    SHARON COHEN LEVIN
        ALEXANDER J. WILSON
        SARAH E. PAUL
        Assistant United States Attorneys
        One St. Andrew's Plaza
        New York, New York 10007
        Tel. (212)637-1060/2453/2326

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
        :

UNITED STATES OF AMERICA,
        :

        Plaintiff,            12 Civ. 2600 (GBD)

        :

      - v. -

        :

A 10th CENTURY CAMBODIAN SANDSTONE
SCULPTURE, CURRENTLY LOCATED AT SOTHEBY'S IN  :
NEW YORK, NEW YORK,

        :

        Defendant in rem.

        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF DANIEL MCCLEAN

```
- - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                      :
UNITED STATES OF AMERICA,
                                                      :
                Plaintiff,                                    DECLARATION OF
                                                      :      DANIEL MCCLEAN
              - v. -
                                                      :
A 10ᵗʰ CENTURY CAMBODIAN SANDSTONE                           12 Civ. 2600 (GBD)
SCULPTURE, CURRENTLY LOCATED AT SOTHEBY'S IN :
NEW YORK, NEW YORK,
                                                      :
                Defendant in rem.
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

Daniel McClean, hereby declares under the penalty of perjury:

**Introduction**

1.  I am a solicitor, in practice at the London law firm of Finers Stephens Innocent LLP. My practice encompasses art and cultural property law. I have extensive experience of advising art world clients including in disputes relating to the ownership of artworks and antiques which includes both reported and unreported cases.

2.  I have been supplied with copies of the following documents:

2.1  Complaint for Declaratory Relief filed by the United States of America on 4 April 2012;

2.2  Claimants' Notice of Motion to Dismiss filed by the US attorneys on 5 June 2012;

2.3  Declaration of Brian Doctor QC *(Counsel)* delivered on 1 June 2012.

3.  I am instructed by the US Attorney's Office of the Southern District of New York to prepare and express an Opinion on English law as it relates to a title dispute concerning a significant 10th century Cambodian sandstone sculpture *(the Statue)*, the Defendant in rem. I have been asked to specifically to express an opinion on the English law of limitation and its application to the question of the title of the Statue.

4.  I understand that a claim has been brought by the United States of America. It is alleged by the United States of America that the Statue is the stolen property of Cambodia and was unlawfully imported into the United States contrary to law in order to be sold at auction by Sotheby's.

**Factual Assumptions**

5.  My Opinion is based upon the following underlying set of factual assumptions. I have been asked to assume that these are true and as such I pass no judgement or comment on whether these assumed facts are true.

5.1 The Statue was created in Cambodia in the 10th century. The Statue (also known as the Duryodhana Sculpture) formerly belonged at the entrance of the Prasat Chen Temple, which is part of the historic and archaeological site of Koh Ker, Cambodia.

5.2 The state of Cambodia had and continues to have title to the Statue: a title that is enforceable under United States law in the courts of the United States.

5.3 The Statue was *stolen* from the site sometime after 1960 but before the end of 1975 (a period in which there was widespread looting of artifacts from Cambodia's historic sites including Koh Ker and Angkor Wat).

5.4 The Statue was put up for sale in London in 1975 by a dealer and auction house, Spink. It would appear that this was the first time the Statue was sold on the open market.

5.5 The buyer, which shall be described as 'the Company' purchased it from Spink in 1975. Accordingly, the Company converted the Statue under English law when it purchased it at auction in 1975. This was the first conversion.

5.6 The Company was a Belgian private company. At the time of the sale, the Company was wholly owned by the husband *(Ms Ruspoli's husband)* of Ms Ruspoli di Poggio Suasa *(Ms Ruspoli)*. Both Husband and Ms Ruspoli were residents in Belgium. It is not clear whether the Company still exists and if not when it was dissolved.

5.7 The Statue was collected from Spink on 7 January 1976. It was delivered to Belgium on 8 January 1976.

5.8 At the death of Ms Ruspoli's husband in 1984, 50% of the shares in Company passed to Ms Ruspoli. The remaining 50% were bequeathed to members of Ms Ruspoli's husband's family.

5.9 In 2000, Ms Ruspoli personally acquired ownership of the Statue, in a settlement with other family members.

5.10 2010, Ms Ruspoli shipped the Statute to Sotheby's New York for the purposes of sale at auction.

5.11 The Statue was kept in the private home of Ms Ruspoli in Belgium until it was shipped to Sotheby's (New York) and advertised for auction by Sotheby's.

5.12 The United States Government commenced a claim for forfeiture of the Statute in the New York court in 2012 against Sotheby's Inc. and Ms Ruspoli who have responded by issuing a Notice of Motion to Dismiss the Claim. I shall refer to Sotheby's Inc and Ms Ruspoli as the *Claimants* and to the US Government as the *Plaintiff* in this dispute.

