UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
UNITED STATES OF AMERICA,            )
         )
         Plaintiff,        )
         )
      - v. -       )  **12 Civ. 2600 (GBD)**
         )
A 10th CENTURY CAMBODIAN SANDSTONE   )
SCULPTURE, CURRENTLY LOCATED AT     )
SOTHEBY'S IN NEW YORK, NEW YORK,    )
         )
      Defendant in rem.   )
------------------------------------------------------------------ X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF CLAIMANTS' SOTHEBY'S, INC.
AND MS. RUSPOLI DI POGGIO SUASA'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

Preliminary Statement ........................................................................................... 1

I.    The Government Fails To Adequately Allege That The Statue Was Stolen ................ 4

    A.    The Colonial Decrees Do Not Unambiguously Vest Title .................................. 4

    B.    The Government Does Not Allege A Single Instance Of
        Enforcement Of The Particular Laws That It Claims
        Created Ownership .......................................................................................... 10

    C.    The Government's Allegations Fail To Support A
        Reasonable Belief That It Will Prove That the Statue
        Left Cambodia After The Colonial Decrees Were Issued ............................... 12

    D.    The Government Fails To Allege Adequately That
        The Statue Was Taken Without Permission ...................................................... 12

II.    The Complaint Does Not Sufficiently Allege That The Statue
       Remained Stolen When It Was Imported ................................................................ 13

III.    The Complaint Does Not Sufficiently Allege That Sotheby's
        Knew That The Statue Was Stolen ......................................................................... 16

# TABLE OF AUTHORITIES

**CASES**                                                                              **PAGE(S)**

*Bakalar v. Vavra,*
    619 F.3d 136 (2d Cir. 2010) ..................................................................14

*Government of Peru v. Johnson,*
    720 F. Supp. 810 (C.D. Cal. 1989),
    *aff'd,* 933 F.2d 1013 (9th Cir. 1991).........................................................11

*Phelps v. Kapnolas,*
    308 F.3d 180 (2d Cir. 2002) ..................................................................18

*United States v. $1,399,313.74 in United States Currency,*
    591 F. Supp. 2d 365 (S.D.N.Y. 2008) .....................................................12

*United States v. Daccarett,*
    6 F.3d 37 (2d Cir. 1993) .......................................................................23

*United States v. Mask of Ka-Nefer-Nefer,*
No. 4:11CV504 HEA, 2012 WL 1094652 (E.D. Mo. Mar. 31, 2012),
*mot. for reconsid'n denied,* 2012 WL 1977242 (E.D. Mo. June 1, 2012)...................12, 13

*United States v. McClain,*
    545 F.2d 988 (5th Cir. 1977) ...................................................................9

*United States v. McClain,*
    593 F.2d 658 (5th Cir. 1979) ...................................................................5

*United States v. One Tyrannosaurus Bataar Skeleton,*
    No. 12-cv-4760 (S.D.N.Y. Sept. 7, 2012) .................................................17

*United States v. Patrisso,*
    262 F.2d 194 (2d Cir. 1958) ..................................................................17

*United States v. Portrait of Wally,*
    No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002)...........................13, 16

*United States v. Premises & Real Property at 4492 S. Livonia Rd.,*
    889 F.2d 1258 (2d Cir. 1989) ..................................................................23

*United States v. Schultz,*
    333 F.3d 393 (2d Cir. 2003) .............................................................*passim*

## Preliminary Statement

Simply because the Statue at one time stood in an ancient temple in Cambodia does not mean that its removal from Cambodia constituted theft.  In the thousand years between when Koh Ker was abandoned to the jungle and when the Statue's first known sale occurred in London, the Statue may have changed hands countless times in an almost unimaginable variety of circumstances.  Such uncertainty is the norm with antiquities.

Recognizing that such uncertainty is inevitable, the law aims to strike an appropriate balance, protecting the interests of museums and collectors who have acquired objects in the marketplace in good faith reliance on well-established law, while respecting the claims of countries of origin when it can be demonstrated that an ancient object is actually "stolen" within the meaning of U.S. law.

As our opening brief explains, removal of an object from the ruins of an ancient foreign temple only renders the object "stolen" under U.S. law if (a) at the time of the removal, there was a clear and unambiguous foreign law vesting title in the foreign state, (b) the foreign state actually enforced that law as vesting title, and (c) the removal was without the foreign state's permission.  And even if the removal rendered the object stolen, such an ancient object is only subject to forfeiture if (a) it remained stolen at the time of import, and (b) the person importing it *knew* that it was, and remained, stolen.

To survive the motion to dismiss, the Government bears a substantial burden—it must demonstrate that it has pled sufficient facts to support a reasonable belief that it will be able to meet its burden of proof on all of these points at trial.[1]

---

[1] The Government seeks to make much of the fact that a forfeiture complaint may not be dismissed on the ground that the Government lacks sufficient evidence to meet its ultimate burden of proof.  Govt. Br. at 8-9.  But we have not sought dismissal on that basis.  Rather, we seek dismissal because the Government has not alleged sufficient facts to create a *reasonable belief* that the Government will meet its burden at trial, *see* Opening Br. at 9, 29, as Supplemental Rule G(2)(f) expressly requires.

The Government has not met that burden.

* On the threshold question of whether Cambodia had, and enforced, a law clearly and unambiguously declaring it the owner of the Statue at the time it was removed, the Government relies primarily on two decrees issued more than eighty years ago by a long-defunct French colonial regime. Unable to argue convincingly from the plain language of these decrees, the Government simply rewrites them, omitting most of the actual text from its presentation, and offering instead an expert who paraphrases and misquotes the decrees. But this effort cannot show that the actual law—rather than the expert's reimagining of it—is clear. Notably, the Government is unable to support its interpretation of the colonial decrees with even a single example in the eighty-seven years since the decrees were issued in which *anyone* has interpreted these decrees to mean what the Government and its expert now say they mean.

