C9rdcamm

                              Motion

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    Plaintiff,            New York, N.Y.

5              v.                          12 Civ. 2600 (GBD)

6    A 10th CENTURY CAMBODIAN
     SANDSTONE SCULPTURE, CURRENTLY
7    LOCATED AT SOTHEBY'S IN NEW
     YORK, NEW YORK,
8
                    Defendant-in-Rem.
9
     ------------------------------x
10
                                           September 27, 2012
11                                         11:56 a.m.

12   Before:

13                   HON. GEORGE B. DANIELS,

14                                         District Judge

15                         APPEARANCES

16
     PREET BHARARA
17        United States Attorney for the
          Southern District of New York
18        Attorney for Plaintiff
     BY:  SARAH E. PAUL
19        ALEXANDER J. WILSON
          SHARON COHEN LEVIN
20           Assistant United States Attorneys

21
     WILMER CUTLER PICKERING HALE AND DORR LLP (NYC)
22        Attorneys for Defendant-in-Rem Sotheby's
          and Claimant Ruspoli di Poggio Suasa
23   BY:  PETER G. NEIMAN
          JOSEPH YU
24        PABLO KAPUSTA

25

C9rdcamm

Motion

```
 1          THE CLERK:  United States v. A 10th Century Cambodian

 2    Sandstone Sculpture, 12 Cv. 2600.

 3          Can you please stand and state your name for the

 4    record, starting with the government?

 5          MS. PAUL:  Yes.  Good afternoon, your Honor.  Sarah

 6    Paul for the government.  With me at counsel table are

 7    Alexander Wilson and Sharon Cohen Levin.

 8          MR. WILSON:  Good morning, your Honor.

 9          MS. LEVIN:  Good morning, your Honor.

10          THE COURT:  Good morning.

11          MR. NEIMAN:  Good morning, your Honor.  Peter Neiman,

12    from WilmerHale.  I am joined by Joseph Yu and Pablo Kapusta.

13    We are for Sotheby's and Mr. Ruspoli.

14          THE COURT:  I guess, Mr. Neiman, let me start with you

15    with regard to your application.

16          MR. NEIMAN:  Yes, your Honor.

17          We have moved to dismiss the complaint, and let me

18    just walk you through what we see as the most important reasons

19    why the complaint should be dismissed.

20          My client, Ms. Ruspoli, almost 40 years ago went to a

21    reputable dealer in London, in 1975, and bought the statute,

22    paying 105,000 pounds.

23          THE COURT:  Actually, her husband did.

24          MR. NEIMAN:  Her husband did, yes.

25          And the government has now come in and is seeking to
```

C9rdcamm
                        Motion

1    seize that statue from her on the theory that at some point in

2    the 1960s or 1970s some unknown person stole it from Cambodia.

3    And they have a very special theory of that.  They are not

4    saying it came from some museum or somebody's backyard or

5    somebody's storeroom.  Their theory is that Cambodia owned all

6    the antiquities that could ever be found from a particular

7    place.

8              And their theory of why that is so is set forth at

9    great length in an expert affidavit to try to weave together

10   30-some-odd decrees from the French Colonial Regime dating back

11   to the 1900s.  And they say if you read all those things

12   together, Cambodia owns this particular place where this thing

13   came from, and they own everything that will ever be found from

14   that particular place.

15             We actually don't agree at all with the government's

16   reading of those old decrees.  But the case is actually simpler

17   than trying to figure out who has the better reading of those

18   old decrees.  The reason for that is that there is a basic due

19   process test that is really the settled law in this area where

20   the government is asserting that something is stolen by virtue

21   of a foreign declaration of national ownership, which is what

22   the claim is that the government is making here, when that is

23   the claim, the settled case law, from the Fifth Circuit in

24   McClain and followed by Second Circuit in Schultz, is that the

25   foreign law has to be clear and unambiguous.  It has to be able

C9rdcamm
                                    Motion

 1    to survive translation into English in a way that somebody can

 2    understand that that's what it means.

 3              That is a test that is based on due process, basic

 4    fairness, notice.  The idea is you are going to have a stable

 5    and predictable art market where people can know what their

 6    obligations are and try to conform themselves to those

 7    obligations.  If you are going to claim that something is

 8    stolen based on foreign ownership law, that ownership law has

 9    to be clear enough to survive translation into English so that

10    somebody can understand what it says.

11              If you just look at the central things that the

12    government cites as giving ownership of this ruin and the

13    statutes found in that ruin, they just don't meet the due

14    process test by a long shot.  As we read the decrees, the

15    natural reading of them is that this place has sort of a

16    landmark status, the sort of protections that come with that,

17    but that is not the same thing as saying that the state owns

18    the place where the things were found in it, and that is what

19    you need to have in order for this to be stolen.

20              So I would direct your Honor in particular to the May

21    16, 1925 Decree, which we've given you a copy of.  It's Exhibit

22    1 to the affidavit that I put in in connection with our reply

23    papers.

24              THE COURT:  Yes.

25              MR. NEIMAN:  It is this degree that the government

C9rdcamm
                              Motion

1    cites several times in their brief as the thing that

2    establishes that the Prasat Chen Temple, where the feet of the

3    statute were eventually found, is the property of Cambodia.

4         All you have to do is read it.  It just doesn't say

5    that.  I mean, the title of it is the decree regarding the

6    classification of historic monuments in Indochina.

7         THE COURT:  I'm sorry.  Are we looking at Exhibit 2 or

8    1?

9         MR. NEIMAN:  Exhibit 1, your Honor.

10        THE COURT:  Is the translation --

11        MR. NEIMAN:  There is a translation.  The French, the

12   first part is quite long, and then we've translated the

13   relevant portions in the back.

14        (Pause)

15        MR. NEIMAN:  I can hand another copy to your Honor.

16        THE COURT:  No.  I have it.  Just tell me what page is

17   the translation begins.  Is it 551?

18        MR. KAPUSTA:  It is the fourth page from the back.

19        THE COURT:  Yes.  I have the French version that goes

20   through page 647 at the top.

21        MR. NEIMAN:  Yes, your Honor.  It is immediately after

22   that.

23        THE COURT:  And I have 551 is the English translation

24   that goes four pages -- three pages after that.

25        MR. NEIMAN:  That is correct, your Honor.  You are

C9rdcamm
                              Motion

1    looking in the right place, your Honor.  If you are looking in

2    the place that has 551 at the top, this is the decree that they

3    say survives translation into English and clearly and

4    unambiguously establishes that Cambodia owns this temple ruin.

5          THE COURT:  And remind me of whose translation this

6    is.

7          MR. NEIMAN:  This is one we prepared.  The government

8    has not challenged it, and we read its relevant paragraph as

9    saying exactly the same thing as their expert was saying.

10         And here's what it says:  "The real estate and

11   tangible moveable items located with the territorial limits of

12   Indochinese Union, as they are listed in the table attached to

13   this Decree, are classified among the monuments and historic

14   objects of French Indochina."

15         Our view is that the most natural and logical reading

16   of that is that this is a list of the things located in

17   Indochina, French Indochina, that are classified as monuments

18   and historic objects.  The government agrees with us that

19   classification is not the same thing as ownership, that

20   something can be classified and still privately owned.  That is

21   not in dispute, at least as I read the papers.  I'm sure

22   they'll tell you they disagree, but as I read the papers I

23   don't think they do.  And the question is is saying that

24   something is classified among the monuments and historic

25   objects of French Indochina mean that it is owned by French

C9rdcamm
                                Motion

1   Indochina?  I think the clear answer to that, just on the plain

2   language, is no.  The much more natural reading is that these

3   were of the landmarks.

4              THE COURT:  You interpret "of" to mean "in?"

5              MR. NEIMAN:  Yes.

6              THE COURT:  And they interpret "of" to mean ownership?

7              MR. NEIMAN:  Exactly, your Honor.

8              Just to be clear here, the burden is on them.  If both

9   of those readings are plausible, then it is not clear and

10  unambiguous and we win.  We think ours is by far the more

11  natural reading.

12             I think if you think about what the structure of the

13  French decrees here is, that supports our view that ours is

14  much more natural, because the structure of the decrees, as we

15  laid out in our papers, quite clearly recognizes that just

16  saying something is classified doesn't mean it belongs to the

17  state, because there are lots of references to classified

18  things having individual owners, and we've cited that in our

19  papers.

20             THE COURT:  Well, I guess partially it depends on what

21  word or words were translated that is translated to "of."  My

22  French isn't as good as it used to be but --

23             MR. NEIMAN:  No, your Honor.  I would just suggest

24  that I think both sides translated that word as "of," and --

25             THE COURT:  No.  Both sides -- you translate the word

C9rdcamm
                                    Motion

1    to be "in," and they translate the word to be ownership.

2              MR. NEIMAN:  Well, no.  The translation is really not

3    in dispute.  The question is what does that translation mean.

4              THE COURT:  It depends.  It depends on whether "of" is

5    a literal translation of another word that only means of.

6              MR. NEIMAN:  Well, your Honor, all I can tell you is

7    that we've translated it as "of."  Their expert uses of when he

8    describes what it means.  So both sides say of.  And so --

9              THE COURT:  I guess they have the heavier burden here

10   because your argument is that even if "of" can mean more than

11   one thing, it is not clear and unambiguous.

12             MR. NEIMAN:  Exactly.

13             THE COURT:  Your argument has got to be that of can

14   mean only one thing, that it means ownership, it designates

15   ownership.

16             MR. NEIMAN:  That is exactly right, your Honor.  That

17   is exactly our position.

18             In addition, I think there are things that reinforce

19   why our position -- our reading of "of" is really much more

20   logical than their reading.

21             THE COURT:  There seems to be two issues for me, and

22   they are not as clearly articulated by the parties.  Even if

23   you are right, why is that an issue for a motion to dismiss the

24   pleadings at this stage of the proceeding?  I can't tell from

25   the pleadings whether or not you are right or they are right.

C9rdcamm
                           Motion

 1   I can only tell from some further evidence by somebody who can

 2   make it determinative one way or the other.

 3        MR. NEIMAN:  I don't agree with that, your Honor,

 4   because I think the legal test here that they have to meet is

 5   that it is clear and unambiguous and survives translation into

 6   English in a way that a person can read it and understand it --

 7        THE COURT:  Yes, but what about --

 8        MR. NEIMAN:  This is what they've identified as the

 9   law that meets that test.

10        THE COURT:  I don't whether it is clear and

11   unambiguous in either French or Cambodian.

12        MR. NEIMAN:  That is exactly right, your Honor.  That

13   is not the standard.  Let me just explain how the court

14   approached this in McClain, which may be helpful in thinking

15   through why we've come to the conclusion that this is an

16   appropriate argument to address at the motion to dismiss phase.

17        In McClain the facts were in the first trial the

18   government puts two experts on the witness stand and the

19   defense puts none.

20        THE COURT:  That wasn't a motion to dismiss.

21        MR. NEIMAN:  No.  Just to give you the context of why

22   we think this is the kind of issue you can resolve.

23        And in that case both experts say, look, Mexican law

24   from 1897 has been Mexico owns everything, and the Court of

25   Appeals says, well, we hear you say that but we look at what

C9rdcamm
                              Motion

 1   the law actually says and it is just not clear that that's what

 2   it says, and they throw out the conviction?  OK?  They don't

 3   say I need to have two experts so I can resolve this.  They say

 4   you haven't met your burden.

 5          THE COURT:  No.  They say that the evidence that was

 6   presented alone did not support such a claim.  They did not say

 7   that the claim that was originally made had to prove that fact.

 8          MR. NEIMAN:  Well, your Honor, again, I think the

 9   point is, as we would see it, first of all, this is not a fact

10   question, this is a question of law.  OK?  Foreign law is set

11   forth in the rules.  It is an issue of law for the Court to

12   decide.

13          THE COURT:  Well, no, it is not an issue of law.  I

14   know what the law says.  I just don't know what the language

15   says.  It is not an issue of law.

16          If you tell me what definitively the language says,

17   then I can tell you what the law is that controls, and the law

18   is not very difficult on that issue.  If the language as it's

19   interpreted does not mean ownership, does not mean

20   unambiguously clear ownership, then you win.  If the language

21   as interpreted can only reasonably be interpreted as ownership,

22   then you lose on that.

23          MR. NEIMAN:  Here's where I disagree with you on

24   that --

25          THE COURT:  That is not a legal question, that is a

C9rdcamm
                              Motion

1   question of translation.

2            MR. NEIMAN:  I actually don't think that is the legal

3   test, your Honor, and here's why.  And this is what I was going

4   to next, which is what happens in the second <u>McClain</u> trial.

5            In the second <u>McClain</u> trial the government puts on

6   seven experts who all say this is the right interpretation of

7   the statute.

8            THE COURT:  Right.  I assume they got past the motion

9   to dismiss.

10           MR. NEIMAN:  Well, it is a criminal case, your Honor.

11  There is no --

12           THE COURT:  It is a criminal case, right.

13           MR. NEIMAN:  And the Court says, OK, yeah, you have

14  seven experts who said this, but the fairness test, the due

15  process test is can you translate this into English so that it

16  is sufficiently clear that an American who reads it in

17  translation would understand what it meant?

18           THE COURT:  Suppose they say they can do that.

19           MR. NEIMAN:  Well, if it is clear enough, fine.  In

20  the '72 Mexican law, it says, you know, all historic monuments

21  are the property of the state.  That is not an exact quote,

22  your Honor, but that is the gist of it.

23           THE COURT:  It was much clearer in that case and the

24  language was more direct with regard to that.

25           But, again, you know, I don't disagree with your

C9rdcamm
Motion

premise.  Let's work backwards.  I don't think I disagree with
your premise if at the end of the day if they can't demonstrate
that the language that was written, in whatever language it was
written, that it doesn't clearly and unambiguously mean
ownership, I don't disagree with you that they will not be able
to seize the statue and forfeit.

But the question now is how much of that do I say at
this stage of the proceeding has to be in the complaint.  Your
argument is that it's got to be, even if they say it is clear
and unambiguous, if the translation that's available now is not
itself clear and unambiguous, that means the original language
is not clear and unambiguous and they cannot possibly prove
some other way that some other translation or some other
evidence at the time that it is clear and unambiguous.

MR. NEIMAN:  Let me explain why I think this is
something that you can resolve at this stage, your Honor.  And
I think there are two different tracks here that I want to
suggest to you.

First, I think if you look at what the Second Circuit
says in Schultz and what the Fifth Circuit says in McClain, it
is a legal issue for the court to resolve.  That is the first.

THE COURT:  What is a legal issue?

MR. NEIMAN:  Whether the foreign law is clear and
unambiguous.

THE COURT:  Not whether the translation is accurate.

C9rdcamm
                              Motion

1           MR. NEIMAN:  OK.  Your Honor --

2           THE COURT:  That is a factual question, right?

3           MR. NEIMAN:  Fair enough.  If the government stands up

4   and says we think that the translation is wrong, you might need

5   to resolve that question.  Fair enough.  I don't think the

6   government has suggested that, because their expert -- and I'll

7   just quote you, if you want, what he says about this passage.

8   He reads it the same way we do.

9           THE COURT:  But he says his translation means

10  ownership.

11          MR. NEIMAN:  Well, your Honor, he comes up with the

12  same words.  In fact --

13          THE COURT:  I know.

14          MR. NEIMAN:  In fact, he doesn't say it means

15  ownership.  The government then says, in other words,

16  ownership.  So it is not what he says.

17          Let me just read you what he says.  This is from the

18  affidavit of Mr. Rendall and it is in paragraph 30.

19          He says:  "The Prakas" --

20          That is this May 16th Decree.  This is the second

21  sentence.

22          -- "provided that both the immovable and movable

23  objects situated within the limits of the territorial union of

24  Indochina that are listed and enumerated in the tables annexed

25  to that Prakas, are classified as the historical monuments and

C9rdcamm
                              Motion

1   objects of French Indochina."

2           It is the exact same language that we have your Honor.

3   So there is not a translation dispute here.  The question is is

4   that language itself clear and unambiguous?  The test is if it

5   survives translation and is something that is clear and

6   unambiguous, we both translated it the same way, and I think it

7   is on its face simply not clear.

8           THE COURT:  That is not the only language they rely

9   upon.  They rely upon specific language with regard to this

10  site.

11          MR. NEIMAN:  That is the language regarding this

12  particular site, your Honor.

13          THE COURT:  No.  I thought there was further language

14  they included that identified this site a being classified --

15          MR. NEIMAN:  Oh, it is on the list.

16          THE COURT:  I thought it was more than just on the

17  list.  I thought there was something referenced with regard to

18  the --

19          MR. NEIMAN:  I don't believe there is, your Honor.

20          THE COURT:  OK.

21          MR. NEIMAN:  I think that's it.  I think they have a

22  long list, and it is prefaced with this language.  And their

23  claim from their brief is this is what they say the May 16,

24  1925 decree specifically classified Koh Ker and Prasat Chen as

25  historical monuments belonging to Cambodia.  That is their

C9rdcamm
                                    Motion

 1   theory.   The problem is their decree just doesn't say that.

 2          Now, they may have an argument that they're trying to

 3   make that if you read everything in context and you have

 4   perfect knowledge of everything that Cambodia has ever done and

 5   everything the French Colonial Regime has ever done, that if

 6   you did all of that interpretation, that they would have a

 7   better view about Cambodian law.   That is their argument.

 8          We don't agree with that but we don't even think that

 9   argument addresses the legal test, because the legal test that

10   is set forth in cases like McClain and Schultz says:   Can you

11   read it?   Is it fair to hold Americans to this standard?   Can

12   they read this and understand what it means?   All you have to

13   do is read it.   And you can't because "of" can mean lots of

14   things, but it certainly can mean this is just located in

15   French Indochina.

16          And, secondly, we think that is the far more plausible

17   reading when you think about a couple of factors.   One is that

18   French Indochina, which is the supposed recipient of ownership

19   here, is the geographical region.   It comprises six different

20   colonies at the time in what are now modern day Laos, Vietnam

21   and Cambodia.   It wasn't a political body --

22          THE COURT:   Well, it was a political body.   It was a

23   colony at the time that was governed by the French government.

24          MR. NEIMAN:   Just to be clear about that, your Honor.

25   There is something called the Indochinese Union, which is a

C9rdcamm
                                   Motion

 1    term that is used elsewhere in this very decree, that is the

 2    political body.  And then there is a geographic area, French

 3    Indochina, which is something very different.  I mean, they may

 4    not be different in terms of what they cover, but one is a

 5    geographical term and one is a political term.

 6              If you look at this article itself, it says -- it

 7    talks about the territorial limits of the Indochinese Union.

 8    That is the political body.  And then at the end it talks about

 9    the things that have historic value to French Indochina.

10              So that is one point --

11              THE COURT:  That is not a particularly compelling

12    argument, since this is the Official Journal of France and it

13    was presented by the Interim Governor General of Indochina,

14    Commander of the Legion of Honor.

15              MR. NEIMAN:  Yes, your Honor.  That's --

16              THE COURT:  So he obviously has some government

17    authority over the things that he's talking about.

18              MR. NEIMAN:  No doubt, your Honor, that there is a

19    political body called the Indochinese Union, of which there is

20    a governor.  But my understanding from the people that we've

21    spoken to about this is that French Indochina is not how one

22    would refer to that political body, and that is the term that

23    they chose to use here.