**Conclusions**

6. I have examined the expert opinion of Counsel and his arguments concerning whether the Claimants in this action are likely to be able to rely upon the English law of limitation. I agree with much of Counsel's analysis and certain of his conclusions. However, I consider that there is a material flaw in Counsel's opinion, namely the consideration of good faith.

*Good faith*: In order to be able to rely on the limitation period the purchaser, in this case the Company must be able to establish *good faith* (Section 4 of the 1980 Limitation Act hereinafter referred to as 'the 1980 Act'). Under English law this cannot be assumed (whether the sale was undertaken in public or otherwise). This is a substantive hurdle with the onus of proof on

the Claimants. Whether or not the Claimants can demonstrate that the Company did purchase the Statue in good faith is not something on which I need to comment upon. What I can say is that the burden of proof to establish good faith is significant and sits firmly on the Claimants.

7. Even if the Claimants can demonstrate good faith, they could also need to establish that they did not subsequently deliberately conceal the Statue (section 32(2) of the 1980 Act). The burden of proof is again significant and probably sits firmly on the Claimants.

**The English legal position**

### Conversion

8. In English law, the tort of conversion consists of "any act of wilful interference, without lawful justification, with any chattel in any manner inconsistent with the right of another, whereby that other is deprived of the use and possession of it"[1]. In particular, conversion is a tort of strict liability: the intentions of the seller or purchaser at the time of sale and delivery, or the disposer and taker, are irrelevant, as is the knowledge of the true owner[2].

9. I agree with Counsel's analysis of the tort of conversion (see paragraphs 9 to 14) and his application of the law to the assumed facts (see paragraph 13): "if the assertion in the Complaint about the theft of the statue is correct, and that Spink had no title to sell it and did so without lawful justification and inconsistently with the rights of the claimant to assert its ownership and claim to possession, it must be concluded that the First, Second and Third Dealings constituted acts of conversion by Spink and/or Company which would have given the claimant a right to sue them for recovery of the statue or damages".

### Limitation

10. The consequences of a defendant being able to successfully rely upon the law of limitation in relation to a conversion claim brought by the owner of stolen goods is that the claimant's title to the stolen goods is extinguished. This result is the same under both the Limitation 1939 Act (hereinafter 'the 1939 Act') and the 1980 Act.

11. The 1939 Act was the Act in force in England at the time of the sale of the Statue. The 1939 Act was replaced and consolidated by the 1980 Act, which came into force on 1 May 1981. Both Acts prescribe a six-year limitation period from the date of the conversion in, which subject to the exceptions contained in both Acts (the exceptions vary between the Acts) a claimant must bring a conversion claim.

12. It is not entirely clear which Limitation Act would apply to the Company's act of conversion when it purchased the Statue on 30 December 1975. The better view – and I agree with Counsel here – is that the 1980 Act is the governing statute as the limitation period, taken from 30 December 1975, was still running when the 1980 Act came into force. There is nothing in the 1980 Act which states that it should not apply to such instances, although I agree with Counsel's view that there is no definitive provision to this effect.

---

[1] *MCC Proceeds Inc v Lehman Bros International (Europe)* [1988] 4 All ER 675, 685-6, Mummery LJ.

[2] *Lancashire and Yorkshire Railway Co v MacNicoll* [1918] 118 LT 596 at 598 per Atkin J, and at 597 per Lawrence J.

13.   In this opinion I will assume that the 1980 Act applies. However, I would only add that the application of the provisions 1939 Act could lead to a different conclusion.

14.   Further, I also confirm that I agree with Counsel's reasoning regarding:

*Equitable claims:* The provisions of Section 3 of both Limitation Acts, which extinguish the title of the true owner, cannot be avoided by a claimant adopting the strategy of framing his claim in some equitable form of claim like a constructive trust (as distinct from constructive bailment) as is confirmed in the case law cited by Counsel.

**The Limitation Act 1980**

15.   The key provisions dealing with limitation in respect of conversion claims are set out in sections 2 to 4 of the 1980 Act.

16.   These provisions are explained with clarity in the judgment by Tugendhat J. in *Kurtha v Marks* [2008][3]:

(1)   "Six years is the normal period within which an action for the recovery of property, or for damages, must be brought in England.

(2)   Save for cases of theft, if the claim is not brought within that time, a claimant's title to the property of which he has lost possession is extinguished.