* The Government also takes liberties with English law, which is controlling on the question of whether Ms. Ruspoli and her husband obtained good title when they purchased the Statue for £105,000 from a reputable dealer in London in 1975. Unable to point to any allegation or evidence that Ms. Ruspoli or her husband acted in bad faith, the Government invents a presumption that they did so. But no such presumption exists, leaving the Government with nothing to meet its burden of pleading a reasonable basis to believe it will prove that the Statue remained stolen at the time of import.

\*   Finally, the Government proffers multiple factual inferences that defy common sense.

*First*, on the question of *when* the Statue was removed from Cambodia, it seeks to explain away the Statue's absence from a comprehensive archeological survey of the very spot where the Statue's feet were allegedly later found with the speculation that this five foot tall, three foot wide object (and its equally large twin) must have been hidden by underbrush.

*Second*, on the question of whether Sotheby's *knew* the Statue was and remained stolen, it asks the Court to overlook its failure to allege in the Complaint even a shred of evidence that Sotheby's either (i) anticipated the Government's unprecedented rewriting of Cambodian law, or (ii) had any reason to doubt the good faith of the 1975 London purchase, both of which the Government would have to show in order to prevail.  Instead, it suggests that this Court can infer Sotheby's knowledge that the Statue was stolen prior to import from certain basic facts about the Statue's provenance—its style, condition, and first known sale date—even though those facts do not bear on the relevant *legal* questions (e.g., what Cambodia's law was at the relevant time, what the circumstances of the 1975 London sale were), and even though Sotheby's demonstrated its good faith by fully and accurately disclosing these basic provenance facts (i) to anyone in the world who read Sotheby's auction catalog or reviewed Sotheby's web site, and (ii) to

3

Cambodia's Ministry of Culture, in writing, more than four months prior to
the planned sale.

*Third*, with regard to its one forfeiture theory as to which
Sotheby's post-import mental state is at issue, it urges the Court to assume
that Sotheby's would have relied on the preliminary view of a free-lance art
historian (rather than its own legal and compliance departments), even
though that view was founded on insufficient facts and no legal analysis and
was promptly recanted after the art historian spoke to a senior official in
Cambodia's Culture Ministry.

The Government resorts to these arguments because the facts alleged in the Complaint
are insufficient to support a reasonable belief that the Government will be able to show that the
Statue was ever stolen, that it remained stolen at the time of import, or that Sotheby's (or Ms.
Ruspoli) knew that the Statue was or remained stolen.  Accordingly, dismissal is required.

I.     **The Government Fails To Adequately Allege That The Statue Was Stolen.**

   A.     **The Colonial Decrees Do Not Unambiguously Vest Title.**

The Government acknowledges, as it must, that settled law requires it to show that the
foreign law on which its forfeiture claim is based is both clear and unambiguous.  Govt. Br. at 9-
10.  But the Government does not seem to understand what this standard means.

Rather than supplying the Court with translations of the text of the relevant laws, so that
the Court may evaluate the clarity of that law for itself, the Government relies upon a prolix,
forty-nine page affidavit that purports to summarize and paraphrase—*but does not include and
almost never quotes*—more than *thirty* different French and Cambodian legal documents, many
of which the Government has not produced in discovery.  Even before one considers what the

expert affidavit says, the need to rely on such a lengthy declaration, rather than the plain text of the laws themselves, is devastating evidence that the laws in question are neither clear nor unambiguous.

To show that a foreign law is sufficiently clear as to support a determination that an item is "stolen," the law must speak for itself, for due process forbids deeming property stolen "only on the basis of unclear pronouncements by a foreign legislature." *United States v. McClain* (*McClain II*), 593 F.2d 658, 671 (5th Cir. 1979). It is not enough to offer the testimony of an expert—or even multiple experts—that, in their opinion, the object belongs to the foreign state. *See id.* at 670-71 (rejecting "emphatic" expert testimony where written law ambiguous). Rather, the foreign law must be sufficiently clear to "survive translation into terms understandable by . . . American citizens." *Id.* at 670.

The only way to test this is to *translate* the law into English, and see whether the putative ownership provision is "understandable by … American citizens." If the basis for ownership is not apparent without paraphrase or reinterpretation by an expert—which is precisely what the government has supplied[2]—it must fail that test.[3]

Although one would not know it from the Government's submission, there is a translation—prepared by the Cambodian government in 1965—of the key July 1925 French colonial decree on which the Complaint relies. The July 1925 decree is the decree the

---

[2] The Rendall declaration expresses no view on whether the law on which it relies is clear or unambiguous.

[3] The Government suggests that because the District Court in *Schultz* heard expert testimony about the meaning of the Egyptian law in question, the issue is not one ripe for disposal on a motion to dismiss here. But in *Schultz*, the law was clear on its face—it recited that "all antiquities are considered to be public property"—and a hearing was necessary only because the defense argued that its *own* expert testimony showed that the apparently clear law was in fact ambiguous in light of other provisions. *United States v. Schultz*, 333 F.3d 393, 399 (2003). Nothing in *Schultz* establishes that expert testimony is an appropriate method to establish that the foreign law is clear on its face, or that a hearing is necessary when the law is facially ambiguous but a government expert insists that he knows what it means. To the contrary, the *Schultz* court expressed confidence that "our courts are capable of evaluating foreign patrimony laws to determine whether their language and enforcement indicate that they are intended to assert true ownership of certain property or merely to restrict the export of that property." *Id.* at 410.