24              THE COURT:  Well, that is the term that the Interim

25    Governor of Indochina -- he obviously is the Interim Governor

C9rdcamm
                              Motion

1    of some political body.

2              MR. NEIMAN:  The Indochinese Union, your Honor.

3              THE COURT:  Right.

4              MR. NEIMAN:  Which is not the same thing as the

5    language used here.

6              THE COURT:  What difference does it make?  That is

7    semantics.

8              MR. NEIMAN:  If you are looking for a clue --

9              THE COURT:  You might say I am the President of

10   America, that doesn't mean that I am not the President of the

11   United States.

12             MR. NEIMAN:  Fair enough, your Honor.  But if what you

13   are looking for is a clue in the context to what the words

14   mean, one would expect if you were giving title to property in

15   these words, you would use the entity that was capable of

16   owning the property, the Indochinese Union, rather than the

17   geographical area.

18             THE COURT:  The only problem with that argument is

19   that then to accept that argument I would have to conclude that

20   this whole document was a waste of time and it granted no

21   powers at all for any government entity to protect the

22   antiquities --

23             MR. NEIMAN:  Absolutely not, your Honor, and let me

24   explain why that is not right.

25             THE COURT:  So if they have the authority to do that,

C9rdcamm
                              Motion

 1    they have the authority to say that we're also asserting

 2    ownership over these antiquities.

 3           MR. NEIMAN:  Your Honor, let me just be clear about

 4    two points here.  OK?  We're not saying this was a decree that

 5    had no effect.  OK.  This decree had an effect.  The effect was

 6    to say that certain protections that go with classification

 7    apply to everything on this list.  Those classifications are

 8    things kind of like being a landmark, you are not supposed to

 9    tear it down, and things like that.

10           THE COURT:  Yes.  But the authority to classify is no

11    different than the authority to assert ownership.

12           MR. NEIMAN:  Absolutely, your Honor.  We're not

13    saying --

14           THE COURT:  So you are not saying Indochina or

15    something more specific.  If this is a document that is

16    asserting authority to classify and protect antiquities, it

17    clearly, if it expressly says so, can still constitute a

18    document that asserts authority of the right of ownership of

19    that.

20           MR. NEIMAN:  Yes.  I'm sorry.  I hadn't made my point

21    clear, your Honor.  Let me just try and walk you through it,

22    and then I will move on.  There are plenty of other points

23    here, but I do want to try and make sure I have made this point

24    as clear as I can.  I clearly haven't explained it properly

25    yet.

C9rdcamm
                                  Motion

1            THE COURT:  So I am just not sure what difference it

2       makes.

3            MR. NEIMAN:  OK.

4            THE COURT:  I understand your point, but I don't

5       understand in what way it advances your argument one way or the

6       other.

7            MR. NEIMAN:  Here is the difference it makes.  If what

8       you were doing was declaring that certain things belonged to

9       somebody, that it was their property, you would want to be

10      specific and accurate in describing whose property it was.

11      That's our point.  And, therefore, we think it is more likely

12      you would use the term that describes the person who could own

13      the property rather than simply that describes the geographical

14      area.

15           THE COURT:  If I am the Interim Governor General of

16      Indochina, however, you describe it, and I am asserting this

17      authority, what else does anybody need to know?  We know who

18      the Interim Governor General was and we know what authority he

19      had.  So whatever he calls himself, he could call himself the

20      king of the world but if he is asserting -- if that is the only

21      authority he has as the Interim Governor General of the colony

22      over which the French have governmental control, that is the

23      authority he is asserting no matter what he says in this

24      document.

25           MR. NEIMAN:  Your Honor, I am not talking about the

C9rdcamm
                              Motion

1    authority of the governor.  That is not the point that I am

2    making at all.  The only point I am making, and then I will

3    move on, is that if you thought what you were doing was

4    transferring ownership to somebody in this document and you

5    were the governor of the Indochinese Union, the political body,

6    and you were saying that the Indochinese Union now owns this

7    stuff, what you would say is I'm giving this property to the

8    Indochinese Union.

9              THE COURT:  I still don't understand that argument but

10   we could move on.  If I was trying to classify this property so

11   that I could protect it from looters, I had just as much

12   incentive to do what you just said, and that's not what was

13   done, if I accept your argument that they are only classifying

14   it for protection to protect it as a government property.

15             MR. NEIMAN:  That is a very good point, and let me

16   explain why it actually supports our reading of this.  Because

17   when he is talking about -- if you look at the sentence, it

18   says:  "The tangible items located within the territorial limit

19   of the Indochinese Union."  That is what is going to get this

20   protection.  OK?

21             THE COURT:  All right.

22             MR. NEIMAN:  He uses the proper term, "Indochinese

23   Union."  And he says, "as are listed in these tables."  And

24   then he says they are classified; that is the legally

25   significant thing that makes them landmarks.  And then he says

C9rdcamm
                              Motion

1    they are classified among the monuments and historic objects of

2    French Indochina.  And our point is just having specified the

3    legal territory and having specified the consequence, that is,

4    classification, if you were also trying to do something else --

5            THE COURT:  You would describe it as the Indochinese

6    Union.

7            MR. NEIMAN:  Exactly.

8            THE COURT:  And he did describe it as the Indochinese

9    Union.

10           MR. NEIMAN:  No, your Honor, not when he was referring

11   to -- not immediately after the "of," which is the crucial

12   point here.  They are saying that this establishes that it

13   belongs to something because the something is what comes after

14   the "of."  OK?  Our point is just the something is not the body

15   that you would designate as the owner if you were trying to --

16           THE COURT:  So you are saying that the Indochinese

17   Union is not designated as the owner, it's just the general

18   region of what is referred to as the greater French Indochina

19   that is being described.

20           MR. NEIMAN:  That is right.  That makes it much more

21   plausible for us that this is a description of location rather

22   than ownership.  That is the whole point, your Honor.

23           But I will move on.  I think there is another point

24   here, and that's the structure point, that I think supports our

25   reading.  And that is that, as we've cited in our briefs, you

C9rdcamm
                              Motion

 1   know, it is very clear that there were procedures available

 2   under the French decrees to claim ownership.  You could assert

 3   a claim at the time of a new discovery.  You could assert a

 4   claim at the time of sale.  There were time limits set up

 5   around those things.  There were very specific procedures

 6   created.  There were references to having procedures to

 7   expropriate property, all of those things which are different

 8   from just classifying something.  And structurally it doesn't

 9   make sense, given that you have all of these things that make

10   clear that classification is not the same thing as ownership,

11   to say that because they were classified, they were owned.  It

12   is just not logical.

13              THE COURT:  I understand.

14              MR. NEIMAN:  OK.  So, your Honor, that is the first

15   point that we want to urge on you is that this is an issue that

16   you can decide right now.  This is clear and unambiguous.

17   There is not a dispute about the translation.  And we think on

18   its face it is simply not unclear, and we think that we have

19   much the better of the reading.  That is the first point I want

20   to make.

21              And, by the way, just one more point underlying that.

22   I think, you know, the plausibility of the reading the

23   government has offered is really undermined by the fact that

24   they put in a 49-page expert affidavit and they have not been

25   able to identify one instance where anybody has interpreted

C9rdcamm
                                    Motion

 1   this language as meaning what they say it means.  They don't

 2   have an example of that in the 87 years, and I think that is

 3   telling.

 4         So that's the first point.  We don't think the clear

 5   and unambiguous test is satisfied.  We think that is sufficient

 6   to warrant dismissal.

 7         The second point I want to talk about just a little

 8   bit today is the good faith purchase by Ms. Ruspoli in 1975 --

 9   Ms. Ruspoli and her husband.  You are quite correct, he is

10   actually the buyer through the corporation, and she ultimately,

11   through various family transactions, comes to be the owner

12   herself personally.

13         I think, as we've said in our briefs, there is an

14   English law that says even if there is a theft somewhere back

15   in the chain of title, if you bought and a claim isn't asserted

16   within six years, the original owner's claim is extinguished,

17   you have good title, unless your purchase was related to the

18   theft.  That I think both sides' expert agree is what the

19   English law is.

20         And our view is there is no evidence at all cited in

21   the complaint that would allow the Court to form a reasonable

22   basis to believe that the government will succeed in meeting

23   its ultimate burden here at trial of establishing that

24   Ms. Ruspoli didn't get good title and, therefore, that this

25   object remains stolen at the time it was being purchased --

C9rdcamm
                              Motion

 1          THE COURT:  The way you characterize it is not their

 2  burden in this case.  They don't have to demonstrate that they

 3  will ultimately succeed in demonstrating that and proving that

 4  at a trial; that is not the standard.  The standard is whether

 5  or not they have pled sufficient factual allegations to put you

 6  on notice that that's what they intend to do.

 7          MR. NEIMAN:  I don't agree with that, your Honor.  I

 8  think if you look at Rule G of the Admiralty Rules, the

 9  standard that they have to meet -- and, frankly, I think

10  they've acknowledged this in their brief -- includes what you

11  have just said, but it also requires that they establish a

12  reasonable basis to believe that they will be able to meet

13  their ultimate burden of proof at trial.  That is what Rule G

14  says.

15          It is G(f)(2), I think it is.  I can find it exactly

16  for you, if you want.  So I think that is the legal standard --

17          THE COURT:  The legal pleading standard?

18          MR. NEIMAN:  Yes, you Honor.  I will read it to you.

19          It is Rule G of the Admiralty Maritime Claims

20  Supplemental Rules.

21          THE COURT:  What page are you on?

22          MR. NEIMAN:  It is page, in my book, 325.

23          THE COURT:  OK.

24          MR. NEIMAN:  And this is what the complaint must do.

25  Rule G(2):  "The complaint must" -- and if you look down at (f)

C9rdcamm
                            Motion

1   -- "state sufficiently detailed facts to support a reasonable

2   belief that the government will be able to meet its burden of

3   proof at trial."

4            THE COURT:  OK.

5            MR. NEIMAN:  And if you look at the government's

6   brief, they acknowledge this.  If you look at page 9 of their

7   brief, they say, quoting the Second Circuit in Daccarett:  "In

8   other words, the complaint need not allege facts sufficient to

9   show that specific property is tainted, but facts sufficient to

10  support a reasonable belief that the government can demonstrate

11  probable cause," which the pleading was the ultimate proof

12  burden at trial in that case on the facts there.

13           THE COURT:  Well, it is hard to accomplish.  If not,

14  maybe I take it you think that there was a reasonable belief.

15           MR. NEIMAN:  Yes.

16           THE COURT:  You said that they had to meet the burden

17  of proving a showing that they can prove at trial.

18           MR. NEIMAN:  Your Honor, I misspoke if I said that.  I

19  apologize.  The legal standard, the pleading standard is a

20  reasonable basis to allege sufficiently detailed facts to

21  support a reasonable basis to believe they can meet their

22  burden at trial.  And they have alleged, in our view, no facts

23  that will suggest --

24           THE COURT:  They claim that it was stolen from

25  Cambodia and they bought it when she knew it was stolen.

C9rdcamm
                              Motion

 1          MR. NEIMAN:  They haven't.  Your Honor, there is no

 2   allegation in this complaint that Ms. Ruspoli knew this was

 3   stolen at the time she purchased it -- none.  You can ask them

 4   that.  They won't be able to point to you any allegation.

 5          THE COURT:  Well, they made argument that they should

 6   be allowed to prove it.

 7          MR. NEIMAN:  OK.  But the question is have they

 8   alleged specifically in the complaint sufficiently detailed

 9   facts to make a reason belief that they will be able to prove

10   it.  That is the standard that they have to meet.  And they

11   have alleged no facts at all, and so I don't think they have

12   met their standard.  OK.

13          There has been some argument or some suggestion from

14   them that English law might not be the relevant law here, and I

15   am happy to speak to that for a minute.

16          The government has not said what law they think does

17   apply, or whether there would be a different consequence under

18   the law in some other jurisdiction.  And I would suggest really

19   it is on them, if they think we've picked the wrong law, to

20   explain which law they think does apply, why, and why that law

21   would be different.  But --

22          THE COURT:  I wasn't clear from your papers whether or

23   not your position was that this remained in Britain sitting

24   there for a significant period of time.

25          MR. NEIMAN:  We did not, your Honor.  But our expert

C9rdcamm
                                    Motion

1    opines that an English court would nonetheless apply English

2    law in this context.  And we think it's quite reasonable to say

3    that it's the law of the place of the purchase.  And, in fact,

4    if you look at what happens in Portrait of Wally, which we've

5    cited in our brief, you know, in that case they applied the law

6    in the place where the transactions had occurred as well.

7             The government, you know, may have made -- you know,

8    had an opportunity here, your Honor.  If they thought that we

9    were wrong in saying whose law applied or whether they thought

10   there was some other law that applied that would be different,

11   they --

12            THE COURT:  I thought they did say that they weren't

13   sure that British law applied.

14            MR. NEIMAN:  Yes.  But they didn't do the other things

15   I am talking about; that is, they didn't say we think it is

16   this law and here's why.  Nor did they say -- and that law is

17   different.  Until you have them saying either of those things

18   and explain why, we put forth the law that we think follows

19   from Portrait of Wally and that seems perfectly rational to

20   apply here and which, you know, has a consequence that we think

21   is very significant to this case.  That was fully teed up in

22   our opening brief, and the chance for government to come back

23   and say that is not the right analysis, they had their chance

24   and they haven't suggested it is something else.  They just

25   said, you know, it could be, which I don't think meets their

C9rdcamm
                              Motion

1   obligation at this stage.  That is the second point.

2            The third point is on that same pleading burden, have

3   they met the burden of pleading sufficient facts to establish

4   that Sotheby's knew that this was stolen, which would, of

5   course, require Sotheby's to know a whole lot of stuff.  You

6   would have to know what Cambodian law was.  You would have to

7   know when this thing came out of Cambodia.  You would have to

8   know the area within Cambodia it had come from.  A lot of stuff

9   you would have to know.  And, also, you would have to know that

10  Ms. Ruspoli didn't take good title when she and her husband

11  bought it back in 1975.  A lot of stuff you would have to know

12  in order to come to the conclusion that this was stolen.

13  Starting first in the period prior to importation, which is the

14  relevant period for two of the three periods the government has

15  here.

16           There is no evidence that Sotheby's knew what the

17  specific site was where this came from, what Cambodian law was

18  as to that site, how --

19           THE COURT:  Well, I thought it was fairly clear what

20  site this came from.

21           MR. NEIMAN:  Your Honor, I am talking now the period

22  prior to importation.  The period prior to importation, the

23  only evidence is that this was known to be in the style of Koh

24  Ker, which is a large multi-thousand-acre setup.

25           THE COURT:  There doesn't seem to be any basis for me

C9rdcamm
                              Motion

1    to conclude that when Sotheby's imported it into the United

2    States, at the time they imported it into the United States

3    they didn't have a pretty good idea where this came from.

4              MR. NEIMAN:  Well, your Honor, the question is how

5    specific did they have to know, because the government's theory

6    of ownership here is a quite specific one which has to go with

7    a particular temple showing up on a particular list.

8              THE COURT:  I'm not sure at what point you say that

9    Sotheby's knew that the statute was lopped off at the feet and

10   knew that those feet matched the feet that were still at the

11   site.

12             MR. NEIMAN:  Your Honor, that didn't happen until June

13   of 2010, which is two months after the importation.

14             THE COURT:  I can't tell that from the complaint.

15             MR. NEIMAN:  That in fact was alleged in the

16   complaint.

17             THE COURT:  That they didn't know that until then?

18             MR. NEIMAN:  No.  But that is the first time there is

19   any fact alleged in the complaint that would suggest that they

20   did know that, to be clear.  Sorry about that, your Honor.

21   Absolutely.

22             THE COURT:  Sotheby's is a sophisticated company.  I

23   think Sotheby's has clearly enough experience to know that this

24   wasn't a gift from the Cambodian government.

25             MR. NEIMAN:  Let me just give you some facts that are

C9rdcamm
                                    Motion

1   set forth in the complaint that I think put this in a very

2   different context from which your Honor has just suggested of

3   the things that Sotheby's knew relative to this.  One is they

4   had provenance going a long way back, almost 40 years, and

5   leading to a reputable dealer in London.  That is a favorable

6   fact.  The second is that they --

7        THE COURT:  So does Indiana Jones, but that doesn't

8   mean that a particular item is stolen or not stolen.

9        MR. NEIMAN:  There is a lot more to this list, your

10  Honor.

11       THE COURT:  I understand that.  Look, Sotheby's

12  clearly had enough notice that they thought it was appropriate

13  to make some inquiry as to whether or not it would be

14  appropriate to sell this item.  So they clearly wanted to

15  satisfy themselves minimally that it wasn't in fact stolen.  I

16  think Sotheby's probably could assume what we can all assume,

17  that if the statute was lopped off at its feet, that maybe this

18  might have been something that was -- they knew the general

19  region it came from, even if they didn't know exactly where it

20  came from, and it was obviously taken from someone under some

21  circumstances that might imply that they just walked into the

22  forest and took it.  And, you know, I mean, if you tell me that

23  they were getting ready to auction off a mummy from Egypt, I

24  would not go into any particular inquiry at this stage of the

25  proceedings as to whether or not they should have reasonably

C9rdcamm
Motion

 1    known that there is a good chance somebody might have stolen

 2    that out of Egypt.

 3         MR. NEIMAN:  Well, your Honor, a couple of points that

 4    I want to make with regard to that.

 5         I think, first of all, with regard to the feet, the

 6    government tries to have it both ways a little bit.  I mean,

 7    they have a problem, which is that there is this archeological

 8    survey they have cited in their complaint, the Parmentier

 9    survey, where a guy went to this very site in 1939, or at

10    published in 1939 a detailed survey of the site, including the

11    very place where the statute, which is five-feet tall and

12    three-feet wide and has a companion that is the same size, is

13    supposedly standing, on the government's theory, and he doesn't

14    say anything about the statue.  He describes other statues.

15    And the government's explanation to that is, well, you know, it

16    could have been kind of hidden by underbrush and rubble, or

17    whatever, which tends to suggest it is not still on its feet

18    anymore.  But then when you get to the point where they want to

19    say --

20         THE COURT:  They are surprised that it is not there

21    anymore.  As you say, it is six-feet tall and three-feet wide,

22    I mean, even if it was not on its feet, somebody might stumble

23    over it.

24         MR. NEIMAN:  Exactly.  Our theory is it wasn't there

25    at that time and we win the case on that theory.

C9rdcamm
                                Motion

1            THE COURT:  I understand.

2            MR. NEIMAN:  But their theory is it was there.  Their

3    theory can't be and I don't understand them to be saying it was

4    there, it was standing up, but somehow nobody saw it.  They

5    figure it has to be it was literally knocked over back then.

6    But then when you get to 1975 --

7            THE COURT:  I am not sure that that is necessarily

8    their theory.  I don't know how deep the brush is.  I don't

9    know whether it is standing up, not standing up, you know,

10   hidden by brush --

11           MR. NEIMAN:  Maybe their theory is that it was still

12   standing on its feet, it was six-feet tall and three-feet wide

13   and no one could see it.  I will let them articulate that, if

14   that is their theory.  I am just trying to point out that I

15   think they are actually trying to have it both ways a little

16   bit.