(3)   In cases of theft there are special provisions. A claim by a person from whom a chattel is stolen is not subject to the six year time limit from the date of the theft. In a case of theft the six year period never starts to run in favour of the thief, nor does it run against anyone whose possession is related to the theft.

(4)   The six year period does not begin to run unless and until someone purchases the chattel in good faith. Any conversion subsequent to the theft is presumed to be related to the theft: so the burden lies on the purchaser to show that the purchase of the goods was in good faith".

17.   In particular, should the Claimants seek to rely upon sections 2 and 3 of the 1980 Act to claim that the Cambodian Government's title to the Statue was extinguished at the end of the six year period following Company's purchase of it then Company's purchase will be *presumed to be related to the theft* under section 4(4) and the *burden* will lie on the Claimants to prove that. Company did in fact purchase the Statue in good faith. As such, for a limitation defence to succeed good faith cannot be assumed: it must be proved.

**Good Faith**

18.   English case law applying section 4(4) of the 1980 Act confirms unambiguously that the burden of proof for asserting good faith lies on the defendant to establish this evidentially on the balance of probabilities. I refer to *Nicole de Preval v Adrian Alan Limited* [1997][4] where the director of the defendant company was required to show that he had purchased the claimant's stolen candelabra in good faith (which he failed to do); and to *Kurtha v Marks*[5] [2008] a case involving the theft of two paintings, where the defendant possessor was required to show (and again failed to do) that the paintings had been purchased by a third party in good faith.

---

[3] *Kurtha v Marks* [2008] EWHC 336 (QB) at para 8, Tugendhat J.

[4] *Nicole de Preval v Adrian Alan Limited* [1997] (unreported).

[5] *Kurtha v Marks* [2008] EWHC 336 (QB).

19.    Although good faith is often not further defined, the test commonly applied by the English courts for good faith is one of subjective honesty, for example, section 61(3) of the Sale of Goods Act 1979, which reads: "A thing is deemed to be done in good faith within the meaning of the Act when it is in fact done honestly, whether it is done negligently". A similar test has also been applied in the conversion claims where defendants have sought to assert good faith in order to rely upon the limitation period (for example, see *de Preval* above).

20.    The court will consider contextual factors to enable it to determine whether the purchaser was subjectively honest. Factors include whether the purchase was a hasty one,[6] whether the purchaser was experienced in the trade or business,[7] whether the purchaser had reason to be suspicious of the seller, the nature of the consideration and whether the price was unnaturally deflated.[8]

21.    The standard for showing good faith is non-trivial. In *Manifest Shipping Co Ltd v. Uni-Polaris Shipping Co Ltd and Others* [2001][9], the House of Lords examined the meaning of 'good faith' in the context of a marine insurance contract. They held that a person turning a 'blind eye' to avoid knowledge of what he believes to be true in order to avoid knowledge of the truth would constitute bad faith. Lord Hobhouse said: "If the ship owner *deliberately* refrains from examining the ship in order not to gain direct knowledge of what he has reason to believe is her unseaworthy state, he is privy to the ship putting to sea in that unseaworthy state".

22.    In art market transactions, dealers are expected by the courts to conduct a high level of due diligence before making acquisitions, including asking questions relating to the provenance of the artwork and retaining proper records relating to sale. In *Kurtha v Marks*, the judge was highly critical that the purchaser (who was an art dealer) had not asked proper questions as to the painting's provenance and had not kept any records. We consider in the light of the relevant case law that a similar high standard of due diligence would also apply to collectors of artworks and antiquities[10].

23.    Accordingly, the Claimants face a serious hurdle if they are to rely upon the defence of limitation set out in section 3 of the 1980 Act, in that they would be required to demonstrate on the balance of probabilities that the Statue had been purchased by the Company in good faith: following a theft, bad faith is presumed until the contrary can be proven.

**Other Considerations**

24.    The focus of my opinion is good faith, but for there are further legal considerations which should be taken into account.

---

[6] *Central Newbury Car Auctions Ltd v Unity Finance Limited* [1957] 1QB 371

[7] *Moody v Pall Mall Deposit and Forwarding Co Limited* [1917] 33 TLR 306.

[8] *Heap v Motorists' Advisory Agency Limited* [1922] 1KB 577.

[9] *Manifest Shipping Co Ltd v Uni-Polaris Shipping Co Ltd and Others* [2001] UKHL 1, 469, 487, Lord Hobhouse.

[10] *Kurtha v Marks* [2008] EWHC 336 (QB) at para 140, Tugendhat J.

**Concealment**

25. Even if the Claimants are able to successfully establish that the Company purchased the Statue in good faith and the limitation period would be deemed to start to run from 30 December 1975, the Claimants could also have to establish that they did not subsequently deliberately conceal the Statue (section 32(2) of the 1980 Act). Concealment – rather the duty not to conceal - is in effect a strict liability obligation.