Government contends was in effect when (on the Government's theory) this Statue was removed from Cambodia at some point between 1960 and 1975.[4]  According to the Government and its expert, this July 1925 decree provides that:

> statues existing on or in the soil of an immovable property granted from the Sovereign domain or the protected State, commune or other legal entity under public or private law, *remained the property of the Sovereign domain.*

Govt Br. at 13 (emphasis added); Rendall Decl. ¶ 32.  But according to the Cambodian government's own 1965 translation of the July 1925 decree (included in the affidavit in support of our motion to dismiss), the Decree says something very different:

> statues . . . existing on or in the ground of a piece of immovable property of a commune or any other legal entity of public or private law, *remain the property of such domain.*

Neiman Decl. Ex. 10 at Art. 27 (emphasis added).  The switch from "such domain" to "Sovereign domain" in the Government's paraphrase completely changes the meaning of the provision.  It turns a decree stating only that if a commune or other legal entity of public or private law owned land, that same entity also owned statues on that land, into something very different—a decree stating that all statues on any "granted" immovable property belong to the sovereign.

The Government engages in a similar sleight of hand in order to claim that the monument where the Statue once stood—a temple abandoned to the jungle—was the property of the state.  The Government's complaint asserted that the abandoned temple belonged to the State under an 1884 ruling by the French Governor that "structures . . . assigned to a public service" were part of the public domain.  Compl. ¶ 36.  After we showed in our brief that it was far from clear that a thousand-year-old abandoned temple ruin remained "assigned to a public service," *see* Opening.

---

[4] For this reason, we do not separately discuss here the pre-1925 legal regime described at length in the Rendall affidavit.  As we showed in our opening brief, the prior regime (a) was declared to be "flagrantly illegal" in 1924 and (b) in any event, did not vest title in the state.  Opening Br. at 13-14.

Br. at 16-17, the Government and its expert dropped that theory—the Rendall affidavit does not even mention the 1884 ruling. In its place, the Government now relies on the May 16, 1925 decree "classify[ing]" the Prasat Chen ruin at Koh Ker as one of the "historical monuments and objects of French Indochina." Rendall Decl. ¶ 30. That the Government needs to change its theory at this late date is powerful evidence of the law's ambiguity and the unfairness of its attempt to attribute knowledge to Sotheby's of a legal theory that the Government is only now formulating.

In any event, the Government's new theory is as flawed as its old one. As we showed in our opening brief, "classification"—while imposing certain preservation obligations and transfer limitations—does not transfer to the state title to property that is classified. Indeed, the relevant colonial decrees expressly and repeatedly contemplate the continued *private* ownership of classified objects and structures. *See* Opening Br. at 12-15. Decrees also repeatedly provide for separate procedures for the Government to "expropriate"—that is, take ownership of—classified property, making perfectly clear that classification itself *does not transfer title to the State. See* Opening Br. at 14.

The Government concedes that Cambodia does not own all classified antiquities, but insists that it does own this one, because it comes from "Prasat Chen, a state-owned historical monument." Govt. Br. at 14. But the Government bases its claim that Prasat Chen was state-owned entirely on the fact that it was "classified" in May 1925. Govt. Br. at 14. The Government's argument thus chases its own tail.

To get to its desired result, the Government's brief has to go beyond what its expert is willing to say. The Rendall declaration describes the May 16, 1925 decree as classifying certain sites, including Prasat Chen, as among "the historical monuments and objects of French

Indochina," ¶ 30, but does *not* equate the protection that comes with such a classification with ownership.[5]   The Government, citing this very paragraph of the declaration, writes that the decree classified Prasat Chen as one of "the historical monuments and objects of French Indochina," and then offers its own remarkable gloss: "in other words, as historical monuments and objects belonging to the national or colonial domain." Govt. Br. at 12.   This begs the whole question.   There is nothing about the plain language in the context of the May 1925 decree to support reading "of" to mean "belonging to," as the Government does.   The far more natural reading in context is that "of" means "located in," just as listing Fraunces Tavern as "one of the historical monuments of New York City" is a statement of its location and protected status, not its ownership.   Read this way, the May 1925 decree makes perfect sense:   the decree identifies the listed sites as the historical monuments located in French Indochina to which the various protections that come with classification extend—protections that no more transfer title than does New York City's landmarking process.

The Government's contrary reading is further undermined by the fact that the supposed recipient of title under the Government's reading is "French Indochina."   But "French Indochina" is a geographical region, encompassing the various French colonies that now make up modern day Viet Nam, Cambodia, and Laos, not a political entity capable of owning property. It makes no more sense to speak of "French Indochina" owning something than it does to say that "North America" owns an historical site.[6]

---

[5] The Government produced the May 1925 classification decision in discovery, and a professional translation of the relevant language is attached as Exhibit 1 to the Declaration of Peter G. Neiman in Support of Claimants' Reply Memorandum of Law in Support of their Motion to Dismiss ("Neiman Reply Decl.").

[6] To avoid the illogic of its position, the Government rewrites "French Indochina" as "the national or colonial domain," words that simply do not appear in the May 1925 decree.

In any event, even if the Court were to view both "belonging to" or 'located in" as plausible interpretations, the existence of ambiguity defeats the Government's position, for only a clear and *unambiguous* declaration of ownership meets the due process standard.

The contrast between the legal theory the Government advances here and the laws accepted as clear and unambiguous in *McClain* and *Schultz* could not be more stark. In *McClain*, the 1972 Mexican law recited that historical objects "are the inalienable and imprescriptible *property of the Nation.*" *United States v. McClain* (*McClain I*), 545 F.2d 988, 1000 (5th Cir. 1977) (emphasis added). The 1983 Egyptian law at issue in *Schultz* provided in relevant part that "all antiquities are considered to be *public property.*" 333 F.3d at 399 (emphasis added). Cambodia itself, eighteen years after the Statue was sold in London, enacted a 1992 law declaring that "the mineral, cultural and historical patrimonies underground, on the ground, at the bottom and under the bottom of the sea are the property of the state." *See* Rendall Decl. ¶ 49; Neiman Reply Decl. Ex. 2. There is nothing at all unfair about treating property as nationally owned based on such clear and unambiguous texts. But here—where the Government's legal theory depends on (a) finding that a July 1925 decree says something different from the Cambodian government's own English translation of that decree, and (b) accepting the Government's "in other words" rewriting of a May 1925 classification decree as a transfer of title (even though the entire structure of the French decrees makes clear that classification *does not transfer title*)—it would be enormously unfair, and contrary to both due process and settled law, to treat these decrees as rendering stolen the statue Ms. Ruspoli and her husband bought in good faith more than three decades ago.