17           THE COURT:  Well, I don't think that that is what the

18   government says.  It seems to me that the real question is how

19   thorough a survey was done.  If somebody walked around the site

20   and did a thorough survey and didn't find it, I would imagine

21   they would say it wasn't there.  And if somebody walked around

22   the site and just did a superficial survey of the items, they

23   might have missed it.  They might not even have gone into this

24   area.

25           MR. NEIMAN:  Fair enough.  We supplied you, your

C9rdcamm
                                    Motion

1     Honor, with six pages that describe what the surveyor saw at

2     this site, and he had, you know, placed measurements of things

3     at a hundredth of a meter.  So I think there is a pretty fair

4     inference that what is described is a careful --

5              THE COURT:  There is nothing in the survey that

6     specifically describes the area where this site --

7              MR. NEIMAN:  No, that is not correct, your Honor.

8     We've submitted this to you, and here's what the survey said.

9     I am going to give you the translation.

10             THE COURT:  You know the feet were at least there, and

11    they didn't do a thorough enough survey to say we saw two pair

12    of feet for a large statue and the statue was missing.

13             MR. NEIMAN:  Your Honor, here's what they said about

14    the very specific spot where the government's allegation is the

15    feet were:  "Gopura I West" -- that is the spot where this

16    supposedly was -- "is in complete ruin.  Only its west gate is

17    recognizable and it is indicated only by its jambs and by a

18    colonette of the usual shape here.  The one on the east appears

19    to have been rendered in prasat style, with two opposing doors,

20    without porticos" -- it goes on.

21             THE COURT:  How large an area do you contend is being

22    described there?  I assume you don't know.

23             MR. NEIMAN:  No.  Your Honor, I think the whole site

24    is not --

25             THE COURT:  I am not talking about the whole site.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

C9rdcamm
                              Motion

 1   How large an area do you say that is being described there that
 2   would infer that if it was there he must have seen it?
 3           (Pause)
 4           I mean, it describes a specific area.  How large an
 5   area do you say that is?
 6           MR. NEIMAN:  Well, the enclosure to, which I think
 7   is -- I mean, there is a map, your Honor.  I am not making this
 8   up.  There is a map and there is a scale in the map.  I am
 9   happy to take a more careful look at this and try and give you
10   a more precise idea of the size, if that is important to you.
11           THE COURT:  I mean, it shouldn't be important because
12   I shouldn't have to go through this at this stage of the
13   proceedings --
14           MR. NEIMAN:  I was about to say exactly that.  I
15   didn't try to make that a larger point here.
16           THE COURT:  I don't know whether or not the size you
17   were describing is the size of this room, the size of this
18   floor, or the size of this block.
19           MR. NEIMAN:  That is a fair point, your Honor.
20           THE COURT:  With brush.
21           MR. NEIMAN:  Yes.  I didn't really want to get hung up
22   just on this point.  There is a sort of a longer list that I
23   wanted to make sure you had before you as you thought about
24   this.
25           THE COURT:  I think I already have the list.

C9rdcamm
                            Motion

 1          MR. NEIMAN:  OK.  The one is, you know, provenance

 2   going back a good long way which -- and certainly goes back,

 3   you know, longer than the modern nation of Cambodia, which

 4   comes into existence in the early 1990s.  OK.

 5          There is the fact that there is the twin of this

 6   statue which has been on display in a museum in Los Angeles

 7   which is identically situated in terms of provenance:  Also

 8   bought at Spink in the same time as this statue was bought.

 9   Her feet are off still in Cambodia.  The Cambodian authorities

10   have known about this for a long time.  And they have never

11   made a claim to it.

12          So, again, if you are trying to put yourself in

13   Sotheby's shoes and say, well, what did they know, they knew

14   that Cambodia never asserted that it owned something that was

15   essentially identically situated and quite out there in the

16   public.  OK?  That is two.

17          Three is they knew, from what they were hearing from

18   the art historian, that she had spoken to Hab Touch, which is a

19   very senior person in the Cambodian Ministry of Culture, the

20   same person that the government's expert ended up relying on to

21   help explain Cambodian antiquities law, and that Hab Touch is

22   saying, according to what Sotheby's is being told at this time,

23   that Cambodia is not interested in going after things that left

24   years ago when there were no restrictions.

25          THE COURT:  Well, you skipped over what they were

C9rdcamm
                              Motion

 1   first told.  They were first told that they shouldn't sell it

 2   because it is probably stolen.

 3          MR. NEIMAN:  Well, it was actually slightly worse than

 4   that, your Honor.  I think what she said was that it was

 5   definitely stolen.

 6          THE COURT:  Yes.  Which makes it sad and it is quite

 7   fair and generous of them, you are right.

 8          MR. NEIMAN:  That is what she said.

 9          THE COURT:  They have a combination of information

10   that at least -- because, remember, your argument goes to

11   whether or not they knew it was stolen; if it was stolen,

12   whether they knew it was stolen when they imported it but,

13   also, whether they knew it was stolen thereafter --

14          MR. NEIMAN:  Correct.

15          THE COURT:  -- while it was in the United States.

16          So your argument is even though she told them it was

17   stolen, they shouldn't sell it, because she later on changed

18   that view -- and she is really not a lawyer so she doesn't know

19   whether or not they got a legal right one way or the other --

20   that when she sort of satisfied herself later that she was

21   wrong and it wasn't stolen, that it was appropriate for them to

22   rely on that and rely on what the Cambodian government

23   initially said in terms of their interest in this because

24   ultimately what they say is that we want it back.

25          MR. NEIMAN:  No question, your Honor, they ultimately

C9rdcamm
                            Motion

1    came to that view, but the timing after we are trying to

2    measure what Sotheby's mental state is, right?  But --

3          THE COURT:  I'm not quite sure with regard to the last

4    issue what timeframe that you say is critical, because the

5    question is at any time when they had this item in the United

6    States, whether they knew this item was stolen, right?

7          MR. NEIMAN:  Well, on the third of the government's

8    three theories, your Honor is correct that possession, knowing

9    it to be stolen and to have been imported when it was stolen,

10   whether the knowledge related back to that time is relevant.

11   You are absolutely right about that, your Honor.

12         THE COURT:  So if there was a point in time when they

13   thought it was stolen and in fact it really was stolen, that

14   might meet that requirement.

15         MR. NEIMAN:  Your Honor, if they had come to that

16   conclusion --

17         THE COURT:  Right.

18         MR. NEIMAN:  -- they could have returned it.

19         THE COURT:  Well, that is not the issue.

20         MR. NEIMAN:  No.  But we've obviously laid out in our

21   brief at great length why we think this thing is not stolen.

22   So it is quite clear that Sotheby's does not today have --

23         THE COURT:  No.  What is clear is that Sotheby's has

24   an interest in selling it.  That doesn't prove one way or the

25   other that they really believe that it is not stolen.  Maybe

C9rdcamm
                                Motion

 1    they do and maybe they don't; the evidence seems to indicate

 2    they do or they don't.  But just because they want to sell it

 3    doesn't mean that they don't think it is stolen and they

 4    wouldn't want to sell it if even if were stolen.

 5          MR. NEIMAN:  I hope at some point to convince you that

 6    that's not how they think, but that doesn't have to be today,

 7    your Honor.

 8          THE COURT:  Right.  I can't make any assumptions about

 9    them knowing it is inappropriate.  The question is whether or

10    not -- on their third point, the question is whether or not

11    they have alleged sufficient facts to indicate that at some

12    point while they had possession of this in the United States

13    they had reason to believe that it was stolen and in fact it

14    was stolen.  Those two have to go hand in hand.

15          MR. NEIMAN:  Exactly right, your Honor.  And I would

16    just encourage you, first of all, as you think about this,

17    which is really only the third issue that we are talking about,

18    is -- you know, there are three separate forfeiture theories

19    here and ultimately it matters which go forward, because the

20    pre-importation theory has a different burden of proof

21    ultimately than the post-importation theory.  So I think it is

22    significant that there is different evidence as to the two

23    types, first.

24          Second, I think if you are looking at what Cambodia

25    said in the letter that they wrote to Sotheby's in 2011, one

C9rdcamm
                              Motion

1    thing they didn't say is that they owned the statue.  They

2    actually don't say that.  They say they would like it back, but

3    they don't say it is theirs, that they have a property interest

4    in it.

5              THE COURT:  Why do you think they want back?

6    Sotheby's is pretty sophisticated.  If the Cambodian government

7    says I want it back, I assume they are not asking you,

8    Sotheby's, to give them a gift of something that they could

9    auction off for a million dollars.

10             MR. NEIMAN:  Actually, your Honor, I think there is a

11   long history in this particular area, and I am not talking

12   about Cambodia specifically, but countries all the time say,

13   you know, this came from our country at some pint in the last

14   5,000 years; we would like it back.  That is not the same thing

15   as saying --

16             THE COURT:  Are you really arguing that Sotheby's

17   didn't reasonably interpret this as an assertion of their right

18   to this statue?

19             MR. NEIMAN:  Well, I am arguing that.  But even if

20   they did interpret it as an assertion of Cambodia's right to

21   the statue, which I don't think is what the letter itself says,

22   but clear enough --

23             THE COURT:  You think they are asking for a gift?

24             MR. NEIMAN:  Fair enough.  Even if your Honor is right

25   that that is an assertion, that doesn't end the question about

C9rdcamm
                              Motion

 1   whether it is reasonable to believe that Sotheby's knew --

 2          THE COURT:  Yes, but it is more consistent with an

 3   assertion of right of ownership than consistent with I don't

 4   own this, it is yours, you found it, nothing I can do about it.

 5          MR. NEIMAN:  No.  But the same letter, your Honor,

 6   just to be fair, the same letter also says that the twin, which

 7   has the identical provenance, belongs to the Norton Simon

 8   Museum.  The government, you know --

 9          THE COURT:  I'm not sure that the words were "belonged

10   to."  I thought it said it was either at or held by or in

11   possession of.

12          MR. NEIMAN:  No, your Honor.  That is not correct.  I

13   will quote it to you.

14          THE COURT:  Where are you quoting from?

15          MR. NEIMAN:  This is Exhibit 4 to my declaration in

16   connection with the motion, not to the reply declaration but to

17   the initial declaration in support of our motion to dismiss.

18          If you look, your Honor, at the second paragraph of

19   this letter, Exhibit 4, which is the letter which Cambodia asks

20   that the statue --

21          THE COURT:  OK.  I do see that.

22          MR. NEIMAN:  OK.

23          THE COURT:  It does say the statue now belongs to the

24   Norton Simon Art Foundation, Los Angeles.

25          MR. NEIMAN:  Exactly, your Honor.  One of the ironies

C9rdcamm
                              Motion

1    of this case is that on the one hand the government says, well,

2    when the Cambodians say it belongs to them, it doesn't mean

3    anything, but on the other hand the government says when they

4    say of that means belonging to.  So I think if you look at this

5    letter in context and ask what would it tell Sotheby's, I think

6    one thing it would tell Sotheby's is that Cambodia recognized

7    that a statue of identical provenance belongs to the Los

8    Angeles Museum.  The second thing it would say is that the

9    Cambodian government was asking Sotheby's to take the

10   opportunity -- if you look at the fourth paragraph, it says,

11   "In view of the tremendous historical and archeological value

12   of the statue, the government would like to take the

13   opportunity to request Sotheby's to pull the object from sale

14   and to facilitate its return to the Kingdom of Cambodia."

15        So I don't think it is actually the most logical

16   reading of this letter that is an assertion of ownership; it is

17   an assertion of the desire to have the statue back.

18        THE COURT:  Isn't that a factual dispute?

19        MR. NEIMAN:  Yes.  I am not asking your Honor to rely

20   on that as a basis for ruling in our favor.  On this motion I

21   am simply pointing out to you that as you wade through yourself

22   whether there is a reasonable basis to believe in either the

23   pre-importation or post-importation period.

24        THE COURT:  Because they are happy to let the museum

25   keep it on display in the museum doesn't necessarily mean that

C9rdcamm
                              Motion

1    they wouldn't want to assert a right against some private owner

2    who just wants to keep it in their own private collection.

3          MR. NEIMAN:  Fair enough, your Honor.  They certainly

4    could choose to have two different views as to the two

5    different objects; I don't disagree with that.

6          But I think one of the things that is really important

7    about this -- and this sort of folds back into the due process

8    and notice point that we started with -- is that, you know, if

9    the question is, you know, was it known, was it knowable that

10   Cambodia asserted, based on 1925 decrees, that it owned all of

11   this stuff, one thing that you would want to look at if you

12   were in Sotheby's position is, well, what has Cambodia done

13   historically over objects that have identical provenance.  And

14   what you would see was that Cambodia has not done anything.

15   And so --

16         THE COURT:  I don't see that in the pleadings.

17         MR. NEIMAN:  Well, I think where you see that, your

18   Honor, is that, well --

19         THE COURT:  I didn't see that in the proof.

20         MR. NEIMAN:  I think what you see in the pleadings is

21   no allegation they've done anything.  And I think what you see

22   in the affidavit that the government's expert has submitted is

23   no allegations they've ever asserted that these particular

24   decrees give them ownership in the fashion that the government

25   is now claiming it does.  I think that is relevant as you think

C9rdcamm
                              Motion

1    about the due process and notice issues.

2           So, your Honor, I think you have our points.  There is

3    the central due process issue, which I think is ripe for your

4    decision now.  There is the issue of Ms. Ruspoli's knowledge,

5    and I think there is nothing in the complaint that would cast

6    doubt on her good faith, and the government's burden is to

7    plead reasonable facts.  And I think there is no evidence in

8    the complaint, or elsewhere, cited by the government that

9    Sotheby's knew about this Cambodian law, which, after all, on

10   its face doesn't appear to say what the government says it says

11   and which takes the government's expert, you know, 49 pages to

12   explain why he thinks it means what he thinks it means.  There

13   is just no evidence that Sotheby's ever thought it meant that.

14   And if they didn't think it meant that, there was no reason for

15   them to think it was stolen.  Even if they thought that it had

16   come out from Cambodia in the 1970s, that wouldn't mean it was

17   stolen unless Cambodia had a law saying that they owned those

18   things.

19          So for all of those reasons, the government hasn't met

20   its burden of pleading sufficient facts to establish that it

21   will meet its burden of proof at trial.  They haven't met the

22   due process test.  And we think the appropriate step here is to

23   dismiss the complaint.

24          THE COURT:  Let me hear from the government for about

25   ten minutes and then we will continue this afternoon.

C9rdcamm
                              Motion

 1        MS. PAUL:  Yes, your Honor.

 2        In the government's view, the claimants' motion here

 3   is clearly premature.  The arguments that they are making are

 4   really not appropriate on a motion to dismiss.

 5        They have relied on cases which were decided after

 6   hearings and trials.  They haven't relied on cases that were

 7   decided at this stage of the proceedings.  And, in addition,

 8   they're suggesting that the relevant inferences be drawn in

 9   their favor, in the favor of Sotheby's and Ms. Ruspoli, rather

10   than in the government's favor.  And it is well-established

11   that on a motion to dismiss the relevant evidence -- the

12   relevant inferences should be drawn in the government's favor.

13        Starting with their argument regarding the Cambodian

14   national ownership laws, Mr. Neiman has referred to a

15   particular place from which Cambodia is claiming that it owned

16   all antiquities.  The particular place -- just to be clear, the

17   particular place at issue here is a Cambodian temple from a

18   Cambodian archeological site which was built by a king, and

19   that is alleged in our complaint.  So that's the baseline that

20   we start with.  That's where we've alleged this sculpture came

21   from -- a Cambodian temple built by a king.

22        And then we've alleged in the complaint that there is

23   a series of national ownership laws that reiterate the fact

24   that this is land that belong exclusively to Cambodia, to the

25   Crown, and was inalienable.

C9rdcamm
                              Motion

1           Mr. Neiman has said that the settled law is that there

2   has to be a clear and unambiguous national ownership law.  We

3   think we have that here.  And it is not just the May 16, 1925

4   decree that he cites to; it is, rather, a series of laws, going

5   back to before 1900, that establish that Cambodia owned this

6   piece.  And the reason we'd put in a very lengthy affidavit

7   from a Cambodian law expert is to just illustrate how that law

8   was reiterated again and again and again.

9           THE COURT:  Well, but you haven't cited to any law

10  that specifically referenced their ownership of the objects of

11  antiquity.  You cite a number of laws talking about their

12  ownership of land.  But where besides the May 16, 1925 decree,

13  what else are you relying on that specifically is clear and

14  unambiguous language that they own this statue?

15          MS. PAUL:  Yes.  We believe we have, your Honor,

16  beginning with a decree issued by the Governor General of

17  Indochina in 1900.  That is referenced in the complaint and in

18  the affidavit of our expert.  And the affidavit of our expert

19  actually quotes from the relevant language of the 1900 decree.

20          THE COURT:  All right.  Which is what?

21          MS. PAUL:  Which says, in essence --

22          THE COURT:  What page is that on?

23          MS. PAUL:  Well, if you turn to page 11 of our

24  expert's affidavit, paragraph 19, it is Article 17 of the 1900

25  decree.

C9rdcamm
                            Motion

 1            THE COURT:  I'm sorry.  Which page?

 2            MS. PAUL:  Yes.  It is page 11, paragraph 19 of the

 3     declaration of Matthew Rendall.

 4            THE COURT:  All right.

 5            MS. PAUL:  Which states that "ownership of art or

 6     archeological objects, buildings, bas-reliefs, statues, medals,

 7     vases, columns or inscriptions which may exist on or in the

 8     soil of immovable properties constituting a part of the

 9     national domain in Indochina or granted by the government to

10     private individuals shall be reserved for the domain."

11            So this actually doesn't even refer to any requirement

12     of classification.  What it says is that if a statue exists on

13     land that is part of the national domain, that statute, which

14     is itself a part of the national domain, is a state-owned

15     antiquity.  So starting with this 1900 decree, we think it is

16     clear that the statue here was located on property that was a

17     part of the national domain, which, again, is a Cambodian

18     temple built by a king.

19            And the claimants have made this due process argument

20     that it is somehow remarkable or unfair to read the law in this

21     way, but the government submits this is really the only

22     conclusion that makes sense.  If the Cambodian temple on which

23     the statue was found was not part of the national domain but

24     was on state-owned property, who did own it?  The claimants

25     have no alternative theory about who did own it.

C9rdcamm
                                    Motion

1           THE COURT:  Their theory is fairly simple.  If it is

2   not owned by the government, it is owned by whoever picks it up

3   off the ground and walks away with it.  I mean, isn't that

4   their theory?  And so, no, it doesn't have to be owned by

5   anybody in particular until somebody decides if they see it

6   lying there and they want to take it home.

7           MS. PAUL:  So then I guess their theory is that no one

8   owned it.  They don't have an alternative owner other than

9   Cambodia.  We don't think that one can reasonably be inferred

10  from the laws that we have cited.

11          THE COURT:  That could be inferred in every case

12  unless you have a specific clear and unambiguous law by the

13  nation that they do own it.  Without this decree and without

14  the 1900 decree and without the 1925 decree, it would be your

15  argument that nobody owned it, right?  They could walk in there

16  and pick it up because you have no law where the government

17  asserted any right over it.  So your argument would be that

18  nobody owned it.

19          MS. PAUL:  I don't think that is the case, your Honor.

20          THE COURT:  Who would own it -- if the 1900 decree and

21  the 1925 decree don't give ownership to the Cambodian

22  government, who do you say owned it?