26. The provisions of section 32 of the 1980 Act, state that the effect of an act of fraud, concealment or mistake can take effect to postpone the running of the limitation period as from the date of the relevant event. In the event of a deliberate concealment (section 32.1 (b) of the 1980 Act) this serves to postpone the limitation period until the Claimant's discovery of its right of action or the date when the Claimant could have discovered its right of action through due diligence. It important to note in this context that an act of deliberate concealment may occur 'subsequent' to the accrual of the cause of action as was confirmed by the House of Lords in *Sheldon v Outhwaite* [1995][11]. The subsequent discovery that a chattel was lost or stolen may serve to suspend the running of the limitation period *following* a good faith purchase.

27. "Deliberate concealment" specifically includes "the deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty" (section 32(2) of the 1980 Act). This was expanded upon in *Marfani v Midland Bank* [1968][12], Diplock LJ said: "At common law one's duty to one's neighbour who is the owner, or entitled to possession, of any goods is to refrain from doing any voluntary act in relation to his goods which is a usurpation of his proprietary or possessory rights in them. Subject to some exceptions which are irrelevant to this present case, it matters not that the doer of the act of usurpation did not know, and could not by the exercise of any reasonable care have known of his neighbour's interest in the goods. The duty is absolute; he acts at his peril".

28. The respective meanings of both sections 32.1(b) and 32(2) have been heavily litigated, but the prevailing legal test (provided by the House of Lords in *Cave v Robinson Jarvis & Rolf* (a firm) [2002])[13], is that there is deliberate concealment where a defendant:

29. Takes active steps to conceal his own breach of duty after becoming *aware* of it; and

29.1 Where he is guilty of deliberate wrongdoing and conceals or fails to disclose it in circumstances where it is unlikely to be discovered for some time.

30. In *Giles v Rhind* [2008],[14] the Court of Appeal confirmed that a breach of duty under section 32 (2) would involve almost any act of wrongdoing, and that this required (we consider this to be a slightly clearer expression of the necessary test):

30.1 A deliberate commission of an act;

30.2 The act must amount to a breach of duty; and

30.3 The breach must occur in circumstances unlikely to be discovered for some time.

---

[11] *Sheldon v Outhwaite* [1995] 2 ALL ER 558, HL.
[12] *Marfani v Midland Bank* [1968] 1 WLR, 956, 970-971, Diplock LJ.
[13] *Cave v Robinson Jarvis & Rolf (a firm)*[2002] 1 WLR 58 HL.
[14] *Giles v Rhind* [2008] EWCA Civ 118.

31.     The courts assess the burden of proof contextually. Providing the United States can show the necessary breach of duty and can show further that the Cambodian Government neither knew of nor could with reasonable diligence have discovered the necessary concealment, the burden would appear to shift presumptively on the Claimants to show that the Company *did not deliberately* conceal the facts involved in that breach.

32.     To discharge this burden in light of the prevailing facts, the Claimants would need to demonstrate not only (a) good faith in the sense of honesty *but also* (b) the Company's due diligence in having no reason to believe that the Statue was stolen, smuggled out of Cambodia, and/or disguised as a legitimate antiquity.

### Constructive Bailment

32.1    The Claimants could be considered to be constructive bailees (for the Cambodian Government) of the Statue[15] after taking possession because:

      32.1.1    The Company should have known that it had come into possession of property belonging to another;

      32.1.2    By retaining the Statue the Company consented to possession on the Cambodian Government's behalf and consequently became its bailee;

      32.1.3    That the Company therefore had a (continuous) duty of care to the Cambodian Government to identify it as its owner and to reunite it with its property/or to maintain it and not convert it.

32.2    If so, it would certainly be arguable that the limitation period under English law does not apply to bailment claims and so no limitation period has in fact even begun[16].

### Declaration

36.     The statutory provisions on which I rely in making this report are referred to in the text above. Where any matter dealt with is subject to a range of opinion, I, to the best of my knowledge and belief, have sought to indicate this.

37.     I have set out all the assumptions which I have relied on. The factual assumptions on which my opinion is based are matters now within my personal knowledge. I therefore cannot comment on the reasonableness or unreasonableness, or likelihood or unlikelihood, of those factual assumptions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed on 20 August 2012**

**London, United Kingdom**

**Daniel McClean**

---

[15] *Chesworth v Farrar* [1967] 1 QB 407.
[16] Gilead Cooper QC in *Palmer on Bailment* (3rd edn 2009) chapter 40.