The Government's burden at this stage is to establish a reasonable basis to believe it will be able to prove at trial that the Statue was stolen. To meet that burden at trial, the Government

would need a foreign law vesting title in Cambodia that was clear and unambiguous on its face. The colonial decrees cited in the Complaint and in the expert affidavit do not come close to meeting that standard, and due process bars the Government's efforts to rewrite those decrees now.  There is therefore no reasonable basis to believe the Government will be able to meet its burden, and for this reason alone, the complaint should be dismissed.

**B.    The Government Does Not Allege A Single Instance Of Enforcement Of The Particular Laws That It Claims Created Ownership.**

One would have hoped that before the Government sought to seize property on behalf of a foreign country based on eighty-year-old colonial decrees, it would have first insisted on *some* evidence that those decrees had *ever* before been used as a basis for asserting ownership of *anything*.  But the Complaint is entirely silent on the question.  The forty-nine page affidavit submitted by the Government's expert—while detailing various *other* steps Cambodia has taken to protect its historical treasures and territorial integrity—is conspicuous for what it does not include: *any* instance prior to this litigation in which *anyone*—the French Government, the Cambodian government, or even a legal scholar or art historian—has taken the position that the 1925 decrees on which this case is based transferred title to antiquities like the Statue to the State.[7]

Instead, the Government (Govt. Br. at 17) asks the Court to infer "that since the Cambodian laws were instituted, the laws have also been enforced" but cites no authority for the

---

[7] The Government does not ask the Court to rely on the various alleged efforts by Cambodia identified in the Rendall affidavit to obtain the return of antiquities, and it would not be proper for the Court to consider Rendall's factual assertions regarding these alleged efforts as supporting the adequacy of the Complaint. But what is striking is that Rendall does not assert that any were predicated on the 1925 decrees (or on any other law that could apply to the Statue).  Repatriation may be sought on purely moral or policy grounds without a claim of ownership.  Countries also sometimes seek return of objects that were owned in conventional terms, such as objects collected by government expeditions and stored in national museums or warehouses and stolen from those locations.  Claims for property on these grounds say nothing about whether the foreign state has ever asserted that it owns objects by operation of laws, simply because they are ancient.

proposed inference.  Nor is it logically sound.  The existence of a law provides no reasonable

basis to believe the Government will be able to prove that the law has ever been enforced to

mean what the Government claims it means.

Equally off-point is the Government's suggestion that non-enforcement is a *defense* as to

which respondents bear the burden at this stage.  Govt. Br. at 17-18.  The Government's burden

is to plead and prove that the Statue was "stolen" when imported; proving that it was "stolen" at

that time requires proof of ownership by someone other than Ms. Ruspoli; and proving

Cambodia's ownership requires proof both that the foreign law on which that ownership is based

is clear and unambiguous, and that it was enforced as transferring title.  *See* Opening Br. at 11-18;

*Government of Peru v. Johnson*, 720 F. Supp. 810, 814 (C.D. Cal. 1989), *aff'd*, 933 F.2d 1013

(9th Cir. 1991); *Schultz*, 333 F.3d at 402.   The Government thus bears the burden on

enforcement, and must plead facts sufficient to support a reasonable belief that it can meet that

burden.

The Government also points to an email quoted in the Complaint to the effect that seven

pieces of Khmer art were (in 2010) in the process of being returned to Cambodia.  Govt. Br. 17.

But nothing in the Complaint says that the objects returned in 2010 were covered (on the

Government's theory) by the 1925 decrees (*i.e.*, that they were removed from Cambodia prior to

its 1992 modern cultural property law).[8]

In short, the Government bears the burden of pleading enforcement of the 1925 decrees,

but offers nothing but speculation.  Dismissal is appropriate.

---

[8] Government press releases strongly suggest that the June 2010 return of objects to Cambodia was the product of an investigation by the Department of Homeland Security, the same agency handling this case.  *See* http://www.ice.gov/news/releases/1008/100818washingtondc.htm; http://www.msc.navy.mil/N00p/pressrel/press10/press27.htm. From the press releases, it appears this operation related to ongoing smuggling (which would be covered by, among other things, Cambodia's 1992 law, and certain bilateral agreements in place for objects exported from Cambodia after 1999, *see* Rendall Aff. ¶ 61) rather than the 1925 decrees at issue here.  The Government—having arranged that return—obviously knows full well whether the return was based, in any way, on the 1925 decrees, and consistent with its obligation of candor to the tribunal, should correct the record if it was not.

C.   **The Government's Allegations Fail To Support A Reasonable Belief That It Will Prove That the Statue Left Cambodia After The Colonial Decrees Were Issued.**

The Government does no better in its assertion that the pleadings establish a reasonable likelihood that it will be able to prove at trial that the Statue was removed from Cambodia after 1960 (as it contends), notwithstanding its omission from the comprehensive 1939 Parmentier survey of the site.   The Government proposes that Parmentier somehow missed the five-foot tall, three-foot wide Statue—along with the equally-sized Companion Statue—because they must have been "buried underneath the vegetation and rocks." Govt. Br. at 23.   But "[a] complaint devoid of any facts to support its bare allegations and consisting solely of speculative assertions and innuendo cannot stand." *United States v. $1,399,313.74 in United States Currency*, 591 F. Supp. 2d 365, 374 (S.D.N.Y. 2008).   The Government also points to its allegations that the first *known* sale occurred in 1975 during a time of turmoil in Cambodia, and to the *improved* road built in 1965.   But more is required to make it reasonable to believe that the Government will be able to prove that a Statue of this size and dimension, abandoned a thousand years ago, and entirely absent from a careful archeological survey, is more likely to have been hidden from the surveyor under branches and stones than to have simply been removed at some unknown time prior to the survey (whether by Thai invaders, French souvenir seekers, or any of the countless other possibilities in the long history of movement of Cambodian statues).