23          MS. PAUL:  Well, even before the 1900 decree, it was

24  the establish law that in ancient Cambodia all land belonged

25  exclusively to the crown.  So the land --

C9rdcamm
                            Motion

1              THE COURT:  The land?

2              MS. PAUL:  The land, yes.  I think that's really what

3      is at issue here, whether the land belonged to the crown.

4              THE COURT:  No, that is not what is at issue.  We all

5      accept the proposition that the land belongs to the government.

6      Land belongs to the government.  But I'm in Yellowstone Park

7      and find $5, I am not going to say it belongs to the government

8      just because it is lying in the park.  That doesn't follow.

9              MS. PAUL:  Very well, your Honor.  Well, with that as

10     the baseline, that all land belonged to Cambodia --

11             THE COURT:  But that is pretty much true in every

12     situation even where the government has not asserted rights as

13     to their antiquity, isn't it?

14             MS. PAUL:  Yes, your Honor --

15             THE COURT:  So that is not determinative.

16             MS. PAUL:  I think the point I was trying to make is

17     that if you read it in conjunction, if you read it in

18     conjunction with the baseline that the land belonged to the

19     crown and then you read the 1900 decree, which says, in fact,

20     that all antiquities on property that's part of the national

21     domain are themselves state-owned, that's sufficient.  That's

22     was a clear and national ownership law.

23             THE COURT:  It seems to me your biggest hurdle --

24     well, not your biggest.  One hurdle is even if I were to accept

25     that that is a plausible argument, where in 87 years has the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C9rdcamm
                                    Motion

1    Cambodian government ever taken that position?

2              MS. PAUL:  The position that Cambodia was the owner of

3    the antiquities of this temple?

4              THE COURT:  The position that you are taking with

5    regard to this temple or any other temple.  The interpretation

6    that you are giving these decrees, am I to assume that not once

7    in 87 years has the Cambodian government ever relied on any one

8    of the decrees that the U.S. government is relying on to assert

9    their ownership over some antiquity?  I am not even sure they

10   have asserted that in this case.  It seems like the U.S.

11   government is asserting that, through this interpretation.  But

12   they didn't cite this as their interpretation when they asked

13   for the statue back, nor did they ever take this position in

14   almost 100 years.  This is the first time -- have you ever

15   heard this argument made by anybody else ever other than the

16   government in this case?

17             MS. PAUL:  Well, a couple of responses to that, your

18   Honor.

19             First, I think it overstates our burden at this stage

20   to say that we had to plead specific instances of times where

21   Cambodia has cited to the 1900 decree or the May 16, 1925

22   decree in an effort to recover its property.  I think that's

23   just not at this stage --

24             THE COURT:  Yes, but you are arguing just as strongly

25   for an inference as they are.  You are arguing for the

C9rdcamm
                              Motion

1    inference that they must own it because of these decrees.  But

2    that inference is significantly weakened by the fact that

3    they've never relied on any of these particular decrees to

4    assert any ownership over any antiquity.

5         MS. PAUL:  Well, I think, first, it is not necessary

6    for Cambodia to specifically cite to these decrees as it seeks

7    to enforce its ownership rights.  There is a series of decrees

8    that are reiterated over many years.  I don't think -- I think

9    it is too high a burden to place on Cambodia to say they needed

10   to cite to a particular one when seeking to recover an

11   antiquity.  I think it is clear that --

12        THE COURT:  Well, give me some context which you say

13   is an example that it may or may not be your burden at this

14   stage, and that is what I will have to resolve, but give me any

15   example whether Cambodia ever asserted ownership over the

16   antiquities and what their rationale for doing so was.

17        MS. PAUL:  I can give you some examples, your Honor.

18        THE COURT:  OK.

19        MS. PAUL:  I'll start with -- well, first, just

20   looking at our complaint, where I don't think we needed to

21   allege specific instances of enforcement, but we do quote from

22   an e-mail sent to Sotheby's in which Sotheby's is told about

23   seven pieces of Khmer art that are being returned to Cambodia.

24        THE COURT:  OK.  But that doesn't say that they are

25   asserting specific ownership based on any particular decrees

C9rdcamm
                              Motion

 1   that everyone should have understood that meant that they owned

 2   these antiquities.

 3        MS. PAUL:  That's true.  We don't specifically allege

 4   that in the complaint.  As discovery progresses, that is

 5   something that we may put forth but we need discovery in order

 6   to collect that information.

 7        Also, we do have additional examples, though, of

 8   enforcement, your Honor, set forth in our expert's affidavit,

 9   which, again, I don't think we needed to plead at this stage.

10   But there are instances where Cambodia sought to recover its

11   cultural property from Sotheby's specifically.  We also, your

12   Honor, have an instance set forth in our expert's affidavit of

13   Cambodia asserting its territorial sovereignty over one of the

14   temples that is actually listed in that May 16, 1925 decree.

15   It's detailed -- let me get the page for you -- on page 20 of

16   our expert's affidavit, paragraph 38.

17        THE COURT:  But they have never made the argument that

18   you are making, that it is based on the 1925 decree, the 1900

19   decree, and I'm not sure which other decrees you say -- the

20   land decree that you say it was from the 1800s, they never made

21   that argument.

22        MS. PAUL:  They may have, your Honor, they may have

23   made that argument, and at this stage --

24        THE COURT:  Well, you don't assert that they have ever

25   made that argument, and you didn't even make that argument

C9rdcamm
                            Motion

1    until you got an expert to interpret the law on which to base

2    that argument.

3         MS. PAUL:  Well, I do think we pled in the complaint

4    the same series of laws upon which our expert relies.  We

5    didn't go into a detailed interpretation in the fashion that

6    our expert does, again, because it is our complaint, and I

7    don't think necessary to do at that stage.

8         This is why in the cases that claimant cites, <u>McClain</u>,

9    <u>Schultz</u>, the Court had a hearing in <u>Schultz</u> and a trial in

10   <u>McClain</u> before determining these issues, where the experts were

11   allowed to testify, they were subject to cross-examination, and

12   a full record was developed before these issues were decided.

13        THE COURT:  All right.  But on what basis do you

14   allege that there is reasonable belief that when the statue was

15   purchased, that the purchaser should have known that it was

16   stolen?

17        MS. PAUL:  Well, I think here, your Honor, the

18   claimants have really twisted around the burden of proof.  They

19   are relying on British law.  They say first that British law

20   applies to the purchase of the statue in 1975 by Ms. Ruspoli's

21   husband.  As an initial matter, we certainly don't concede that

22   British law applies.  But even if it does apply, it can't

23   conceivably support dismissal of the complaint at this stage.

24   And that is because the burden of proving the purchaser's good

25   faith, their expert and our experts agree that that burden

C9rdcamm
                                  Motion

1   rests on the party asserting it; that burden rests on the

2   claimants to show good faith.  It is not something we have to

3   plead in our complaint.

4           THE COURT:  But what you have to plead is sufficient

5   facts for someone to conclude that you can demonstrate that

6   they knew it was stolen.  What is your allegation in this case

7   that would support any factual assertion that you believe that

8   they knew it was stolen?

9           And I'm not even sure that is what you affirmatively

10  are claiming.  Are you really claiming that when they bought

11  this, they thought they were buying stolen property?  Is that

12  what you are claiming?

13          MS. PAUL:  As a pleading matter, I think what we had

14  to allege was that Sotheby's knew it was stolen.

15          THE COURT:  Well, only if you are abandoning your

16  argument that any claim that when it was purchased the

17  purchaser knew it was stolen.  That's not your claim?  I

18  thought that was part of it, or one of your claims.

19          MS. PAUL:  Our claim is that Sotheby's knew was

20  stolen.

21          THE COURT:  If your claim is not that the purchaser

22  knew it was stolen, then why are we even discussing British law

23  and why do we even care?

24          MS. PAUL:  We don't think we should be discussing

25  British law, your Honor.

C9rdcamm

Motion

 1          THE COURT:  Then I assume we cannot discuss it if you

 2   are abandoning that claim.  But I thought your claim was that

 3   you are alleging that you were going to demonstrate that when

 4   the purchaser received it, the purchaser knew that there was

 5   reasonable belief to conclude that the purchaser knew that it

 6   was stolen.  If that is not your argument, then we can leave

 7   that on the floor at this point and go beyond that.

 8          If your sole argument is that Sotheby's knew that it

 9   was stolen when they brought it into the United States, that is

10   one of what I thought were three arguments which you were

11   making, but I assume it is only one of two arguments which you

12   are making.  And your only argument is that Sotheby's knew when

13   they brought into the United States that it was stolen even if

14   the purchaser did or did not know and/or that Sotheby's knew

15   that it was stolen when they had it in the United States,

16   possessed it in the United States, with the intent to sell it

17   at auction.

18          MS. PAUL:  I think, to be clear, what we allege in the

19   complaint is that Sotheby's knew it was stolen both at the time

20   of importation and afterwards.  We don't allege in the

21   complaint anything about the purchaser.  That is not to say

22   that we're conceding that the purchaser had no idea that it was

23   stolen; it is just not something that we had to allege.

24          THE COURT:  Well, it is not a concession that you

25   believe that they didn't know it was stolen, but it is a

C9rdcamm
                                Motion

1    concession that you don't intend to forfeit the statue on the

2    basis of proving as a claim that the purchaser knew it was

3    stolen when the purchaser bought it.

4              MS. PAUL:  I think what we're really talking about

5    here, your Honor, is an affirmative defense that the claimants

6    are raising.  What they're trying to say --

7              THE COURT:  But that is not an affirmative defense.

8    It is only an affirmative defense to a claim that the purchaser

9    knew it was stolen.  It's not an affirmative defense to the

10   fact that Sotheby's knew it was stolen.  Sotheby's can't import

11   into in the United States knowing it is stolen.  And if they

12   imported it into the United States knowing it is stolen, it is

13   subject to forfeiture.  I don't care what the purchaser

14   thought, because Sotheby's should have said to the purchaser

15   I'm sorry, we can't import this into the United States because

16   it is stolen.  You may not have known it was stolen, but we

17   can't do this because it gives the government the right to

18   seize the property if we bring it in stolen.

19             So whether they are an innocent purchaser or not

20   doesn't matter if your case is not I am going to prove that the

21   purchaser knew it was stolen and there is no affirmative

22   defense to the purchaser, you know, based on British law or the

23   purchaser not knowing that it was stolen unless your claim is

24   that you are going to prove you want it back because when they

25   bought it they knew it was stolen.

C9rdcamm
                                Motion

 1              MS. PAUL:  I think that's right, your Honor.  I think

 2     the only reason why we're discussing this at all is because

 3     claimants have raised the argument that the statue -- their

 4     argument is that the statue no longer remains stolen because

 5     they say British law applies and the purchaser acquired good

 6     title to it within the six-year limitation period.

 7              THE COURT:  I see.

 8              MS. PAUL:  That is why we are discussing it.

 9              THE COURT:  In that context I understand.

10              Let's take a break.

11              MS. PAUL:  Yes.

12              THE COURT:  Let's take the lunch break.

13              Why don't we continue at 2:30, all right, and then we

14     will go forward.  Thank you.

15              (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

C9rdcamm

**A F T E R N O O N   S E S S I O N**

2:35 p.m.

THE COURT:  Be seated.

Ms. Paul.

MS. PAUL:  Thank you, your Honor.

Your Honor, if I may, I would just like to go back and clarify a couple of points at the outset.

Beginning with the question of enforcement, your Honor had inquired about whether we were aware of specific examples of Cambodia enforcing its laws.  And I just wanted to direct your Honor's attention to our expert affidavit, page 15, and it is paragraph 27 in particular.

THE COURT:  Let me just make sure -- I'm sorry, page 15?

MS. PAUL:  Yes.  It is page 15 and in particular paragraph 27.

THE COURT:  OK.

MS. PAUL:  Which speaks about the prosecution of a Frenchman Malraux who was prosecuted for stealing items from a Cambodian temple.  This was in December of 1923 that the looting occurred, and he was prosecuted along with his accomplice in 1924.

THE COURT:  Well, but you're not relying upon that in any regard to argue that there was a legal basis to prosecute this person in 1923 consistent with anything that got us here.

C9rdcamm

1    1923 is even before you say that they enacted the law that

2    protected and classified all of these antiquities.  So they

3    base it on the argument that you are making here.

4              MS. PAUL:  Well, not the May 1925 law, but certainly

5    the 1900 decree was in place, the framework of laws beginning

6    with that was in place, which had to have been the basis for

7    the prosecution.  It is just an example, your Honor, of at

8    least one criminal prosecution that came out of a situation

9    where someone was looting from a Cambodian temple.

10             THE COURT:  OK.  But that is only of limited utility

11   because, you know, if they caught me dragging away a statue at

12   that time, you know, if they decided they didn't like me and

13   they wanted to arrest me, whether or not we would say that is

14   consistent or inconsistent with international law or U.S. law

15   is a different issue.  This is not a situation where they

16   asserted a right to a piece of antiquity and sought the

17   assistance from a foreign government to retrieve that piece.

18   That is what I am more interested in.

19             I mean, I don't think that you claim that there is any

20   instance that they have ever come to the United States and

21   asked you to forfeit and retrieve a piece of art antiquity and

22   did so on the basis of the argument that you are making here

23   now.  That's never happened before.  This is the first time

24   ever, that I am aware, of that that has occurred.  And,

25   clearly, I don't see any indication that you are saying that

C9rdcamm

1    you are aware of any other time that Cambodia either sought the

2    assistance of the United States to do this and did so based on

3    the arguments that the United States is making now in support

4    of forfeiture.

5         MS. PAUL:  Well, there are, your Honor, certainly

6    examples of Cambodia trying to retrieve its antiquities from

7    the United States and from Sotheby's in particular.  If you

8    look at our expert's affidavit on page 38, paragraph 71, our

9    expert lists a number of examples of Cambodia making efforts to

10   recover antiquities.  And although it doesn't specifically

11   state here in our expert's affidavit which of the laws Cambodia

12   was relying on, whether it was the 1900 decree, whether the

13   1925 decree, or some amalgamation of those, I think it just

14   highlights the point why it is really premature to discuss at

15   this stage.  The government would have had to lay -- under the

16   claimant's theory, the government would have had to lay all of

17   this out in its complaint, which is simply not reasonable to

18   do.  This is the exact sort of thing that should be developed

19   through discovery, and that's what we are seeking to do here.

20        THE COURT:  Yes.  But paragraph 38 doesn't really

21   address this kind of servicing.  Paragraph 38 addresses a

22   dispute among nations to Cambodia went to the International

23   Court of Justice to try to dispute Thailand's claim to a temple

24   and antiquities involved in that.  That is nothing close to the

25   legal theory that you are arguing here, that somehow that's

C9rdcamm

1    consistent with a forfeiture by the United States based on

2    Sotheby's knowing that they were importing stolen property and,

3    therefore, that gives you the right to seize the property.

4         MS. PAUL:  I think paragraph 38 is just an

5    illustration of Cambodia seeking to recover items that were

6    taken from one of its temples, illustrating Cambodia's view

7    that in fact it was the owner of the items in that temple.  It

8    just goes to that general point.

9         If you look at paragraph 71, which is on page 38, that

10   is where our expert has outlined instances of Cambodia

11   attempting to recover cultural objects that were removed from

12   Cambodia including, in particular, items that ended up with

13   Sotheby's.

14        THE COURT:  All right.  But there are two things that

15   are missing.  It doesn't say one -- unless I missed it, and I

16   have to look carefully at your affidavit at this point.  But it

17   doesn't indicate that that was a successful attempt, and it

18   doesn't indicate that it was based on the argument that you are

19   now advancing, which seems to be, if not novel, the first time

20   this argument has ever been made by the government in support

21   of forfeiture.

22        MS. PAUL:  In the list of arguments by our expert

23   there are instances of objects being returned, so some items on

24   the list actually were returned.

25        THE COURT:  Returned under what circumstances?

C9rdcamm

1   Returned because Cambodia established their independent right

2   of ownership to it, or, you know, returned under some other set

3   of cooperative circumstances between nations?

4           MS. PAUL:  No, you are right, your Honor.  It doesn't

5   specifically address the issue of what laws Cambodia was citing

6   to recover the pieces or whether the pieces that were recovered

7   were recovered under particular laws; that's true.

8           And I just go back to the point that I think at this

9   stage it's premature for the government to have alleged that,

10  and we do think that this will be developed in discovery.  It

11  is something that we're pursuing.  And I think as the case

12  progresses it certainly is something we expect to present to

13  the Court as additional evidence of the fact that the Cambodian

14  laws were clear.

15          THE COURT:  I will just tell you where I am focused

16  on.  Obviously, the first issue which I think Sotheby's and the

17  individual possessor of the item have to overcome is why a bare

18  minimum notice pleading, if it has minimal facts which put them

19  on notice of what you contend the claim is, why that's not

20  sufficient and why you need much more detail in further support

21  of the proof that you intend to offer to support those claims?

22  They first have to convince me that, yes, the theories that you

23  have set forth, even if I were to accept the bare factual

24  allegations that you make now, that you are not entitled to

25  further discovery in order to show the proof that supports

C9rdcamm

1   that.  That's one issue.

2          But they make some other basic issues that really go

3   to -- and they arrive at three basic points.  One is in what

4   way factually do you allege that the law that's being relied on

5   is clear and unambiguous when nobody has ever made this

6   argument before, the argument is already subject to dispute as

7   to what it means about possession, and the plain language

8   itself doesn't use specific language of ownership?  Why is this

9   so clear and unambiguous that someone who reads this statute

10  without the benefit of your expert is somehow put on notice

11  that Cambodia is asserting an ownership interest in this

12  statue, particularly since they didn't assert any ownership

13  interest in the other statue?  They knew exactly where it was

14  and it has been sitting in a museum all of this time and it is

15  still sitting in a museum, and they still don't claim an

16  ownership interest based on this law or any other law.  Why is

17  this so clear and unambiguous?

18          MS. PAUL:  Your Honor, we do feel the laws are clear

19  and unambiguous.  The issue of enforcement that your Honor has

20  inquired about is not a separate element.  We don't think we

21  need to plead not only that the law was clear and unambiguous

22  but also that it was in force.  It is perhaps evidence as we

23  continue down the road of the clarity of the law, but we do

24  think we pled --

25          THE COURT:  What is clear and unambiguous about your

C9rdcamm

1    reliance on the simple word "of"?

2            MS. PAUL:  Well, to go back to the structure of the

3    laws, your Honor:  The 1900 decree we discussed earlier.  We

4    think that in and of itself, which indicates that items found

5    on property -- antiquities found on property that was part of

6    the national domain are themselves state-owned, that's clear on

7    its face, just the 1900 decree.  It then becomes supplemented

8    by additional decrees, which we lay out in the complaint.

9    There is a decree on May 6th of 1925 which reiterates the

10   portion of the 1900 decree that said that statues found on land

11   belonging to the national or colonial domain are themselves

12   state-owned.

13           We then have the May 16, 1925 decree, which Mr. Neiman

14   discussed at length, which specifically lists the antiquities,

15   including temples, the Temple of Prasat Chen and the

16   archeological site of Koh Ker, that are classified as the

17   historical monuments and objects of French Indochina.  We think

18   this is a -- if it wasn't clear before that Prasat Chen was a

19   historical monument belonging to the national domain, we think

20   the May 16, 1925 decree makes it abundantly clear.