D.   **The Government Fails To Allege Adequately That The Statue Was Taken Without Permission.**

As we explained in our opening brief, the Government's pleading fails the test of *United States v. Mask of Ka-Nefer-Nefer*, No. 4:11CV504 HEA, 2012 WL 1094652 (E.D. Mo. Mar. 31, 2012), *mot. for reconsid'n denied,* 2012 WL 1977242 (E.D. Mo. June 1, 2012), because it provides insufficient facts to support an inference that the Statue was taken without permission.

The Government seeks to distinguish *Ka-Nefer-Nefer* by pointing to conclusory allegations in the Complaint that the Statue was "looted," and argues that it "need not restate the obvious by expressly stating that permission to loot was not granted." Govt. Br. at 20.

But the absence of permission is hardly obvious. Governments sometimes authorize the removal of valuable objects, as the Government's own expert acknowledges. *See* Rendall Decl. ¶ 23. In *Ka-Nefer-Nefer*, the Court made clear that specific facts demonstrating the lack of authorization were required to support a forfeiture complaint, even though the artwork at issue was documented to be in Egyptian government storage in 1966, before going missing in 1973, without any explanation for its disappearance. 2012 WL 1094652, at *1-3. If facts must be pled in order to turn the unexplained disappearance from a government storeroom in a narrow time frame into theft, then surely facts must be pled to show that the unexplained disappearance of this statue from a jungle site at some point in the last thousand years was a theft. But no such facts are alleged. Just as in *Ka-Nefer-Nefer*, dismissal is appropriate.

## II. The Complaint Does Not Sufficiently Allege That The Statue Remained Stolen When It Was Imported.

The Government bears the burden of pleading sufficient facts to support a reasonable basis to believe the Statue remained stolen when it was imported into the United States. We showed in our opening brief that under the English law applicable to the 1975 transaction, even if the Statue had previously been stolen, Ms. Ruspoli and her husband acquired title when Cambodia failed to make a claim within six years of their good faith purchase.

In response, the Government—without identifying any law other than English law that could conceivably apply to the purchase of this statue in London in 1975—faults respondents for not conducting a "choice of law analysis." But the applicability of English law here follows from *United States v. Portrait of Wally*, No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12,

13

2002) (*Wally III*), which held that the law where the prior purchase occurred (Austria, in *Wally*), "does govern" the question whether the possessor had acquired title by the time the item was shipped to the United States, and that if that law were satisfied it would defeat the forfeiture. *See id.* at *16, *19.[9]  No further analysis is required.

Nor does the Government challenge the substance of the opinion put forward by Claimants' expert on English law—that title passes six years after a good faith purchase of property that was once stolen.  Instead, the Government observes that English courts in conversion cases would place the burden to prove a good-faith purchase on a party alleging that the running of the period of prescription has caused title to vest in her, despite an earlier theft. This, however, is not a conversion claim brought by Cambodia in the English courts (or even the New York courts); it is a forfeiture action brought by the U.S. Government.  In a forfeiture action, the Government undisputedly must plead sufficiently detailed facts to support a reasonable belief that it will be able to meet its burden of proof at trial, Supp. R. G(2)(f), and one of the elements it must prove at trial is that the Statue was stolen when imported.

---

[9] The Government's citation to *Bakalar v. Vavra*, 619 F.3d 136 (2d Cir. 2010) is inapposite.  First, *Bakalar* was not a forfeiture case, but a diversity-based ownership dispute, and so did not require the court to look to forfeiture caselaw to determine the applicable law.  Second, in deciding that New York, rather than Swiss, law should apply to the ownership question raised in *Bakalar*, the court's analysis was driven by facts crucially different from this case:  the disputed drawing was exported to New York just a few months after its sale in Switzerland, long before the five-year prescriptive period applied by Swiss law ran.  Thus, if the drawing had been stolen (as the original owner's heirs alleged), title had not passed by the time it arrived in New York.  Accordingly, on the heirs' allegations, "a stolen piece of artwork was delivered in New York to a New York art gallery, which sold it in New York." *Id.* at 144.  Here, by contrast, almost three decades had passed after the prescriptive period under English law had expired, vesting title in Ms. Ruspoli.  *Bakalar* does not remotely suggest that New York law could apply to a transaction occurring outside New York and decades prior to the object's arrival in New York, when title in the artwork had already passed to its possessor—rendering it not "stolen"—long before it arrived in New York.

14

Nowhere in the Government's complaint did it allege that the original purchase of the Statute from Spink in 1975 was made without good faith.[10]  The absence of any such allegation renders it exceptionally unlikely that the Government would be able to succeed, at trial, in proving that the Statue remained "stolen" at the time of import in 2010.

In attempting to fill this gap in their argument, the Government and its expert insist that English law presumes that any purchaser of a previously-stolen item acts in bad faith.  *See* Govt. Br. 25 ("[T]he bad faith of any purchaser of the stolen Statute is presumed."); McClean Decl. ¶ 23 ("[F]ollowing a theft, bad faith is presumed until the contrary can be proven.").  But the English statute does not say that.  The statute creates a presumption that a conversion following a theft *is related to the theft*, and provides that a showing of good faith will overcome that presumption.  As Claimants' expert explains in his Second Declaration ("2d Doctor Decl."), "That is not the same as saying that [a] purchaser … is presumed to have acted in bad faith unless the contrary is shown…. [T]he court does not 'presume' that [the purchaser] was acting in bad faith."  2d Doctor Decl. ¶¶ 9-10.  When the Government's invented presumption of bad faith is taken away, there is nothing before the Court to suggest that the purchaser lacked good faith.