21           THE COURT:  Well, nobody in 1926 said it was clear.  I

22   mean, nobody -- I mean, if it's so clear, then why has the

23   government never enforced it based on these provisions, and why

24   has it taken an army of United States lawyers and their experts

25   to explain this as being the basis on which they are going to

C9rdcamm

1    seek forfeiture?

2         MS. PAUL:  I don't know if it is the case that it has

3    never been enforced before.  I don't know if that is so, your

4    Honor.

5         THE COURT:  Well, we know of no instance where it has

6    been enforced before, and we know this argument was not made

7    with regard to the other statue that has been in Los Angeles

8    and brought into this country under similar circumstances, one

9    could infer, as this statue has been here from at least the

10   1970s.  No one has ever made this argument before.  And, you

11   know, this argument didn't spring out of somebody else's

12   office; it sprung out of the U.S. Attorney's Office.  It wasn't

13   you went to someone else and they said, oh, well, you know,

14   this is the argument that we've always made, this is what we've

15   always relied upon.  You have sort of collected this argument

16   together and put this argument forth and found an expert who

17   can give you both a translation and an interpretation.

18        Your expert is not just a translator.  You put forth

19   this expert as an interpreter of what the consequences are of

20   these decrees.  If we just wanted a translator all we needed

21   was somebody with some expertise in linguistics.  Your expert

22   is giving us more than just linguistics.  And we need an expert

23   to tell us what this means when that's not as consistent with

24   "clear and unambiguous," as opposed to I can just read it and

25   the common layperson can say, oh, OK, it is clear to me at this

C9rdcamm

1    point that obviously they own this.  That is not the situation

2    that you are putting forth in this complaint.

3            MS. PAUL:  Your Honor, in the cases cited by

4    claimants, McClain and Schultz, for the proposition that the

5    law has to be clear and unambiguous, the courts relied on the

6    opinions of experts in both cases to interpret the law.  So we

7    think it was entirely appropriate for us to put forward the

8    affidavit of an expert to set out what the law is and, yes,

9    offer an opinion on what it means, because in the cases where

10   the standard was established that the law be clear and

11   unambiguous, the courts relied on experts.  So it is a

12   completely novel theory that claimants are advancing that we

13   can take the rulings of McClain and Schultz that the law has to

14   be clear and unambiguous and just say on a motion to dismiss,

15   well, we're going to read the law and not take any testimony on

16   this and decide that it is not clear.  That is a completely

17   novel theory they are advancing, and they haven't cited a case

18   that supports that theory.

19           Your Honor, with regard to the Norton Simon statue, I

20   just want to make it clear to the Court that Cambodia is not

21   contending that Norton Simon validly owns the statue.  In fact,

22   Cambodia's contention is that Norton Simon does not validly own

23   the statue.  Why hasn't it been pursued in the form of a formal

24   forfeiture complaint?  Well, clearly, as your Honor knows, we

25   have to allege not only that the statue was stolen but that the

C9rdcamm

1    person who imported it knew that it was stolen either at the

2    time of the importation or later.  And so that's something we

3    need to investigate and we are investigating and we would have

4    to make a determination on that before filing a forfeiture

5    complaint.

6              THE COURT:  But the only representations that I have

7    before me of any Cambodian official with regard to that statue

8    in the museum is that the museum owned it.

9              MS. PAUL:  Well, we --

10             THE COURT:  You may say they don't own it in the legal

11   sense, but they own it in some sense that the Cambodian

12   government recognizes because the Cambodian government said

13   they owned it.

14             MS. PAUL:  Well, to be clear, your Honor, that letter

15   is not written -- the Cambodian official who wrote that letter,

16   English is not that person's native language.  So I think --

17             THE COURT:  So you would argue --

18             MS. PAUL:  -- not so much can be made of their use of

19   the word belonging to.

20             THE COURT:  You would argue that at least that letter

21   is not clear and unambiguous.

22             MS. PAUL:  Yes, your Honor.  And to be clear, that's a

23   letter, that is not the law here.

24             And we just wanted to make it clear for the Court that

25   Cambodia's position is not that the twin statue wasn't stolen.

C9rdcamm

In fact, Cambodia is of the view that that is a stolen item and
they would like us to pursue it and investigate further.

THE COURT:  One of the issues that you have both
addressed and I don't think we discussed it yet is don't you
have to make some allegation -- some factual allegation that
would reasonably lead to the conclusion that it was stolen
after 1925?

MS. PAUL:  Yes, your Honor.

THE COURT:  You have to give me the date.

MS. PAUL:  Yes, certainly, your Honor.  We believe
we've done that.  We have specifically alleged that we believe
the statue was looted from Cambodia sometime after 1960.

THE COURT:  Based on what?

MS. PAUL:  Based on the conclusion of an expert.
Mr. Eric Bourdonneau, which is set forth in our complaint.

THE COURT:  What facts did he examine that a common
layperson can examine that would lead him to come to that
conclusion as an expert but wouldn't lead us to come to that
conclusion as nonexperts?

MS. PAUL:  So if you turn to -- it is paragraph --

THE COURT:  Is it because they built a road?  The only
thing I understand that he says is improper is because the road
was built in the 1960s so they must not have stolen it before
they had a road.

Is there some other argument that some expert makes

C9rdcamm

1    that I'm not even sure that that is a particularly -- unless he

2    is an expert engineer on roads and how you can drag a Cambodian

3    statue out of the jungle, I'm not sure why that is somehow

4    determinative that it couldn't be stolen.  You know, that's

5    like saying it couldn't be stolen until there were airplanes

6    because they wouldn't have been able to get it over here unless

7    they had a big enough airplane to get it over here.

8          What's the argument -- what leads to the conclusion

9    that it was more likely stolen in the '60s, as opposed to the

10   '50s, the '40s, the '30s, the '20s, or in the 1800s?

11         MS. PAUL:  Well, your Honor, in paragraph 15 of the

12   complaint we lay out the different bases for Mr. Bourdonneau's

13   conclusions.  The road that your Honor mentioned is one of the

14   things that he --

15         THE COURT:  But why is that a particularly compelling

16   argument?  I mean, Napoleon took antiquities.  He didn't have a

17   road.  He had a bunch of people who put it on their back and

18   dragged it out of the desert.  I mean, as I say, this not only

19   seems to be a novel argument, it seems to be a new argument.  I

20   just never heard anybody make an argument that it must have

21   happened because before that there wasn't a road.

22         I mean, how is that -- I mean, obviously before that,

23   before there was a road, people got in there, and I don't think

24   you are arguing that people got in there and didn't take stuff

25   out.  So, what, this was too big to get out without a road?  Is

C9rdcamm

1    that your inquiry?

2              MS. PAUL:  That is one of the things that our expert

3    relies on, that before that road was built in 1965, it was very

4    difficult to transport statues of this size out of Koh Ker, but

5    that is just one of the things he relies on.

6              THE COURT:  I don't understand what he is implying in

7    the specifics.  I understand what he is saying in the abstract,

8    that it is more difficult to take out without a road.  But what

9    is he saying?  That it had to have come out on a truck or

10   motorized vehicle?  I mean, I am not sure what specifically you

11   are saying the road does that creates the inference that they

12   couldn't have stolen it before there was a road.

13             MS. PAUL:  I think what he's saying is that the new

14   road made it easier to access the site in general, and so

15   because the site was easier to access in general, the site is

16   in a remote jungle location, it is more likely that the looting

17   took place after that time.

18             THE COURT:  That's only if I have evidence that there

19   was no looting before that time.  I mean, he doesn't say that

20   there wasn't any looting.  He doesn't know when this place was

21   looted.  And even the survey that was done doesn't give us any

22   indication that we have a place that was unlooted when -- as a

23   matter of fact, I think the survey -- when was the survey done?

24   In the '20s?

25             MS. PAUL:  The Parmentier survey?

C9rdcamm

1          THE COURT:  Yes.

2          MS. PAUL:  1939 is the date of the publication.

3          THE COURT:  Wasn't there already significant evidence

4     of looting at that site when that survey was done?

5          MS. PAUL:  No, your Honor.

6          THE COURT:  No?  OK.

7          MS. PAUL:  That's not right.  The claimants have

8     suggested that there is significant evidence of looting at that

9     time, and they say that because the survey describes the site

10    as being in complete ruin.  But as we point out in our brief --

11         THE COURT:  In complete ruin?

12         MS. PAUL:  As in complete ruin.

13         THE COURT:  Well, what do you say that that's supposed

14    to mean, in complete ruin?

15         MS. PAUL:  We say that saying something is in ruin is

16    very different from saying that the monument has been looted.

17    Archeological ruins are characterized by overgrown vegetation

18    and rocks.  So the complete ruin of the site in our view is not

19    evidence of looting at all and, instead, signifies that some of

20    the statuary was buried underneath the vegetation and rocks.

21    That is another point we think we will be able to develop as

22    discovery progresses.

23         THE COURT:  I mean, I don't know where you get that

24    definition of just because a plant grew over it, it is in ruin.

25         MS. PAUL:  I don't know --

C9rdcamm

1        THE COURT:  I don't understand the difference between

2    an archeological site that is in complete ruin and an

3    archeological site that is not in complete ruin.  You are

4    saying the difference is that one has vegetation on it and the

5    other doesn't?

6        MS. PAUL:  That's one thing that can characterize it,

7    the overgrown vegetation.  That is one thing that can

8    characterize a site as being in ruin.  I do think it is very

9    different to say a site is in ruin than to say a site has been

10    looted.

11        THE COURT:  Yes.  But your inference is not the more

12    logical inference.  I mean, I don't have to go to a pyramid and

13    simply say that this pyramid is in complete ruin and all I'm

14    describing is that it is old and some of the rocks are falling

15    off or that there is something growing on top of it.  Why would

16    I even bother to give that description unless it is totally

17    superfluous?  I mean, we know what ruins are.  But to say

18    something that this site is a certain type of archeological

19    ruin, that is not the same as saying the site was completely

20    ruin.  Then you are saying that that is supposed to mean the

21    same thing.

22        MS. PAUL:  I think our basic point is that it doesn't

23    suggest the site was looted.  To say the site is in ruin does

24    not suggest the site is looted.

25        THE COURT:  Just broken?

C9rdcamm

1          MS. PAUL:  Just broken --

2          THE COURT:  Just in somehow disarray.

3          MS. PAUL:  In disarray, that pieces were buried

4    underneath vegetation, but it doesn't suggest looting.  That's,

5    I think, the important point.

6          THE COURT:  That's what I don't understand.  So you're

7    saying that if you had no evidence of any looting at all, ever,

8    until after -- I don't know, I'm not quite sure when you say

9    the first evidence of looting exists.  When do you say the

10   first evidence of looting exists?

11         MS. PAUL:  Well, our expert says that it indicates --

12   the survey indicates that looting didn't take place until after

13   1939.  So that it was at least --

14         THE COURT:  I mean, what is the evidence that he basis

15   that conclusion on beyond that there wasn't a road?

16         MS. PAUL:  Well, by his review of the survey; his

17   review of the survey, which doesn't reference looting.  So

18   that's one of the things that he relies on.  That, the road,

19   also pictures taken of the sites in the 1950s and '60s which he

20   says show that the statuary at Koh Ker generally remained

21   intact at that time.

22         THE COURT:  But not this statute, not either one of

23   these statues.  The last time -- quite frankly, I am not sure

24   you can tell me the last time anybody said they saw these

25   statues in place where the feet are.  Can you even represent

C9rdcamm

1    that you're confident that they were there standing in the

2    Twentieth Century?

3        MS. PAUL:  Can we represent that we're confident they

4    were there in the Twentieth Century?

5        THE COURT:  They were there standing in the Twentieth

6    Century, anytime in the Twentieth Century?

7        MS. PAUL:  We can represent we are confident they were

8    there in the Twentieth Century.  I think that is right.

9        THE COURT:  That is not my question.  That would be my

10   second question, because I assume that the answer to my first

11   question is no.  You have no basis to say that the statues were

12   standing upright in place at any time during the Twentieth

13   Century; you don't have any basis to say that.  Start there.

14       Isn't that a correct statement?

15       MS. PAUL:  It's not something we allege in our

16   complaint, which is where we are, but as we continue with the

17   case we think we will be able to present that evidence.

18       THE COURT:  Well, what makes you think that?

19       MS. PAUL:  Based on the discovery that has been

20   completed so far, based on interviews we conducted of people in

21   Cambodia --

22       THE COURT:  That indicate what?  That people saw them

23   standing upright at some point in time at this location?

24       MS. PAUL:  Yes.  And -- yes, that's exactly the type

25   of evidence we think we will be able to rely on as the case

C9rdcamm

```
 1    progresses, but, again, that's not where we are.

 2              THE COURT:  You say you have such information, or you

 3    are hoping you will find such information?

 4              MS. PAUL:  We are in the process -- we have some of

 5    that information already and we think we will find more.

 6    That's where we are.

 7              THE COURT:  And that information is factual

 8    information that would indicate to you that the statues were

 9    there when?

10              MS. PAUL:  That they were there certainly after 1900

11    and, you know, up through 1960.  I mean that's information

12    we've been gathering.  Although it is not --

13              THE COURT:  What is some of that based on when you say

14    that's information we've been gathering?

15              MS. PAUL:  Do you want me to go into what we found in

16    discovery?  I'm not sure what you are asking.

17              THE COURT:  I'm trying to understand what you are

18    representing, that's all.

19              Are you representing that you have a witness who said

20    they saw the statue at a particular time that you think is

21    relevant to this case?

22              MS. PAUL:  Well --

23              THE COURT:  I mean, is that the representation you are

24    trying to derive?

25              MS. PAUL:  I'm representing that we have talked to
```

C9rdcamm

1    witnesses who believe they saw the statute in the site in the

2    1900s.  I can represent that for the Court.

3         THE COURT:  All right.  So the answer to my question

4    is that you do have a reasonable basis to believe that the

5    statues were there as late as the 1900s?

6         MS. PAUL:  Yes, we do.

7         Again, I think what we've alleged in the complaint,

8    though, although it doesn't allege that, is sufficient as we've

9    relied on the -- as we've relied on our expert's conclusion

10   which, first, as an initial matter, that should be enough that

11   we've relied on the reasoned opinion of an expert in the

12   field --

13        THE COURT:  It all depends on what that opinion is

14   based on.  I mean, if the opinion is just based on the fact

15   that they built a road in 1960, no, I don't think it is

16   reasonable to rely on that.

17        MS. PAUL:  Well, it is not based just on the road,

18   your Honor.

19        Another point I would like to mention is that our

20   expert does say that one of the factors he considered was that

21   the first known sale in the art market of this statue was in

22   1975.  So the statue had no provenance prior to 1975.  Now, the

23   most reasonable inference that can be drawn from that is that

24   the statue was looted close in time to then, close in time to

25   1975 -- not, as the claimants propose, that the statue was

C9rdcamm

looted over 35 years earlier, prior to the survey that was

completed in 1939, and then after that absolutely no record

whatsoever was kept of the sales that followed.

THE COURT:  Well, maybe there wasn't a sale prior to

'75.

MS. PAUL:  But no record at all was kept of what

happened to it between 1939 and 1975?  That's just not -- on a

motion to dismiss, where inferences have to be drawn in favor

of the government, the more reasonable inference by far is that

the statue was looted close in time to 1975, which is the time

of the first sale.

THE COURT:  We know in the 35 to 40 years between 1975

and 2005 that it wasn't so.

MS. PAUL:  OK.  I'm not sure what you are asking.

THE COURT:  You are saying, wow, there is no evidence

that it was sold in the last 40 years.  Where is the evidence

that it was sold in the 40 years, or 35 years, I guess, or 30

years from 75 to 2005?  The time period is the same.

MS. PAUL:  There is a record of where it was during

that time period.

THE COURT:  Well --

MS. PAUL:  And also we know it was actually sold

twice.  It was sold in 1975.

THE COURT:  Right.

MS. PAUL:  The sale happens in the U.K., where the

C9rdcamm

husband's company purchased it, and then we've learned through

discovery that it was transferred again from the claimant Ms.

Ruspoli, it was sold to her, and then Sotheby's imported it.

So I don't --

THE COURT:  Well, the period between Sotheby's

importing it and the husband and wife buying it is 30 to 35

years.

MS. PAUL:  I'm not sure what you think that -- I'm not

sure what the question is, your Honor.

THE COURT:  Well, the question, you said, oh, it

must -- because there is no evidence of where it was or that it

was sold in 40 years before '75, that the inference is that it

must have been -- it wasn't in anybody's hands outside of

Cambodia.  That's what your argument is.  I say, well, wait a

minute.  But that's the same time period from '75 to 2010, or

whatever, when there is no record that anything happened to it

there either.

If somebody took it from Cambodia and kept it in their

private collection, what difference does it make when the for

sale happened.  Maybe somebody looted it in 1900 and kept it in

their own private collection until they died and then the

grandchildren decided to sell it.  I'm not sure what inferences

you can address from the time period.

MS. PAUL:  I think the point is that there is no

record whatsoever of what happened to it, where it was from

C9rdcamm

1   before 1975; there is no provenance at all.  It is not just

2   that there are no records of sale, there is nothing after 1975.

3   We know now where it was, but we don't know prior to 1975, on

4   the facts that we have here, exactly where it was.  So I think

5   the reasonable --

6          THE COURT:  But the argument I don't understand is

7   that because we didn't know where it was from 1960 to 1975,

8   that somehow that's a different inference than if I say, well,

9   we don't know where it was from 1900 to 1975.  There is no

10  record of where it was between 1900 and 1975, right?  It could

11  have been anywhere.

12         MS. PAUL:  Right.  But our expert believes that it was

13  at the temple until sometime after 1960.

14         THE COURT:  But why?  But why?  I don't know why that

15  is an inference.  In fact, you had no idea, no clue where it

16  was.  As a matter of fact, there is no -- you can't tell --

17  well, you are not telling me; you may have somebody who can

18  tell me.  But I guess the best you're telling me is that you

19  may have somebody who said -- well, you may have some evidence,

20  I don't know if they would still be alive now, but you say

21  somebody said they saw it in 1900.  If they saw it in 1900,

22  that makes them over a hundred years old so I don't know if

23  they are telling you that now.  I guess it is possible.  But

24  you are saying you have some evidence that somebody saw it in

25  1900.

C9rdcamm

1      Because they saw it in 1900 gives me no inference as

2  to what happened to it between 1900 and 1975.  What do you say

3  I am supposed to infer that happened between 1900, when you say

4  somebody thinks that they saw it in Cambodia, to 1975 that

5  would imply that it didn't leave Cambodia until 1960?

6      MS. PAUL:  Just to be clear, I think it is not

7  really -- the facts of the witnesses we may have who have seen

8  the statute in the 1900s are really not before the Court on

9  this motion so I don't want to --

10      THE COURT:  You mentioned that; I didn't make it up.

11  You tell me that that was going to advance your argument,

12  that's why I accepted it.

13      MS. PAUL:  I certainly brought it up because you

14  asked, your Honor, as an example of what we thought we would be

15  able to develop during discovery.  But I think on the face of

16  the complaint, another factor which I think is important you

17  consider is what was going on in Cambodia in the mid to late

18  1960s.

19      THE COURT:  Total chaos.

20      MS. PAUL:  Total chaos.

21      THE COURT:  It gave somebody an opportunity to loot as

22  much as they wanted to loot during that chaos.