---

[10] Accordingly, we asked our expert to assume that the purchase was made in good faith.  It is disconcerting that the Government has repeatedly accused Claimants of "misrepresent[ing]" English law (Govt. Br. 24) when the good-faith assumption was set out right up front in the expert opinion (Doctor Decl. ¶ 4.3) and the assignment of burden of proof under the 1980 Act was expressly acknowledged (*id.* p.13 n.13).  It is equally disconcerting for the Government to accuse Claimant's expert of providing an opinion with an "improper" conclusion (Govt. Br. 25) when—as the Government does not appear to contest—the conclusion was entirely proper on the assumptions openly made.  The fact that the Government has assumed a different position regarding the consequences of its pleading burden is no justification for leveling unfounded accusations against Claimants' counsel and expert.

Thus, the Government's allegations are insufficient to justify a reasonable belief that it will be able to prove that the Statue remained "stolen" in 2010.[11]

Finally, in a footnote, the Government posits that the six-year prescriptive period "would not necessarily apply here" because "discovery may show that Ms. Ruspoli[] and her husband[] conceal[ed] … their conversion of the Statue." Govt. Br. 25 n.6. Such rank speculation— unsupported by *any* allegations of concealment—has no capacity to support a belief that the government will be able to prove at trial its claim that the Statue was "stolen" when imported. The argument therefore suffers from the same flaws as its good-faith argument. Indeed, it would not even succeed if this *were* a conversion action in an English court, because those courts place the burden to plead and prove deliberate concealment on the party asserting it. *See* 2d Doctor Decl. ¶¶ 20-38.[12]

## III.   The Complaint Does Not Sufficiently Allege That Sotheby's Knew That The Statue Was Stolen.

The Government bears the burden of pleading facts sufficient to establish a reasonable basis to believe it will be able to prove at trial that Sotheby's knew the Statue was stolen. That task is particularly difficult here, because the allegations of the Complaint, and the emails incorporated therein,[13] show that Sotheby's conduct is entirely inconsistent with culpable

---

[11] *Wally III* makes clear that a court in a forfeiture case must engage in this close examination of the Government's allegations as they relate to foreign law of prescription. *See Wally III*, 2002 WL 553532, at *16-18. To be sure, the Government's task in that case was different from the task here, because the Austrian law at issue presumed a purchaser's good faith, and the court therefore examined whether the Government had alleged sufficient facts notwithstanding that presumption. *See id.* at *17-18. Nevertheless, *Wally III* demands an analysis of whether the government's allegations are sufficient to raise a reasonable likelihood that it will prevail at trial in the face of a foreign prescription law—which is the analysis Claimants press here.

[12] For a detailed rebuttal of Mr. McClean's statements regarding concealment—as well as his discussion of constructive bailment, which the Government's brief does not mention—we refer the Court to the full discussion in Mr. Doctor's Second Declaration, paragraphs 20 to 45.

[13] While filling its papers with inappropriate hints about supposedly telling new evidence that it chooses not to share, *see* Govt. Br. at 24 n.6, 27 n.7, the Government asks the Court not to consider the full text of an email string the

knowledge: Sotheby's (a) fully and accurately described the Statue to the U.S. Government at the time of import, (b) included a full and accurate description of the Statue and its provenance in its catalogue, (c) placed the Statue on the cover of that catalogue, which it circulated around the world, and (d) called all relevant facts to the attention of the appropriate senior official in the Cambodian Ministry of Culture, more than four months prior to the planned sale, in precisely the manner it had been told would catch his attention. *Cf. Schultz*, 333 F.3d at 416 (distinguishing defendant's behavior—which "indicated a consciousness that his actions were illegal in some way"—from that in *United States v. Patrisso*, 262 F.2d 194 (2d Cir. 1958), where the defendant's "behavior was not consistent with the consciousness of guilt; he made no effort to conceal the stolen property").

The only plausible inference from this transparency is that Sotheby's believed in good faith that the Statue was not stolen. That was a perfectly reasonable conclusion for Sotheby's to reach, given that Cambodia did not enact clear cultural property laws until the 1990s, decades *after* Ms. Ruspoli and her husband had purchased this Statue in good faith in London.

The Government asserts that its pleading burden regarding Sotheby's knowledge is "minimal" and that it should be permitted to "fully explore through discovery what Sotheby's knew, and when." Govt. Br. at 26. But there is no exception to the ordinary Rule G pleading standards for allegations related to *mens rea.* Instead, as Judge Castel recently explained in *United States v. One Tyrannosaurus Bataar Skeleton*, 12-cv-4760 (PKC), (S.D.N.Y. Sept. 7, 2012) (Dkt. No. 19, Memorandum and Order), a forfeiture complaint "must set forth a basis for

---

Government incompletely excerpts in multiple paragraphs of the complaint. *Compare* Neiman Decl. Ex. 1 *with* Compl. ¶¶ 24, 26; Neiman Decl. Ex. 2 *with* Compl. ¶¶ 24-29; Neiman Decl. Ex. 3 *with* Compl. ¶¶ 31-32. All of the documents in the Neiman Declaration fit into one of three categories that the Court may properly consider in ruling on a motion to dismiss—documents extensively cited or relied upon in the complaint (Neiman Decl. Exs. 1-4, 6-7, 11 ), scholarly accounts of which the Court may take judicial notice unless their accuracy is contested (*id.* Ex. 5), which the Government has not done; or materials related to foreign law (*id.* Exs. 8-10).

believing that some person who engaged in the prohibited conduct . . . had the requisite

knowledge" to satisfy the "specific *mens rea* requirements" of the statutes on which the

forfeiture claim is based.[14]

      In support of its position that Sotheby's imported the Statue believing that it was stolen

property, the Government points to only four facts: that the Statue was in the Koh Ker style, that

the first known sale occurred in 1975 in London, that there was widespread "looting" in

Cambodia prior to 1975, and that the Statue's ankles were broken.  But Sotheby's was

completely transparent about the facts in its possession, including the Statue's first known sale,

Koh Ker style, and broken ankles, disclosing these facts in communications with the Cambodian

government and in its auction catalog, a decidedly unlikely course if it believed that these facts

demonstrated the Statue was stolen.