23      MS. PAUL:  Exactly, which is --

24      THE COURT:  That only is important if the Cambodian

25  statue was still there.

C9rdcamm

1          MS. PAUL:  Well, but this is a time of unrest when the

2     Koh Ker site suffered serious damage and widespread looting,

3     and so that is another factor certainly that can be considered.

4          THE COURT:  So I'm supposed to infer that anything

5     that was stolen out of Cambodia must have been stolen during

6     that time of chaos?  Why is that a logical --

7          MS. PAUL:  It is one additional factor that comes into

8     the total collective list of factors.

9          THE COURT:  Yes.  But they all have to be individually

10     found somewhat significant.  You say, well, we have one

11     significant factor is that there were no roads.  We got another

12     significant factor is there was a lot of chaos going on in the

13     '60s.  So based no road to chaos going on in the '60s, then we

14     infer that it must have been stolen in the '60s.  That is a

15     pretty big leap, isn't it?

16          MS. PAUL:  I don't think it a big leap because I think

17     when you take all the factors together, it's actually quite

18     strong.  It's not just the survey that indicates -- that seems

19     to indicate that there was no looting, it is not just the

20     pictures, it is not just the road, and it is not just the lack

21     provenance before 1975, nor is it just the fact that there is

22     widespread looting of this particular site during that

23     timeframe.  When you take all of them together, certainly at

24     this stage of the proceedings on a motion to dismiss, I think

25     that's more than sufficient to satisfy our burden of alleging

C9rdcamm

1   sufficient facts in the complaint.

2           THE COURT:  I assume you must concede that the survey

3   is not particularly -- it would be more helpful to you if the

4   survey said that the statue was there rather than the survey

5   noticed that there were two big giant statues on the site when

6   they did a survey.

7           MS. PAUL:  That would be helpful, your Honor.  That

8   would certainly be helpful.  But as your Honor pointed out --

9           THE COURT:  It certainly doesn't give me a compelling

10  argument.  You know, if somebody walks in this courtroom and

11  they describe all the people in this room and they all say

12  there is a judge sitting on the bench, I don't see how you say

13  that that's evidence that the judge must have been there.

14          MS. PAUL:  Your Honor, yes, certainly it would be more

15  helpful if we had the survey specifically cataloging the statue

16  as being there in 1939, of course, that would be all that we

17  would need to say.  But --

18          THE COURT:  OK.  So then let's just move to what you

19  say is another critical issue that you must allege and you must

20  prove:  That Sotheby's knew it was stolen when they brought it

21  into -- imported it into the United States.

22          What is it that you say Sotheby's knew that should

23  have put them on notice that it was stolen when it came into

24  the United States?

25          MS. PAUL:  Well, a couple of things, your Honor.

C9rdcamm

1    First let's focus on the time of import.

2            The complaint makes allegations about the statute's

3    appearance, first of all, that it is cut off at the ankles, the

4    fact that there is no provenance prior to 1975, the fact that

5    this is a period of rampant looting at Koh Ker.  All of those

6    things together, combined with the fact that Sotheby's is a --

7            THE COURT:  Wait a minute.  Slow down.

8            MS. PAUL:  Yes.

9            THE COURT:  Because I want to go through each one of

10   those items with you.

11           I don't understand why being cut off at the feet is

12   evidence of theft.  Even if they were going to sell it, it

13   seems to me they were going to have to cut it off at the feet

14   unless they can get the feet out of the ground.  So why is

15   cutting it off at the feet -- if I walked up to it and said to

16   somebody standing there I would like to buy that statue and he

17   says, well, you know, you know it is bolted down at the feet.

18   And I said that's all right, I want it anyway, you can keep the

19   feet.  Why is that evidence of theft because it is cut off at

20   the feet?

21           I mean, there are statues, you know, there are statues

22   in The Louvre that have one arm but that doesn't mean it was

23   stolen.  I don't understand why, you know, having no feet means

24   that they stole it.

25           MS. PAUL:  I imagine, your Honor, if Cambodia was

C9rdcamm

1   going to gift the statue to Sotheby's, for example, Cambodian

2   officials wouldn't have cut off the statue by the feet.

3            THE COURT:  If that is the only way to get it out of

4   there and they decide to give it to somebody, they would.

5            MS. PAUL:  The idea that they would deface a national

6   treasure of that nature is just simply not plausible to the

7   government.

8            THE COURT:  The question is not whether or not the

9   Cambodian government sold it to anybody.  The question is

10   whether Sotheby's, even if you were right, even if Sotheby's

11   should have known that the only way that whoever took the

12   statue got it because they had to cut it off at the feet,

13   that's not an inference that (1) that Cambodia owns the statue,

14   and (2) that they're stealing the statue and that it's now

15   stolen property.  Why does that make it stolen property?

16            I mean, there are a lot of antiquities that were taken

17   from a lot of places, and, you know, because it doesn't have

18   any feet, I don't even know why that is an inference that

19   Sotheby's is supposed to know that it is stolen.

20            MS. PAUL:  Your Honor, the fact that you had the feet,

21   it was a part of the temple --

22            THE COURT:  OK.

23            MS. PAUL:  So in order to remove it from the temple,

24   if you are a looter you would cut it off at the feet.

25            THE COURT:  OK.  If you are not a looter and you

C9rdcamm

1   wanted to put it in a museum but the only way you could get it

2   out of there was by leaving the feet, you cut it off at the

3   feet.

4           MS. PAUL:  I don't know that that is true.

5           THE COURT:  I don't either.  But you tell me the more

6   likely inference is that because it is cut off at the feet it

7   must be stolen.  No, it just means that you couldn't get it out

8   of there unless you cut it off at the feet.  That is the

9   inference.  If you really want to get the statue out of there,

10  you had to leave the feet; lop it off and drag it out.

11          MS. PAUL:  The fact that it had the feet and the feet

12  are still there at the temple suggest that it never should have

13  been removed from the temple to start with; it was a part of

14  the temple.

15          THE COURT:  It suggests that it is much harder to move

16  the feet.  That's what it suggests; it suggests it left.  We're

17  not standing here trying to figure out how to get the feet out

18  of here; let's get the statute and be done with it.  Why is

19  that an inference of why it is stolen?

20          MS. PAUL:  I don't know who else other than looters

21  would have cut off the statue at the feet.

22          THE COURT:  Suppose it was one of these items in a

23  museum but they could not get it out of there unless they

24  lopped off the feet, that's who would lop it off at the feet,

25  right?

C9rdcamm

|  |  |
|---|---|
| 1 | MS. PAUL:  I don't know that that's even true that it |
| 2 | couldn't be removed at all without lopping it off at the feet. |
| 3 | It seems likely to the government that that's how looters would |
| 4 | get it out, and I can't think of anyone else who would be |
| 5 | likely to remove it in that fashion. |
| 6 | THE COURT:  How else would one remove it? |
| 7 | MS. PAUL:  How else would one remove the statue from |
| 8 | the temple? |
| 9 | THE COURT:  Yes. |
| 10 | MS. PAUL:  I'm not sure, your Honor. |
| 11 | THE COURT:  That's the point. |
| 12 | MS. PAUL:  I'm not sure. |
| 13 | THE COURT:  Then why is the inference then that there |
| 14 | is any other way to get it out of there other than to lop it |
| 15 | off at the feet so, therefore, if it is lopped off at the feet |
| 16 | the inference is it must be stolen? |
| 17 | MS. PAUL:  I think the inference is that it shouldn't |
| 18 | have been removed because it was part of the temple, and the |
| 19 | fact that it was lopped off at the feet suggests that looters |
| 20 | took it out of the temple and did so illicitly. |
| 21 | THE COURT:  Well, you would have to concede that if |
| 22 | there is no clear and unambiguous law that prevents one from |
| 23 | taking this antiquity, that someone could -- as they say, |
| 24 | Indian Jones shows up and he decides, oh, this is an antiquity. |
| 25 | I want it.  There is nobody here who is claiming it.  I know if |

C9rdcamm

1    they probably see me wanting to take it, somebody might shoot

2    me or arrest me because they don't want me to take it away.

3    But they don't own it; I'm taking it and I'm putting it in a

4    museum.  I don't understand why that's --

5              MS. PAUL:  Well, now we are going back to the issue,

6    your Honor, of whether there was a clear and unambiguous law.

7              THE COURT:  No.  I'm concentrating on the issue of

8    whether or not they should have known it was stolen.  And

9    clearly they couldn't know it was stole unless there was a

10   clear and unambiguous law that Sotheby's should have been able

11   to reference immediately to tell them that Cambodia owned it.

12   If they didn't have clear and unambiguous notice that -- in

13   order for them to have knowledge, they have to have clear and

14   unambiguous notice that Sotheby's owns it, and they must

15   believe that someone else took it without their permission and

16   stole it.

17             So are you saying that Sotheby's should have assumed

18   that it was stolen because it was lopped off at the feet?  They

19   saw that it didn't have feet.

20             MS. PAUL:  I'm saying that is one indicator, one

21   indicator that we allege in our complaint.

22             THE COURT:  What else should have made them think it

23   was stolen?

24             MS. PAUL:  The fact that it came from the

25   archeological site of Koh Ker, which was an archeological site

C9rdcamm

1    built by the king.

2            So going back to your point, your Honor, that it

3    needed to be clearly owned by Cambodia, that somebody knew

4    where it came, they knew that it came from a temple --

5            THE COURT:  Yes, but every archeological site is built

6    by the king, or the queen.  I mean, how is that different than

7    any other archeological site?  The king is not here and saying

8    give me my --

9            MS. PAUL:  I think that is actually the point.

10   Because it came from an archeological site and they knew that

11   it came from an archeological site, as opposed to, you know,

12   from some private owner, that's an indicator right there that

13   it came from a Cambodian temple.

14           THE COURT:  Yes.  But most of the antiquities in the

15   Louvre came from an archeological site.  And it is still

16   sitting there, and the question is whether or not at the time

17   some government official asserted some authority over that, and

18   that they should have known when they took it that it was in

19   violation of law.

20           You are saying that Sotheby's should have known that

21   this was taken in violation of law?

22           MS. PAUL:  Yes.  I think the laws are clear, as we've

23   outlined and as we outline in the complaint; I think the fact

24   that the feet were lopped off; I think the fact that it came

25   from the archeological site of Koh Ker; I think that it came to

C9rdcamm

1    them -- or the first known sale was in 1975, which is after

2    this period of rampant looting; I think those factors combined

3    with the fact that Sotheby's is a sophisticated participant in

4    the Southeast Asian art market, which has a worldwide

5    compliance department which should know what the law is, I

6    think those factors in combination, when you draw the

7    inferences in the government's favor, it's entirely reasonable

8    to conclude that before importing the statue Sotheby's either

9    knew that the statue was stolen or at a minimum it was aware of

10   a high probability that the statue was stolen and it

11   deliberately looked the other way.

12         THE COURT:  Well, the weakness in your argument, which

13   may not be favorable to you, but the weakness in your argument

14   is that this is not the traditional or standard application of

15   the statute that you are trying to enforce.  The statute that

16   you're trying to enforce was primarily written to make sure

17   that people couldn't go to an archeological site,

18   surreptitiously steal items, and then put them in a box that

19   says bananas and you got a mummy inside instead and you sneak

20   it into the United States and then you loot it from the

21   rightful owner.  That's what the statute is about.

22         But you say that the circumstances under which

23   Sotheby's imported this item somehow implied that they were

24   knowingly bringing in a stolen item in violation of law even

25   though they publish it in their catalog, tell the Cambodian

C9rdcamm

government they have it, and get expert opinions about what it

is, what's it worth, and then announcing to the world that they

are going to sell it at auction.  That's the unusual rather

than the usual application of the statute that you are trying

to apply here.

MS. PAUL:  Well, I think now we're getting into

Sotheby's knowledge after the statue was imported.

THE COURT:  Well, no, knowledge during and after.  I

mean, you don't claim they hid this and snuck it into the

country.

MS. PAUL:  We don't claim they hid it and snuck into

the country.

THE COURT:  That would be further evidence of their

knowing that they were dealing in stolen property.

MS. PAUL:  But they did import it knowing that they

had no provenance -- the statue had no provenance prior to

1975, and they did import it knowing what was going on in

Cambodia prior to 1975, and knowing where it came from, and

knowing that the statue had no feet.  So those are the facts

they knew prior to importing it.

THE COURT:  But they knew that -- they had reason to

believe that there was an innocent purchaser for value who

purchased this in 1975 and there was no evidence that this

person had any illegitimate claim to this property.

MS. PAUL:  But that doesn't mean they had no knowledge

C9rdcamm

| | |
|---|---|
| 1 | that the statue was stolen from the site in Cambodia prior to |
| 2 | that purchaser in Britain acquiring it. |
| 3 | THE COURT:  All right.  Obviously, you're not claiming |
| 4 | that they had any actual knowledge of it being stolen; you're |
| 5 | claiming that under the circumstances they should have |
| 6 | reasonably believed that this was stolen? |
| 7 | MS. PAUL:  I think at this stage we've pled enough to |
| 8 | say that they either knew or under the circumstances should |
| 9 | have known.  It may be, as discovery continues, we find enough |
| 10 | evidence that they actually did know.  That may be. |
| 11 | THE COURT:  That's not the nature of your allegation, |
| 12 | nor is that even something that you would allege on information |
| 13 | and belief at this point in time.  You have no reason to |
| 14 | believe that Sotheby's had any knowledge about the theft. |
| 15 | MS. PAUL:  That it was looted from the temple? |
| 16 | THE COURT:  Right. |
| 17 | MS. PAUL:  I think we do. |
| 18 | THE COURT:  That they had actual knowledge about the |
| 19 | actual looting of it from the temple? |
| 20 | MS. PAUL:  Well, the knowledge -- |
| 21 | THE COURT:  You don't claim that? |
| 22 | MS. PAUL:  No.  At this stage, no.  At this stage of |
| 23 | filing the complaint we didn't have evidence that they knew the |
| 24 | details of what the circumstances were of the looting, that's |
| 25 | right. |

C9rdcamm

1          THE COURT:  And you don't even reasonably believe that

2     you are going to come up with such evidence?

3          MS. PAUL:  We may, your Honor.  We may.

4          THE COURT:  You really think that you are going to

5     come up with evidence that they were specifically aware of the

6     circumstances of how this statue was taken out of the temple

7     and that they would know specifically under what circumstances

8     it was stolen and looted?

9          MS. PAUL:  Your Honor it's possible that we will.  I

10    don't want to get into what we may or may not find out in

11    discovery at this point because I really think --

12         THE COURT:  Well, if you've got a good faith basis to

13    assert that, I would like to hear that because I might cut this

14    all short and say fine and then go ahead and prove it.  But

15    that is not what you are alleging here, and I don't want you to

16    just fall back on that as the fallback position if you can't

17    sustain a reasonable argument that they should have known that

18    this was looted.  Sotheby's is --

19         MS. PAUL:  Well --

20         THE COURT:  You're not accusing Sotheby's of willfully

21    either violating the law or doing something that they should

22    have known was illegal; you are not accusing them of that at

23    this point.

24         MS. PAUL:  Well, what we are saying is that at the

25    time of import they knew it was stolen and the way -- yes, as

C9rdcamm

your Honor points out, the way we're interpreting that is that

it was reasonable to conclude that there was a high probability

that they knew it was stolen.  I mean -- and that's sufficient.

THE COURT:  You are not even reasonably going to

expect that there is going to be any evidence that Sotheby's

was attempting to sneak this item into the country to sell it

out from under its rightful owner and to do so so that the

rightful owner would not have knowledge of it and would not be

able to attempt to get their property back?  You are not saying

that they were complicit in trying to do that?  I mean, that is

not even a reasonable argument to make, is it?

MS. PAUL:  I do think -- the government does think as

discovery progresses we may find evidence that Sotheby's knew

more about the circumstances of the looting than we knew at the

time that we filed the complaint.  And we've already -- as

discovery has gone on so far -- it has really only just

begun -- we've already found some more evidence of the looting

that we think suggests that Sotheby's knew even more than we

thought they did when we filed.

Again, it is hard for your Honor; your Honor can't

really consider that at this point because that is not where we

are.

THE COURT:  I assume you are not asking me to let you

rely on such evidence or asking me to believe whatever you

think you believe to make such a finding because you are not

C9rdcamm

1  giving me any such evidence.

2          MS. PAUL:  Yes, your Honor.  That's exactly right and

3  that's why I'm reluctant to get into it, because that's not

4  where we are and we wouldn't ask your Honor to rely on facts

5  that are outside the pleadings because that's not where we are

6  at this stage.  And we'd like to continue to investigate what

7  Sotheby's knew, and this is information that is uniquely in

8  their possession.

9          They had made the argument that they couldn't have

10  known what the law is.  But we don't know exactly what

11  Sotheby's knew about the Cambodian law, and the reason we don't

12  know that is because we haven't been given any discovery on it.

13  Sotheby's appears to be asserting a mistake-of-law defense, but

14  they haven't waived the attorney-client privilege over those

15  communications so we don't know exactly what they were looking

16  at, and that's another reason we need discovery.

17          THE COURT:  Well, give me what should be my analysis.

18  Give me a plausible scenario that you think you are going to be

19  able to prove at the end of this case based on the allegations

20  that you've made.

21          MS. PAUL:  As to Sotheby's knowledge at what point in

22  time?

23          THE COURT:  Whatever you want to do to take it away

24  and give it back to Cambodia, whichever theory you want, tell

25  me what it is that you say -- and not lawyer-to-lawyer or

C9rdcamm

1    lawyer-to-judge, tell me, based on your allegations, if we have

2    a jury in this box, tell me what you are going to convince this

3    jury of as to what the facts are that would support forfeiture.

4         MS. PAUL:  So, for instance, your Honor, after the

5    statue was imported, we think -- we have very good evidence

6    that Sotheby's --

7         THE COURT:  You don't have to tell me what you think.

8    Tell me exactly what you think a reasonable jury is factually

9    going to conclude based on what you have alleged in this case.

10   What are they going to say happened.

11        MS. PAUL:  I think a reasonable jury could conclude

12   that Sotheby's after importing this statue was explicitly told

13   by a scholar that they hired that the statue was stolen.  I

14   think that Sotheby's was on notice -- I think a jury could

15   conclude that Sotheby's was on notice of that.  And that after

16   learning this information from that scholar, they, rather than

17   acting in a transparent fashion, Sotheby's chose to quietly

18   continue to pursue the sale of the statue in hopes that

19   Cambodia would not enforce its national ownership laws.  For

20   example, Sotheby's decided to have an employee send an e-mail

21   to the Minister of Culture's yahoo.com e-mail account regarding

22   the sale.  The e-mail doesn't ask Cambodia whether it believes

23   that it has a claim, whether it believes it owns the statue.

24   It, rather, just announces the sale.  Sotheby's doesn't receive

25   any response to the e-mail and makes no effort to confirm that

C9rdcamm

1    anyone received it, let alone read it, and Sotheby's then takes

2    that as license to go ahead.

3              I think a reasonable jury could conclude that

4    Sotheby's so-called efforts to be transparent weren't actually

5    efforts to be transparent at all, and that at the end of the

6    day Sotheby's thought there was a high likelihood that the

7    statue was in fact stolen, as someone had explicitly told them

8    that it was stolen, and then hoped --

9              THE COURT:  But that is the same person who told them

10   that it wasn't stolen.