      Nonetheless, the Government contends that Sotheby's surely knew from these facts that

the Statue had been "looted" from Cambodia close in time to 1975.  Even if this were true—and

it is not[15]—that would not come close to establishing that Sotheby's knew the Statue was *stolen*

when it left Cambodia, or that it remained stolen decades later when it was imported into the

United States.  As noted above, to be and remain *stolen*, there had to be an owner, the object had

---

[14] The Government's cites *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002) in support of its assertion that its pleading burden regarding *mens rea* is minimal, but *Phelps* is an ordinary civil case, not a forfeiture case governed by the more stringent pleading requirements of Supplemental Rule G.  Nor is there anything to the Government's claim that it cannot plead facts about Sotheby's knowledge because those facts are "uniquely" in Sotheby's possession.  Govt Br. at 26.  Unlike an ordinary civil litigant, the Government has ample tools to investigate before filing a case.  That the Government chose not to seek interviews of *any* Sotheby's employee before electing to file a complaint accusing Sotheby's of knowingly importing stolen property hardly entitles it to some special exception to Supplemental Rule G's clear pleading requirements.

[15] There are multiple alternative explanations for each of these facts, all of which are more plausible than the Government's speculation of looting close in time to 1975.  It would hardly be surprising for a top-heavy sandstone statue to break at its thinnest point (the ankles) and topple naturally at some point over the course of a thousand years, rather than at the hands of a "looter."  Given that there is no formal method or registry for documenting the ownership history of ancient objects, and that it was not until recently that such documentation has taken on importance, the date of the first *known* sale is not reasonably viewed as the date of the first actual sale.  And because there is an undisputed history of Cambodian statues having been removed from their pedestals and moved in antiquity, *see* Opening Br. at 3-4, merely knowing the style of a piece does not provide reliable information as to where it has resided since antiquity.

to have been taken without the owner's permission, and the object had to have remained stolen despite subsequent sales and the operation of law over many years.

Cambodia—as the Government concedes—is not the owner of *all* antiquities that have ever come out of Cambodia, or even of all classified antiquities that came out of Cambodia close in time to 1975. *See* Govt. Br. at 14 ("The Government does not contend that Cambodia owned all classified antiquities."). Rather, the Government's theory is that Cambodia owned this particular antiquity (and thus its alleged removal without permission was theft), because (i) it came from a particular place, (ii) that place was "classified" in 1925, and (iii) the effect of that classification was—in the Government's novel and circular rewriting—to vest in the state title to statues found at that place. In order to *know* that the Statue was stolen, Sotheby's would have to know all of these things. The Government points to *no* evidence that prior to the importation, Sotheby's knew *any* of them. Indeed, there is no way that Sotheby's could have known all these things. Prior to the Government's assertion in its brief on this motion, the Government has provided no evidence that *anyone* had *ever* taken the position that the impact of the May 1925 French colonial classification of various sites, and the July 1925 French colonial decree, was to grant Cambodia *ownership* of the classified sites and all objects located therein.[16]

Indeed, there is powerful evidence in the Complaint that the Cambodian Ministry of Culture itself did not take this position prior to this litigation. Documents quoted extensively in the Complaint show that one senior Cambodian cultural official said that "years ago" (*i.e.*, before Cambodia's modern cultural property legislation) there were "no restrictions" on removing antiquities from Cambodia (Opening Br. at 18, 28), and another wrote to Sotheby's that the twin

---

[16] The Government makes a passing reference to conscious avoidance, but identifies no facts suggesting either (a) that Sotheby's knew there was a very high likelihood that Cambodia owned the Statue, or (b) that Sotheby's took steps to avoid learning the truth. And the facts pled in the Complaint—including that Sotheby's called the impending sale to the attention of the appropriate official in Cambodia's Culture Ministry—show a conscious effort to learn, rather than avoid learning, whether Cambodia believed it had an ownership claim.

19

to this Statue (which came from the same classified site and appeared in London at around the same time as the Statue, and whose feet are also still in Cambodia) "belongs to" a Los Angeles museum.[17]  Opening Br. at 8.  If these Cambodian officials did not view objects removed "years ago"—including the Statue's twin—as Cambodia's property, there is simply no basis to conclude that the Government will be able to meet its burden of proving that Sotheby's did.

The novelty and shifting nature of the Government's legal theory, its dependence on rewriting the plain language of French colonial decrees (decrees which are not in any event reflected anywhere in the modern legislation of Cambodia), and its inconsistency with what Cambodian officials said *before* this litigation began, provide more than enough reason to conclude that the proposed inference that Sotheby's *knew* the Statue was stolen is *unreasonable*. This case is thus quite unlike *United States v. Schultz*, where the Government established a clear, industry-wide understanding that Egypt owned all antiquities unearthed after 1983.  *See* 333 F.3d at 416 (characterizing Egypt's law declaring ownership of antiquities as "duly adopted, widely publicized, and vigorously enforced"); *id.* at 415 (repeating the district court's finding that "even an ignoramus in this field [of Egyptian antiquities] would know at least about patrimony laws.") The Government alleges no facts showing such common industry understanding about the 1925 French colonial decrees here.