11             MS. PAUL:  Well, she never said that it wasn't stolen.

12   Let's be clear about that.  She said that it was stolen, and

13   then later on in terms of retracting her view she really just

14   suggested, well, it doesn't seem that Cambodia is likely to

15   enforce its laws and seek to retrieve this particular statue.

16   That's what she said, not that it wasn't stolen; she never

17   retracted that view.  And so I think --

18             THE COURT:  So do you think that there is a reasonable

19   basis to argue that Sotheby's thought it was stolen after they

20   got her complete opinion?

21             MS. PAUL:  Yes.  I think so.  And I think a reasonable

22   jury could conclude that Sotheby's thought there was a high

23   likelihood it was stolen and nonetheless decided to take a risk

24   that Cambodia would not enforce its laws and would not seek to

25   recover the statue.  I think that is absolutely what a

C9rdcamm

1      reasonable jury could conclude.

2              THE COURT:  You don't really claim even in this

3      complaint, it is not your allegation that (1) either Cambodia

4      didn't know it was in Sotheby's possession and that Sotheby's

5      intended to sell it, and (2) that somehow Sotheby's did

6      something to try to hide the fact that they had the item and

7      they intended to sell it.  It was clear that Cambodia knew they

8      had it fairly early on, and it is clear that Cambodia knew they

9      intended to sell it.  That is what they are in the business of;

10     of course they intended to sell it.

11             MS. PAUL:  I am not sure that it was at all clear to

12     Cambodia that Sotheby's --

13             THE COURT:  What do you think Cambodia thought that

14     Sotheby's was going to do with it?  Put it in their own private

15     collection?

16             MS. PAUL:  I'm not sure that it is at all clear that

17     Sotheby's even had it.  I think one e-mail to a Yahoo! account

18     to one Cambodian official who is not actually the head of the

19     Minister of Culture is not sufficient to put Cambodia on notice

20     that Sotheby's not only had the statue but was planning to sell

21     it.

22             THE COURT:  Well, we know Cambodia knew they had the

23     statue and that nobody kept that from them because they

24     communicated back at some point to Sotheby's, and then they

25     took the affirmative step to go to the United States government

C9rdcamm

1   and ask the United States government to stop the sale.

2             MS. PAUL:  Of course at that point it was clear.  Once

3   they sent the letter to Sotheby's saying we believe that this

4   statue was illegally removed from our temple, certainly at that

5   point.

6             THE COURT:  What information do you say prompted that

7   letter?  Clearly, Sotheby's was not particularly effective in

8   keeping this information from Cambodia if Cambodia is going to

9   write them a letter telling them don't sell it.  How do you

10  think that they found out about this if Sotheby's was going

11  through such great lengths to keep it from them?

12            MS. PAUL:  I'm not sure if we allege in our

13  complaint -- and I'm looking to see -- I'm not sure if we

14  allege in our complaint exactly how Cambodia learned.

15            THE COURT:  I don't think you did.

16            MS. PAUL:  We probably do not.  But I think it's

17  really an issue that is outside the scope of this motion at

18  this point.

19            THE COURT:  OK.  But all of the arguments you just

20  gave me when I asked you what you would argue to the jury, that

21  only goes to one aspect of your claim.  That simply goes to --

22  that's not evidence that they imported an item knowing that it

23  was owned by Cambodia and stolen from Cambodia.  You are saying

24  that what triggers their knowledge in that scenario you just

25  gave me is merely the fact that they went to an expert and the

C9rdcamm

1    expert said it might be stolen.

2              MS. PAUL:  That is right.  The argument I just

3    advanced only goes to Sotheby's knowledge post-import.

4              THE COURT:  Right.

5              MS. PAUL:  That is true, your Honor.

6              We have other claims that go to Sotheby's knowledge at

7    the time that the statue -- at the time of import, which I

8    think we discussed a little bit already, your Honor, and the

9    combination of the fact that the statue was cut off at its

10   feet, that the statue came from the archeological site of Koh

11   Ker, that it had no provenance prior to 1975, that this was a

12   period of rampant looting, that Sotheby's has a worldwide

13   compliance department and is a sophisticated participant in the

14   southeast Asian art market, I think just based on those facts a

15   reasonable jury could certainly conclude that Sotheby's, even

16   at the time of import, was aware of a high probability that the

17   statue had been looted, it had been stolen, and deliberately

18   looked the other way.

19             And, also, just to be clear, your Honor --

20             THE COURT:  And that they were aware of the clear and

21   unambiguous law that gave Cambodia its right to the statue?

22             MS. PAUL:  Yes, because they are not an ordinary

23   participant in the art market; they are Sotheby's.

24             THE COURT:  So you are just going to ask for that

25   inference, or you are hoping that you are going to find

C9rdcamm

1    something in discovery that is going to prove that actual

2    knowledge?

3              MS. PAUL:  Well, your Honor, I think the forfeiture

4    pleading laws are clear that the complaint does not have to

5    meet the ultimate trial burden.  And the complaint in fact

6    cannot be dismissed -- the dismissal of a complaint is

7    explicitly prohibited on the ground that at the time of the

8    filing the government didn't have enough evidence to establish

9    its forfeitability.

10             So while the arguments I've just advanced are the

11   arguments that we could make to a jury based on what we have

12   alleged in our complaint, it is abundantly clear from the

13   pleading rules for forfeiture that we're entitled to rely on

14   much more than that, and that the complaint can't be dismissed

15   simply because we don't have all of that evidence at the time

16   of filing.

17             THE COURT:  OK.  All right.  Thank you.

18             MS. PAUL:  Thank you.

19             THE COURT:  Do you want to respond?

20             MR. NEIMAN:  Just very briefly, your Honor, in a

21   couple of points.

22             I think from the questions your Honor has asked both

23   me and my colleague, you clearly have a firm grip on the case,

24   but there are a couple of clarifications that I wanted to make

25   of a few points that Ms. Paul made.  And if there are any other

C9rdcamm

1   questions you wanted to ask me, obviously I am prepared to

2   answer them.

3            First, the suggestion that after you read the full

4   views of the art historian you could believe that she still

5   thought it was stolen, I mean, this is what she said.  What she

6   said was, "legally and ethically you can happily sell the

7   piece," and when she said, "The piece was obtained legally, so

8   it can be legally sold."  I think that is a pretty clear

9   retraction of the statement that it was previously stolen that

10  she had previously made.

11           I do go, your Honor, one step back to the big picture

12  here of what is going on.  This is obviously very important to

13  both of my clients.  But I think some of the questions you have

14  been asking and some of the points we have hopefully made to

15  you illustrate that, from our perspective, this case is exactly

16  what the due process standard was designed to catch and prevent

17  from happening.  We have here a foreign law that, at least when

18  I read it, doesn't lead to the conclusion that the government

19  proffers.  That in 87 years they don't have a single example of

20  it ever being enforced with the meaning that they are giving

21  it.  We have a company who is in contact with an art historian

22  who tells them that legally and ethically you can happily sell

23  the piece and that it was lawfully obtained.

24           And you have a situation where I think a clear look at

25  this is not that Sotheby's must have known that this thing was

C9rdcamm

1   stolen when they imported it, but, rather, that there were lots

2   and lots of things that would give them comfort that while it

3   was not possible to know with certainty exactly what had

4   happened -- and it never is or rarely is with antiquities --

5   there were lots and lots of things here that suggested to them

6   that it was lawful and proper.  And then they conducted

7   themselves in a way that you would expect a company to conduct

8   themselves, which was they were prudent.  They displayed this

9   thing openly.  They put it on the cover of their catalog, and,

10  as you point out, they wrote to the e-mail address of the

11  senior official of culture and ministry and told them what they

12  had.

13          And having done all that and being met now with the

14  allegations that are made here, I'm comforted by the fact that

15  there is a due process standard here that says, you know, there

16  has to be a clear and unambiguous foreign law and that there is

17  a pleading standard the Second Circuit has said is more

18  rigorous than the regular pleading standard precisely because

19  of the harsh consequences that come with a forfeiture

20  complaint, which is that a person's property is tied up

21  potentially for years in litigation if the complaint goes

22  forward and there is the stigma of the government saying you

23  knew this thing was stolen and you brought it into this country

24  anyway.  I'm comforted that we have both that due process test

25  and that heavy pleading standard, because I think it provides a

C9rdcamm

1   path for the Court to do what I think is the right thing to do

2   here, which is to say to the government you haven't shown me a

3   clear and unambiguous law, you haven't shown me enough to think

4   that Sotheby's could possibly have known the legal theory that

5   you are articulating that makes this thing stolen because the

6   only place that legal theory has ever appeared is in the

7   affidavit that your expert put in in this complaint, and that

8   when you have all of those things, these legal doctrines say

9   the appropriate result is to dismiss the complaint and the

10   matter goes forward from there.

11          Now, I think, just to touch on one point that I think

12   is very important that Ms. Paul said in trying to suggest that

13   your Honor was not in a position to make a judgment about

14   whether the law was clear and unambiguous sufficient to meet

15   the due process test, I would just point out that you wouldn't

16   need to hear from an expert before you could reach that

17   conclusion.  I mean, I would just point out that the test is

18   whether the language is clear and unambiguous.  You can look at

19   the language and make that judgment for yourself.  That is what

20   the Fifth Circuit did in McClain, where all the experts said

21   one thing and the Fifth Circuit said the opposite.  It wasn't

22   that they felt that they needed to hear from an expert.  They

23   looked at the language and said it just doesn't say what the

24   experts say it does.  That is the kind of judgment that the

25   Court can make all the time.  That is the judgment that the

C9rdcamm

1   Second Circuit said they were confident that courts could

2   make --

3          THE COURT:  You only addressed the 1925.  They have

4   raised the 1900 decree.

5          MR. NEIMAN:  I am happy to address that as well, your

6   Honor, because there are two critical or three critical points

7   about the 1900 law that I want to make sure your Honor focuses

8   on.

9          THE COURT:  Remind me of where you have the 1900 law.

10          MR. NEIMAN:  Sure.  Let me just find it myself and I

11   will point you to it as well.  It is an attachment to my

12   affidavit in support of the motion to dismiss the complaint,

13   and it's at tab -- hold on a second and I will find it for you.

14   The 1900 law is at Exhibit 8.

15          And just a reminder, you know, this is the one that

16   was so obscure that we didn't even have a fully legible copy of

17   it that the government produced to us in discovery in this case

18   after they had brought their case.  Some of the critical things

19   that are in the 1900 law that I want to call your Honor's

20   attention to, if you look at paragraph 7 of the 1900 law --

21   this translation, you know, is a third of the pages of the

22   exhibit from my affidavit --

23          THE COURT:  Article 7?

24          MR. NEIMAN:  Article 7, yes, talks about how

25   "Expropriation for reasons of public utility of a classified

C9rdcamm

1   immovable property may not be pursued without prior

2   authorization."  So it is making clear that expropriation, that

3   is, taking title, is different from this classification.

4          And it says at Article 9 that, "The Governor General

5   may, in complying with legislation in force in Indochina,

6   pursue the expropriation of classified monuments or those which

7   would be the object of a proposal for classification refused by

8   the owner."

9          So it is very clear, your Honor, from this statute

10  that not every monument is owned by the government and that

11  classifying a monument doesn't make it owned by the government.

12         So now let's turn to Article 17, which is the article

13  that the government relies on.  And the government says that

14  "Ownership of art or archeological objects" -- and then it

15  lists various examples -- "which may exist on or in the soil of

16  immovable properties" -- it is not all immovable properties --

17  "constituting a part of the national domain in Indochina or

18  granted by the Government to private individuals shall be

19  reserved for the domain."

20         OK?  So it is not saying that all statues, all

21  antiquities belong to the government.  It is saying only that

22  those that are part of the national domain belong to the

23  government.

24         Then the question is, what is the evidence that this

25  ruin was, quote, part of the national domain?  Here's how the

C9rdcamm

1    cases proceeded on that question, your Honor.

2            In the complaint the government cited to an 1884

3    decision by the French governor in which the French governor

4    said, you know, objects that are consigned to public service,

5    words to that effect, are part of the public domain.  And the

6    government seemed to be inferring from that that the ruins of

7    an ancient temple would be part of the national domain.  As we

8    pointed out in our first brief, it's far from unambiguous that

9    an ancient ruin that was at one time a thousand years ago a

10   government, you know, a capital but was abandoned to the jungle

11   remained a piece of property that's designated to the public

12   use and therefore would fit within this definition.  That's

13   what they said in their complaint.  We pointed out that there

14   was really quite a bit of ambiguity about that, and they

15   dropped that point.  Instead, they said, well, it is the 1925

16   law that establishes it, and that is the one that I started

17   talking about at the beginning today.  Then they said it is the

18   1925 law that establishes this as part of the national domain.

19   Then, of course, the word "national domain" doesn't appear in

20   the 1925 law.  All the 1925 law has is the "of," which the

21   government would have you read as "belonging to" and, as we

22   point out, is much more naturally read as "located in."

23           So what you have here, your Honor, is nothing remotely

24   like the kind of clarity and lack of ambiguity that would put

25   anybody on notice of a theory that the government has not been

C9rdcamm

1    able to find a single instance which anybody has ever advanced

2    before.

3         So, you know, our view is that when you add this all

4    up, there is not a clear and unambiguous law.  There is not any

5    evidence that would defeat the good title we believe Ms.

6    Ruspoli obtained when she bought this in 1975.  And there

7    certainly is not any evidence that Sotheby's knew this was

8    stolen, that they knew of the relevant law that would make it

9    stolen.  And despite ambiguities interpreted in a fashion that

10   had never been interpreted before, there is just no evidence of

11   all of that.

12        And the proper course, when we are in that situation,

13   is not to keep property titled indefinitely in litigation where

14   the government hopes that it might someday have a case, where

15   the heavy pleading standards and due process rules are such

16   that they need a clear and unambiguous law, that they need a

17   reasonable basis to believe that they are going to be able to

18   meet their burden of proof.  They don't have either of those

19   things here, and the proper course is to dismiss.

20        THE COURT:  Did you have something?

21        MS. PAUL:  Just very briefly, your Honor, if I may?

22        THE COURT:  Sure, you may.  You can do it from there.

23        MS. PAUL:  Oh, OK.

24        Your Honor, if I could just go back briefly to the

25   Cambodian laws.  And, first of all, with regard to the 1900

C9rdcamm

1   decree, the government is not talking here about any monument

2   or every monument; we're talking about monuments that are on

3   property that was part of the national domain.  So monuments

4   that would be covered specifically by Article 17 of the 1900

5   decree.  That's what we are talking about here.

6          And we believe it's very clear that this statue was on

7   property that is part of the national domain.  If it wasn't

8   clear in 1900, there is no question, in the government's view,

9   that as of May 16, 1925 it becomes clear, because that May 16,

10  1925 decree specifically lists the temple that's property

11  that's of French Indochina, which is the national or the

12  colonial domain.

13         Now, the claimants have made an argument that the

14  reference to the monuments being historical monuments of French

15  Indochina is some kind of reference to where the monument was

16  located, but we don't believe that's the case.  If you read the

17  entire clause, even if you accept their translation, which we

18  don't necessarily at this stage, but even taking the claimants'

19  translation, the text of the decree, it reads as follows:  "The

20  real estate and tangible movable item located within the

21  territorial limits of the Indochinese Union, as listed in the

22  tables attached to this decree, are classified among the

23  monuments and historic objects of French Indochina."

24         So if the second part of the sentence was just a

25  reference to where the monuments and the objects were located,

C9rdcamm

1    there would be no reason to say in the first part of the

2    sentence this is where the monuments are located.  The first

3    part of the sentence refers to the location.  It says we're

4    talking here about items that are located within the

5    territorial limits of the Indochinese Union.  So we think it is

6    a much more reasonable reading of the statute, reading of this

7    particular law that the second part of the sentence is a

8    reference to the fact that French Indochina owns these

9    monuments.  And if you look at the list of what the monuments

10   are, these are all temples, historical monuments, ruins, roads,

11   things of that nature.  So that's we think clearly the better

12   reading.  We wanted to point that out for your Honor.

13            I just close by making the one final point that the

14   claimants keep going back to this argument that this is some

15   kind of novel legal argument we're advancing, but on the flip

16   side of that, there is no evidence that anybody has ever argued

17   what Sotheby's is currently arguing, which is that property

18   looted from a Cambodian temple does not constitute stolen

19   property.  So it is not clear whether Cambodia ever even had

20   occasion to make these arguments before because it is not clear

21   that anybody has made the argument Sotheby's is making, which

22   is that looted property, property that came from a temple, was

23   not stolen property.

24            THE COURT:  I assume, based on your theory, that you

25   could have written up the same complaint against the museum in

C9rdcamm

1    Los Angeles and relied on the same inferences to accuse them of

2    knowingly importing the other statue in violation of Cambodian

3    law.

4              MS. PAUL:  I don't think that is necessarily the case,

5    your Honor.  I don't think so.

6              THE COURT:  What is the distinction that you draw?

7    That's why I asked the question.  I mean, what distinction do

8    you draw?  Everything that you gave me that you say is the

9    inference that I should rely upon in your complaint to say that

10   you have the basis to accuse them of importing stolen property

11   is exactly what applies to the museum.  What is the distinction

12   you draw?

13             MS. PAUL:  With respect to importation, I don't

14   believe we could have brought a complaint against the Norton

15   Simon Museum based on importation because it wasn't imported

16   within the past five years, so the statute of limitations would

17   have run on that claim.

18             As to their knowledge after importation, that's

19   something that we are still investigating and something that

20   perhaps we will bring a claim on, but as your Honor saw, we

21   have many allegations about what Sotheby's knew after

22   importation.  We believe we would have to allege something

23   similar against the Norton Simon Museum to proceed on that

24   front.  But as to the claim regarding importation, we don't

25   think we could make that claim right now because the statute of

C9rdcamm

1    limitations has run as to that statute.

2            THE COURT:  Well, I guess the real critical question,

3    and probably not dispositive of this case, is it's not whether

4    you could do that but I don't have any indication that any

5    Cambodian government official has asked you to do that.  The

6    only evidence -- indication I have in the pleadings and in the

7    briefs is that they are perfectly happy with the Cambodian

8    statue being in Los Angeles and not being in Cambodia and

9    remaining in the museum.

10           So, you know, you want to apply a fact theory to

11   Sotheby's only because they want to get this particular statue

12   back and they have not raised any of these issues -- quite

13   frankly, once they got any notice that this Cambodian statue

14   was coming in or was in the United States, they had all the

15   information they needed about the statue because they knew the

16   statue was in a museum for decades.  They knew the other thing

17   was already here, and they made no claim to recover that

18   statue, nor do you give me any indication in the pleadings or

19   in these papers that they have taken any affirmative steps to

20   try to advance this argument which, as I started out, I don't

21   see why this argument applies to Sotheby's.

22           The only distinction you draw is that the argument --

23   the only difference of whether this argument could apply to

24   Sotheby's and also apply to the museum is that if you had --

25   that Cambodia never asked you to timely move against the

C9rdcamm

1   museum, and if you had timely moved against the museum within

2   five years of its importation, I assume you would have done so

3   if you were requested to do so by the Cambodian government.