Added to that, of course, is the 1975 London purchase by Ms. Ruspoli and her husband. The Government does not seriously contest that under well-established English law, if that purchase was in good faith, then Ms. Ruspoli is the lawful owner of the piece, and it was not stolen at the time of import.  Govt. Br. at 25.  There is no evidence at all that Sotheby's had any

---

[17] The Government brands as "preposterous" our assertion that when the Cambodian official said the Companion Statue "now belongs to" the Los Angeles museum, he meant that the museum owned the Statue.  Govt. Br. at 7 n.3. It is telling that the Government—whose entire argument depends on inserting the words "belonging to" into the May 1925 decree in order to create implications of ownership where none exist—must simultaneously deny so strenuously that the phrase "belongs to" could possibly connote ownership.

reason to doubt the good faith of Ms. Ruspoli or her husband at the time of import or at any time thereafter. Indeed, the Government has not pointed to *any* basis to question their good faith, whether known to Sotheby's or not. Without a reason to question the good faith of Ms. Ruspoli or her husband, Sotheby's had no basis to believe the Statue remained stolen in 2010, whatever its status prior to 1975. For this reason as well, the Complaint fails to allege facts establishing a reasonable basis to believe the Government will prevail at trial.[18]

With regard to information obtained post-import (relevant only to one of the Government's three forfeiture theories), the Government relies, as it did in the Complaint, on the initial view expressed by the Art Historian on June 1, 2010, even though (a) that view did not follow as a legal matter from the facts cited, and (b) the documents unmistakably show that the Art Historian changed her mind and repeatedly assured Sotheby's that "legally and ethically [Sotheby's] can happily sell the piece." Compl. ¶ 26; *see also* Opening Br. at 28. The Government claims that the Art Historian did "not retract the statement that the Statue was stolen." Govt. Br. at 29. But it does not explain what other possible meaning there could be to her repeated statements—after speaking to a senior official in Cambodia's Ministry of Culture— that Sotheby's could "legally and ethically . . . sell the piece."

And the Government quibbles with the steps Sotheby's took (beyond putting the Statue on the cover of its catalog, describing its provenance transparently therein, and circulating that catalog world-wide) to insure that Cambodia knew of the planned sale, and the provenance of the Statue, well in advance. The Government mischaracterizes as only "minimal notice to Cambodia," Govt. Br. at 6, Sotheby's decision to write directly to a senior official in Cambodia's

---

[18] This argument does not depend on who bears the burden of proof with regard to whether the 1975 purchase was in good faith. The Government bears the pleading burden as to *Sotheby's* knowledge that the Statue remained stolen at the time of import, and unless Sotheby's had reason to doubt the good faith of Ms. Ruspoli and her husband in buying the Statue in 1975, then Sotheby's has no reason to think that the Statue remained stolen at the time of import, even if (contrary to fact) it had reason to believe it was previously stolen.

Ministry of Culture, and mistakenly contends that Sotheby's did so only a "brief period" before the Statue's sale. Govt. Br. at 28.

In fact, the senior official to whom Sotheby's wrote—Hab Touch—is the same senior Cambodian official whom the Government's own expert consulted to formulate his view on Cambodian antiquities law and enforcement. *See* Rendall Decl. ¶ 11. Sotheby's email to Hab Touch fully and accurately described the Statue, including its Koh Ker style, its relation to the Companion Statue, and its appearance in London in the 1960s or 1970s. *See* Neiman Decl. Ex. 3 at SOTHE-000731-32. Sotheby's sent the email to Hab Touch on November 8, 2010, more than *four months* before the planned auction on March 24, 2011, not a "brief period" by any reasonable understanding of the phrase. Sotheby's attached to the email the Statue's catalogue entry (written by the Art Historian) along with high-quality photographs which clearly showed the Statue was broken at the ankles.

Sotheby's did all this even though the Art Historian advised that "sending the catalogue entry to [Hab Touch] would be 'like waving a red flag in front of a bull.'" Govt. Br. at 6. There can be no more compelling demonstration of Sotheby's good faith and desire to provide full notice than Sotheby's having taken the very steps it was told in graphic terms would surely catch the attention of the Cambodians.

For the Government—whose obligation in this and every case is to see that justice is done, and not merely to attempt to win at all cost—to label this as the "behavior of a company trying to sell artwork it knows to be stolen if it can figure out how to get away with it," Govt. Br. at 29, is a disappointing departure from the dispassion and care that more typically characterizes the Government's litigation positions.

22

There is no evidence cited in the Complaint from which the Court could form a reasonable basis to believe that the Government will be able to show at trial that Sotheby's (1) somehow anticipated the rewriting and circular reinterpretation of the 1925 decrees first articulated in the Government's brief in opposition to this motion, or (2) believed that Ms. Ruspoli and her husband had acted in bad faith when they bought the statue in London in 1975. But the Government would have to show both these things to show that Sotheby's knew the Statue was stolen and remained so at the time of import.

It is precisely to protect property owners from the kind of governmental over-reaching and speculation displayed here that forfeiture complaints are subjected to exacting scrutiny. *See*, *e.g.*, *United States v. Premises & Real Property at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1266 (2d Cir. 1989) (standard for forfeiture complaints is "more stringent" than for ordinary civil complaints); *United States v. Daccarett*, 6 F.3d 37, 47 (2d Cir. 1993). The Complaint does not meet the required standards, and should be dismissed.

Dated: New York, New York
September 17, 2012

Respectfully submitted,

Peter G. Neiman
Janet R. Carter
Joseph J. Yu
Pablo Kapusta
WILMER CUTLER PICKERING HALE AND
    DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888


*Counsel for Claimants Sotheby's, Inc. and Ms.
Ruspoli di Poggio Suasa*

24