4   There is no reason to believe the Cambodian government then, or

5   now, has expressed any belief that the other item is rightfully

6   theirs and has been imported into the United States knowing

7   that it was stolen or held in the United States knowing that it

8   continues to be stolen, or advancing the argument in that

9   circumstance that you are advancing here.

10          MR. WILSON:  Your Honor, could I speak to the Norton

11   Simon issue just because I am a little bit more familiar than

12   is Ms. Paul?

13          THE COURT:  Sure.

14          MR. WILSON:  First of all, let me just confirm that,

15   as I think Ms. Paul has indicated, the government's view is

16   that facts about prior enforcements of these decrees were not

17   things that we were required to plead, and we certainly have

18   not; and your Honor is correct, there is nothing in the

19   pleadings to that effect.

20          We can certainly represent to you here that Cambodia

21   has in fact requested us to pursue any actions we can take to

22   recover the statue from the Norton Simon, which they do assert

23   is the property of Cambodia under the same laws as are being

24   asserted here.  As to whether we would be able to move against

25   them, as Ms. Paul said, that's something we're investigating.

C9rdcamm

1    Just a couple of points I wanted to add.  One is that while

2    these came from the same place, we still have to identify the

3    evidence of how they were sold, what the Norton Simon was told

4    about them at the time, any other evidence beyond their pure

5    provenance that would indicate their knowledge that it was

6    stolen.

7             THE COURT:  But why?  Because you don't have any of

8    that knowledge about Sotheby's.

9             MR. WILSON:  Well, we do, your Honor.

10            THE COURT:  What do you know about Sotheby's about

11   what knowledge they had as to whether or not it was stolen

12   other than the same inferences would apply to the museum?

13   Because the museum should know as well if not better than

14   Sotheby's because they are more expert in this area than they

15   are of where this antiquity came from and that it was lopped

16   off at the feet and all the inferences you are saying that

17   should be drawn against Sotheby's are clear inferences that can

18   be drawn against the museum.

19            MR. WILSON:  Well, there are a number of issues.  As

20   to the inferences that we can draw against the museum, one

21   issue is that we don't know what they were told about the

22   provenance.  Here we know that Sotheby's took this item knowing

23   it was unprovenanced before 1975.  It is entirely likely that a

24   similar type of provenance was provided to Norton Simon; we do

25   not have that information at that time.  Until we do, that is a

C9rdcamm

1    crucial fact that we need to allege.

2            Another issue, your Honor, is that while Sotheby's

3    knew what it knew prior to importation, we can take their

4    conduct after they were informed by the art historian that it

5    was stolen, see what they did then, and draw an inference about

6    their conduct afterwards and what it means for their likely

7    knowledge before it.

8            THE COURT:  Yes, but --

9            MR. WILSON:  The fact that they continue to try and

10   sell this statue and did what they did as Ms. Paul has laid out

11   after being told point-blank that this was stolen and that it

12   came from Koh Ker and that they had found where the feet were

13   is a different set of facts that adds weight to the inference

14   that they knew about the fact that it was stolen prior to

15   provision and we don't know if there are similar facts with

16   respect to Norton Simon yet.  And as we are saying, we are

17   continuing to look into it.

18           THE COURT:  It depends on how you look at it.  The

19   reality is is what did Sotheby's do after this conversation?

20   It did exactly what they would have done had they not had the

21   conversation.  They didn't do anything to attempt to hide.

22   They didn't do anything to attempt to avoid anybody being able

23   to make a claim against this property.  They didn't do anything

24   that would give one -- I mean, you are experienced enough in

25   the criminal area to know what you would be arguing to me as

C9rdcamm

evidence of someone's mens rea, you know, in terms of their

knowledge that they're dealing in stolen property.  If they

were told -- I mean, if I sell you a car and then I tell you on

your way from the courthouse that, oh, yeah, by the way, the

car was stolen, you would be pointing to me some actions that I

may or may not be taking in terms of what I am going to do with

that information or how I was going to act having guilty

knowledge rather than innocent knowledge.

So, you know, Sotheby's did exactly the public and

standard things that they always do when they have something to

sell; they didn't act like they knew they had stolen property.

MR. WILSON:  Your Honor, I don't want to revisit too

much stuff that Ms. Paul has already said, but I simply don't

think that that is true.  Sotheby's does not routinely send

people who are working on their behalf to quietly try and

determine, without mentioning the fact that they intend to sell

a piece, to a foreign nation whether they are currently

entertaining enforcement actions about pieces looted from that

country that are about to be sold, which is what happened here.

THE COURT:  Then you ignore what else happened.  They

knew that this individual was in direct communication with

Cambodian officials.

MR. WILSON:  You are right, your Honor, but they

didn't ask -- but, your Honor, if I may?  They didn't ask her

to say Sotheby's is selling this statue, is there any problem

C9rdcamm

1    with that that you are aware of.  That I think is what

2    Sotheby's would have done if they were told something was

3    stolen and wanted to find out if it was stolen.

4            THE COURT:  So you believe that the evidence indicates

5    that when she had the conversations with the Cambodian

6    government, Cambodia did not know that they were in possession

7    of the statue?

8            MR. WILSON:  I don't believe it is even disputed, your

9    Honor, that that is the case.  Sotheby's very carefully decided

10   not to have the art historian share that information with

11   Cambodia, and they ultimately determined to send that single

12   e-mail.  And it is the government's view that the reasonable

13   inference there, and certainly the inference to be drawn in the

14   government's favor on a motion to dismiss, as they are to be

15   drawn, is that that was designed essentially to cover Sotheby's

16   in case Cambodia did become aware of it and decided to make a

17   claim.  There is no question that Sotheby's is a, by and large,

18   legitimate dealer that does legitimate business.  They didn't

19   want to have themselves in the exact situation that they find

20   themselves now where somebody was asserting a claim against

21   them.

22           Their perspective based on the fact that I think it is

23   safe to infer was that they could send this e-mail.  I think

24   they even lay out in one of the internal e-mails that we quoted

25   in the complaint.  Hope that they got no response.  And then

C9rdcamm

sell it.  And always be able to point and say, well, you didn't

complain so we went ahead and relied on it.  And that's what

they were hoping to do.

          We would submit that the normal response if Sotheby's

had no guilty conscious, had no mens rea, was just alerted to

the fact that something might be stolen, would be to pick up

the phone and call Cambodia and say, hey, is this stolen,

because we wouldn't want to sell anything that is stolen so we

want to make sure that it is not.  That is absolutely, your

Honor, indisputably not what happened in this circumstance.

          THE COURT:  You know, I give Cambodia and Cambodian

government officials a little more credit than you do.  I think

that they are sophisticated enough to be aware of their

telephone messages, to communicate by e-mail on an everyday

basis the same way you and I communicate by e-mail, and I have

no reason to believe that if someone sent you an e-mail, that

you could argue to me that somehow they sent it to you hoping

you would never read it and that's how they were going to

surreptitiously try to sell it out from under you.

          If I sent you an e-mail saying you know what, I like

your car, I'm going to sell it to someone else, I don't know if

you could argue that the reasonable inference is I sent you the

e-mail telling you I was going to sell your car hoping that you

wouldn't read your e-mail and therefore that is somehow

evidence of the fact that I knew that I had your stolen car and

C9rdcamm

1    I was trying to do it behind your back

2              MR. WILSON:  I mean, your Honor, I actually -- I guess

3    I disagree.

4              THE COURT:  You think an e-mail in this day and age to

5    a sophisticated government official is somehow some

6    surreptitious communication in the manner that I'm supposed to

7    assume that it is going to get by them and they will never read

8    it, as opposed to --

9              MR. WILSON:  Your Honor, not "assume," they hoped.  I

10   think they hoped that it would get by them.

11             Government officials receive a huge amount of

12   unsolicited mail every day that frequently doesn't even get

13   read by the underlying official.  There is no evidence here

14   that this individual read it.  Your Honor, he doesn't speak

15   English.  I'm not sure he speaks English at all.  It certainly

16   is not his native language.

17             If I was going to communicate with someone in Cambodia

18   and wanted to make sure that they actually got the message, I

19   would either find someone I knew to be English speaking, submit

20   the information in their native language, and, more importantly

21   I would confirm that they had received it.  To be perfectly

22   honest with you, your Honor, I get e-mails all time that are

23   diverted into spam because my spam filter is handled by someone

24   in Washington that is weird.

25             THE COURT:  I would assume they didn't spam the

C9rdcamm

1  Cambodian government.

2          MR. WILSON:  Your Honor, I will give you an example.

3  There is in fact a person on one of my cases who is not a

4  government employee but who is just a member of an outside

5  organization who sends me e-mails and they are diverted to

6  spam.  And had he not called me and said why aren't you

7  responding to me, I would never have known.  The point here

8  is --

9          THE COURT:  Do you believe that the Cambodia

10  government did not get this e-mail?

11          MR. WILSON:  Honestly, your Honor, standing here

12  today -- we can find out for you -- I don't know that they got

13  the e-mail at all.  And more to the point --

14          THE COURT:  But they hadn't represented to you that

15  they didn't get the e-mail and/or that they weren't aware that

16  Sotheby's --

17          MR. WILSON:  They certainly became aware by the time

18  of the sale that Sotheby's was planning to sell it.  I don't

19  know if it was because of that e-mail.

20          THE COURT:  Yes.  How do you claim that they became

21  aware of it?

22          MR. WILSON:  I don't know that we have that

23  information, your Honor, at least not as we sit here today.

24  I'm sure that we can find out for you if you want.  But, your

25  Honor, this is sort --

C9rdcamm

1          THE COURT:  The inference isn't that they became aware

2     of it somehow other than because they got an e-mail from

3     Sotheby's, that could have been --

4          MR. WILSON:  That could have been, your Honor.  I'm

5     not suggesting that Sotheby's had a plan where they were sure

6     that no one would ever read it.  My point is that that they

7     hoped that no one would ever read it.  If they did read it,

8     they wouldn't pay attention to it.  If they didn't pay

9     attention to it, they would then sell the painting and be able

10    to claim to the world that they acted in reliance on the lack

11    of action by the Cambodia government.  And I think that is laid

12    out that that was their hope in another e-mail -- and maybe I

13    can find it in the complaint, because we cited an e-mail in the

14    complaint.  It states that why don't we just send this catalog

15    entry, wait ten days.  If we hear nothing, declare victory and

16    sell it.

17         THE COURT:  That is a significant supposition rather

18    than any evidence that you pointed to that would lead

19    compellingly to that conclusion or --

20         MR. WILSON:  Your Honor, they were informed -- your

21    Honor, you are right --

22         THE COURT:  That's a theory, but you don't base that

23    on anything.  I mean, that is really -- as they say, that's the

24    only way you could explain why you would send somebody an

25    e-mail telling them that you have their property and intend to

C9rdcamm

```
 1  sell it, the only rational argument that you can make, if they
 2  did what you said they did, is they hoped that they wouldn't
 3  read it.  That's like saying I put it up on a billboard I'm
 4  going to sell their property, so the only argument you could
 5  make is, yeah, you put it up on a billboard but you did it
 6  hoping they would never pass by and see the billboard.  You
 7  don't have any basis to announce that they did this, that that
 8  was their theory --
 9          MR. WILSON:  Your Honor, in one of their e-mails they
10  suggest that that is their theory.
11          THE COURT:  What e-mail is that?
12          MR. WILSON:  Hold on one second.  I will try and find
13  it.
14          THE COURT:  What language suggests that they attempt
15  to deceive them by telling them?
16          MR. WILSON:  So on page 14, it is paragraph 27 of the
17  complaint, we quote an e-mail which says -- I will read the
18  whole thing:
19          "Do you think you could work on your essay" --
20          This is an e-mail to the art historian from the
21  Sotheby's employee.
22          -- "and complete it by the end of August?  Our legal
23  department has suggested that perhaps once you've completed the
24  essay you would like to share it with the Minister of Culture
25  purely for intellectual/art-historical exchange of views.  This
```

C9rdcamm

1    way he will be properly informed well in advance. . .  If he

2    doesn't react adversely (within a time span of 7-10 days), then

3    we will first celebrate and then immediately go ahead and

4    prepare our museum packs and send out the packs to all the

5    museums we have listed as targets."

6         THE COURT:  So why is that consistent with let's send

7    them an e-mail telling them that we're going to sell their

8    property but hope they don't read it or they don't understand

9    what that really means?

10        MR. WILSON:  Well, your Honor, because of the entire

11   chain before that which indicates that they were made aware

12   that it had been stolen, and this is their solution to figuring

13   out if it is stolen from Cambodia is to send them an e-mail not

14   mentioning that it might be stolen and saying, you know, for

15   intellectual and art-historical exchange of views.  It is

16   disingenuous, your Honor.  That is not the reason they are

17   sending it.

18        Clearly in this e-mail they are suggesting that they

19   present this information, as I think the e-mail does, in a

20   disingenuous way.  At no point in that e-mail do they suggest

21   that there might be any issue about the provenance of the

22   statue or any claim of any stolen nature of it, all of which it

23   is simply inconceivable that you wouldn't mention if you were

24   making a good faith effort to alert someone to possibly stolen

25   property --

C9rdcamm

1          THE COURT:  Yes, but that is not the e-mail that you

2     are talking about.

3          MR. WILSON:  No.  The e-mail I am talking about is the

4     decision that they made --

5          THE COURT:  It was the e-mail to Cambodia, not the

6     e-mail to their expert.

7          MR. WILSON:  Right.  The e-mail to Cambodia is

8     similar.  The e-mail to Cambodia notes, well --

9          THE COURT:  It clearly indicates that they have a

10    piece of their antiquity from Cambodia.  Does that mean they

11    specifically notify them that they have the statute?

12         MR. WILSON:  It notifies them that they have the

13    statue and are intending to sell it.  It doesn't notify them

14    that it is a possibly stolen statue.  It doesn't ask whether

15    there is any ambiguity --

16         THE COURT:  If I say I have your car and I intend to

17    sell it, what do I have to say?  Do I have to say that I have

18    your car that I stole?

19         MR. WILSON:  Your Honor, they don't lay out --

20         THE COURT:  They say I have the statue and we are

21    going to sell it.  What else could they say?

22         MR. WILSON:  They could say we have a statue looted

23    from Koh Ker, which is what they knew at the time.

24         THE COURT:  Isn't that a reasonable e-mail under these

25    circumstances --

C9rdcamm

1          MR. WILSON:  Not if you are trying to mislead the

2   Cambodian government into not pursuing a claim.

3          THE COURT:  But they're not trying to mislead the

4   Cambodian government but just simply trying to notify them that

5   you have a statue that a private collector says he wants to

6   sell and you intend to sell it.  So if you've got any problem

7   with that, you had better let us know.

8          MR. WILSON:  Your Honor, it is that last piece that is

9   not in the e-mail.

10          THE COURT:  Which piece?

11          MR. WILSON:  If you have a problem let us know.  There

12   is nothing in the e-mail saying if you have a problem let us

13   know.  If this e-mail had included something saying if the

14   Cambodian government has any concerns about selling this

15   property or believes that it has a claim, let us know, I doubt

16   very much, your Honor, that we would be here today.  But that

17   is not what they did.  And I think the evidence and certainly

18   the inferences you could draw and should draw in the

19   government's favor is if they had wanted to know whether it was

20   stolen, that is exactly what they would have included.

21          I would also note, your Honor, that, of course, the

22   evidence that we have alleged in the complaint is sufficient to

23   support the allegations.  The real evidence of this, the

24   information about what Sotheby's was thinking when they were

25   doing this is in the heads of the Sotheby's employees that we

C9rdcamm

1   believe we are entitled to depose in discovery.  On a motion to

2   dismiss, your Honor, I think you have to draw this inference in

3   the government's favor.

4           THE COURT:  OK.

5           MR. WILSON:  Just to come back at the very end, and I

6   know we've sort of drifted far afield, to the Norton Simon

7   statue, this is exactly the sort of information that at present

8   the government doesn't have regarding the Norton Simon statue.

9           And, in particular, just as to your question why

10  Sotheby's didn't promptly notify the government because then we

11  could have gone after it five years after it was imported, it

12  is important to note here that --

13          THE COURT:  Not Sotheby's?

14          MR. WILSON:  Cambodia, certainly not Sotheby's, your

15  Honor.

16          It is important to note that Cambodia was still in the

17  midst of a civil war until, I believe, 1989.  This thing was

18  sold between '75 and I think maybe 1984, or it may have been

19  '81.  In any event, the point being, your Honor, there wasn't a

20  functioning government of Cambodia to ask the United States

21  government to do anything during the relevant timeframe, which

22  is unfortunate but that's so that I don't think a negative

23  inference should be drawn against Cambodia because during that

24  period of civil war they weren't able to make those sorts of

25  requests.

C9rdcamm

1          THE COURT:  Well, at least in the last 13 years they

2     were able to make whatever requests they wanted to make with

3     regard to the --

4          MR. WILSON:  Well, that is true, your Honor, but it

5     still causes the problem of importation and evidence gathering

6     from the earlier period.

7          The one other point that I would make as to when

8     Cambodia could start to affirmatively make these sorts of

9     requests, it is only in 2007 that the feet for both of these

10    statues were identified and, therefore, you could have the

11    clear evidence of looting, which before was an inference which

12    could be drawn but wasn't something that you could necessarily

13    prove in court that this statue came from this place.  That is

14    only identified for the first time by anyone in 2007, when the

15    location finally was demined and become accessible.

16         THE COURT:  At this point what I am going to do:  Let

17    me go back to the complaint and the documents incorporated by

18    it.  It seems to me that my main issue is whether or not it

19    meets the standards to go forward to discovery in this case.

20         Quite frankly, I think the government has significant

21    hurdles to overcome and is maybe looking for a smoking gun in

22    order to prove this case, because I'm not sure, as you beg for

23    further discovery, I think it is an indication that if this is

24    all you have at the end of this case, you don't have the

25    strongest case that might support a forfeiture here, unless you

C9rdcamm

1   get something else other than just these inferences and

2   surmises about what they must have thought and what they must

3   have known.  This isn't the strongest case of knowledge of

4   stolen property and clear ownership established by clear and

5   unambiguous language.

6          So at this point, you know, I will look very closely

7   as to whether or not the government has the right to move

8   forward and, as I say, whether or not I believe that it is

9   reasonably likely that the government has alleged a sufficient

10  minimum set of facts to conclude that the government proves

11  those facts, and only those facts, that they have alleged, that

12  that would be a sufficient basis, a reasonable basis to believe

13  that this was stolen.

14         The argument that you hope that you should find

15  something stronger is not the most compelling argument.  If you

16  can support what you claim here, that there is a reasonable

17  basis to believe that there is some evidence to support what

18  you've alleged here, that this is a lawful theory, then you can

19  move to the next stage.  Then you can revisit this on a summary

20  judgment motion probably, which, quite frankly, I don't see

21  significant discovery in this case, if this case were to go

22  forward; it should be able to be done fairly quickly and fairly

23  directly.

24         But let me look at the complaint and see whether or

25  not I think the government met its minimum threshold, and I

C9rdcamm

1    will try to resolve it fairly reasonably, within the next 30 or

2    60 days at the latest.  We can either resolve this and move

3    forward, or if it is appealed if I dismiss it, or to be able to

4    bring this up for sale, if that is the appropriate thing to be

5    done at this point in time.

6              So this has been helpful.  Thank you.

7

8                              -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25