UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
UNITED STATES OF AMERICA,                          )
                                                   )
                              Plaintiff,           )
                                                   )
           - v. -                                  ) **12 Civ. 2600 (GBD)**
                                                   )
A 10th CENTURY CAMBODIAN SANDSTONE                 )
SCULPTURE, CURRENTLY LOCATED AT                    )
SOTHEBY'S IN NEW YORK, NEW YORK,                   )
                                                   )
                              Defendant in rem.    )
------------------------------------------------------------------ X

# CLAIMANTS' MEMORANDUM OF LAW IN OPPOSITION TO GOVERNMENT'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .................................................................................................................................. 4

I.    Legal Standards ................................................................................................................... 4

II.   The Motion For Leave To Amend Is Futile ........................................................................ 5

    A.   The proposed amended complaint, like the original, fails adequately to allege that the Statue was stolen .......................................................................................... 5

    B.   The proposed amended complaint, like the original, fails adequately to allege that the Statue remained stolen ................................................................................. 10

    C.   The proposed amended complaint, like the original, fails adequately to allege that Sotheby's knew the Statue was and remained stolen ............................................... 11

III.  The Government's Delay In Filing For Leave To Amend Has Unduly Prejudiced Claimants and Squandered Judicial Resources ................................................................ 14

CONCLUSION ............................................................................................................................. 16

# TABLE OF AUTHORITIES

# TABLE OF AUTHORITIES

Cases

*Forman v. Davis*,
  371 U.S. 178 (1962) ..................................................................................................... 4

*In re Merrill Lynch & Co. Research Reports Securities Litigation.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd in part & rev'd in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ................... 15

*In re Nokia OYJ (Nokia Corp.) Securities Litigation*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006) ......................................................................... 14

*Ku v. U.S. Dep't of Hous. & Urban Development*,
  No. 11 Civ. 6858, 2012 WL 2864509 (S.D.N.Y. May 14, 2012) ................................. 4

*Lucente v. IBM Corp.*,
  310 F.3d 243 (2d Cir. 2002) ......................................................................................... 5

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ......................................................................................... 4

*PI, Inc. v. Quality Products, Inc.*,
  907 F. Supp. 752 (S.D.N.Y. 1995) ............................................................................. 14

*Ruffolo v. Oppenheimer & Co.*,
  987 F.2d 129 (2d Cir. 1993) ......................................................................................... 5

*Stevens v. City of New York*,
  No. 10 Civ. 5455, 2011 WL 3251501 (S.D.N.Y. July 22, 2011) ................................. 4

*United States v. Mask of Ka-Nefer-Nefer*,
  No. 4:11CV504, 2012 WL 1094652 (E.D. Mo. Mar. 31, 2012) ................................... 8

*United States v. McClain*,
  545 F.2d 988 (5th Cir. 1977) (*McClain I*) ................................................................ 5, 6

*United States v. McClain*,
  593 F.2d 658 (5th Cir. 1979) (*McClain II*) ...................................................... 5, 6, 7, 8

*United States v. One Tyrannosaurus Bataar Skeleton*,
  No. 12 Civ. 4760 (PKC), 2012 WL 5834899 (S.D.N.Y. Nov. 14, 2012) ......... 8, 9, 10, 12

*United States v. Portrait of Wally*,
  No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002) ................................... 5

*United States v. Schultz*,
  333 F.3d 393 (2d Cir. 2003) .................................................................................. 6, 7, 8

*Vine v. Beneficial Finance Co.,*
    374 F.2d 627 (2d Cir. 1967) ..................................................................................................15

*Volunteer Fire Association of Tappan, Inc. v. County of Rockland,*
    No. 09 Civ. 4622, 2010 WL 4968247 (S.D.N.Y. Nov. 24, 2010) ......................................4, 15

### Rules

Fed. R. Civ. Proc. 15(a)(1)(B)(2).......................................................................................................4

## **PRELIMINARY STATEMENT**

During oral argument on our motion to dismiss, the Court pressed the Government to identify "clear ownership established by clear and unambiguous language." 9/27 Tr. at 126. The Government was unable to do so. The French colonial decrees on which it relied simply do not clearly and unambiguously grant the state ownership of objects like the Statue, and the Government and its expert could not identify even *one* instance, in the eighty-seven years since the decrees were issued, in which *anyone* had interpreted those decrees as doing so.

The proposed amended complaint ("PAC") does not solve this fatal weakness in the Government's case. The PAC does not identify some newly found law declaring Cambodia the owner of the Statue—indeed, it does not identify *any* law beyond those already discussed in the Government's prior filings. Instead, the Government now relies on the inherent right of kings. The PAC claims that a Cambodian king a thousand years ago built the Prasat Chen temple where the Statue's feet were allegedly found, and asserts that the Statue – and anything else from Prasat Chen, no matter when or where found—therefore automatically belongs to the modern Cambodian state.

No court has ever forfeited property on such a theory, which squarely conflicts with the settled and undisputed law articulated in *McClain* and *Schultz*. According to those cases, due process forbids applying the statutes on which this forfeiture case relies unless the foreign law invoked as the basis of ownership is both clear and unambiguous. There is no law at all, much less a clear and unambiguous one, declaring either that the ancient Cambodian king owned everything at Prasat Chen when it was built one thousand years ago, or that the modern state of Cambodia now owns everything from Prasat Chen that was abandoned to the jungle fifty generations ago.

1

The Government's continued failure to identify a clear and unambiguous ownership law, standing alone, means that the motion for leave to amend the complaint is futile and should be denied. Moreover, this failure infects other parts of the Government's case and renders it unable to satisfy its pleading burden on other elements of its forfeiture claims. Specifically, the absence of such a law also prevents the Government from calling into question the good faith of either Ms. Ruspoli or Sotheby's. Both were entitled to conclude from the absence of any clear law vesting ownership in Cambodia that the Statue was not stolen when removed from Cambodia. And both were certainly entitled to conclude that it did not remain stolen at the time of import into the United States, almost two decades after the period allotted by English law for Cambodia to make a claim had expired. For these reasons as well, the motion for leave to amend the complaint is futile and should be denied.

Unable to allege facts from which one could fairly infer that the Statue was and remained stolen, and that Sotheby's knew it, the Government tries to change the subject. The PAC strains to cast Sotheby's in a bad light by offering selective quotations from very limited portions of the documentary record. These attacks on Sotheby's are not just untrue; they are unfair, for they are fully rebutted by documents currently in the Government's possession.[1] For example, the PAC alleges that Sotheby's was "inaccurate" when it told "potential buyers, the Kingdom of Cambodia, and United States law enforcement" that the Statue "had been seen in the United Kingdom in the late 1960s." PAC ¶43. But documents produced to the Government more than a year ago reflect that the Art Historian represented to Sotheby's, in writing, that *she herself* had "[f]irst seen" the Statue at "Spink & Son . . . in the late 1960's while visiting London." Neiman Aff. Ex. 1 at SOTH-000196. Any inaccuracy cannot fairly be attributed to Sotheby's. So too,

---

[1] Because the Government has chosen to omit relevant emails from the PAC, the Court is not in a position to rule on the accuracy of these new allegations at this stage of the proceedings. We provide the context set forth in this paragraph and in the attached Neiman affidavit so that the Court has a more accurate picture, but do not ask the Court to rely on emails outside the PAC in ruling on the Government's motion to amend.

the PAC faults Sotheby's for "omitting" the Collector's alleged prior ownership of the piece when it described the Statue's provenance. PAC ¶44. But the very document the Government cites—a May 2010 email—relates to an instance in which Sotheby's *shared* this information with representatives of a potential buyer. Neiman Aff. Ex. 2. That Sotheby's *later* stopped including this information in the Statue's provenance reflects not an effort to conceal an innocuous fact (the Collector is sufficiently well regarded in the field that his books have featured laudatory forwards by Cambodia's Minister of Culture and the Director of its National Museum, and there is no allegation that Sotheby's knew he was linked to a smuggling ring), but rather a change in its understanding of the facts: in June 2010, the Collector himself, in writing, squarely denied prior ownership. Neiman Aff. Ex. 3.[2]

In addition to being unfair and legally unsound, the PAC is also untimely. Discovery exchanged in this case reveals that the Government had in its possession the "new" facts alleged in the PAC in mid-July of this year, more than a month before the Government filed its opposition to our motion to dismiss. Perhaps recognizing that these facts did not address the key problems with its Complaint, the Government made the tactical choice not to seek leave to amend, and instead to hint in its opposition brief that it had new information. It was only after the Court at oral argument on the motion to dismiss called its case "[not] the strongest," 9/27 Tr. at 126, that the Government rethought that tactical choice and filed this motion. The unreasonable and unnecessary delay between when the Government had the information and when it sought leave to amend significantly burdened both the Court and Claimants, and provides an additional basis for denying leave to amend.

---

[2] To be clear, we do not suggest that the Government overlooked the Collector's written denial of prior ownership, as Sotheby's located its copy of the document only recently in an overseas server not covered by Sotheby's initial document collection. But the Government had ample other evidence making clear that Sotheby's factual understanding had changed. For example, an internal Sotheby's email after May 2010—produced to the Government months ago—reject rumors of the Collector's prior ownership as "not match[ing] with the story we have." Neiman Aff. Ex. 4.

3

The risk in a case like this is that the Government—even if it lacks any fair basis to proceed—can win simply by making the case more expensive to litigate than the property is worth. The PAC is unfair, untimely, and futile. It provides no basis to delay ruling on the pending motion to dismiss. The Court should grant that motion, and deny leave to amend.

## ARGUMENT

### I.   Legal Standards

The filing of a motion for leave to amend does not moot a pending motion to dismiss. Rather, the Court has broad discretion to rule on the pending dismissal motion and deny leave to amend. *See, e.g., Ku v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 Civ. 6858, 2012 WL 2864509 (S.D.N.Y. May 14, 2012) (granting motion to dismiss and denying motion for leave to amend filed while motion to dismiss pending); *Stevens v. City of New York*, No. 10 Civ. 5455, 2011 WL 3251501 (S.D.N.Y. July 22, 2011) (same); *Volunteer Fire Ass'n of Tappan, Inc. v. County of Rockland*, No. 09 Civ. 4622, 2010 WL 4968247 (S.D.N.Y. Nov. 24, 2010) (same).

Federal Rule of Civil Procedure 15 commits to the Court's discretion whether to permit plaintiffs to amend where, as here, the request for leave is filed more than twenty-one days after the filing of a motion to dismiss. *See* Fed. R. Civ. Proc. 15(a)(1)(B)(2); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("[I]t is within the sound discretion of the district court to grant or deny leave to amend[.]"). Among the "good reason[s]" for denying leave to amend are "futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.*; *see also Forman v. Davis*, 371 U.S. 178, 182 (1962) (court may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party, ... [and] futility of the amendment.").

## II.  The Motion For Leave To Amend Is Futile

An amendment is futile where the proposed amended complaint could not withstand a motion to dismiss. *See, e.g., Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (holding that denial of a motion to amend is proper on futility grounds if the proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)). This is because "[w]here it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend." *Id.* at 258 (quoting *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam)).

### A.  The proposed amended complaint, like the original, fails adequately to allege that the Statue was stolen

In briefing on the motion to dismiss, we laid out the settled law applicable to forfeiture claims based on national ownership of cultural property. Ownership by someone other than the possessor is a necessary condition for an item to be considered "stolen" and thus subject to forfeiture. *See, e.g., United States v. Portrait of Wally*, No. 99 Civ. 9940, 2002 WL 553532, at *19 (S.D.N.Y. Apr. 12, 2002) ("[I]n order for property to be considered 'stolen,' the property must rightfully belong to someone other than the person who has it."). When the putative owner is a foreign state, ownership cannot be shown through the assertion of regulatory authority over an antiquity – such as restrictions on excavation, export, or transfer – because such restrictions "do not create 'ownership' in the state." *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977) (*McClain I*). Rather, "[t]he state comes to own property only when it acquires such property in the general manner by which private persons come to own property, or when it declares itself the owner." *Id.* Due process requires that the relevant foreign law be "clear and unequivocal in claiming ownership." *United States v. McClain*, 593 F.2d 658, 670-71 (5th Cir. 1979) (*McClain II*). "[T]he National Stolen Property Act . . . cannot properly be applied to items

5

deemed stolen only on the basis of unclear pronouncements by a foreign legislature." *Id.* at 671; *see also McClain I*, 545 F.2d at 997-1000, 1002; *United States v. Schultz*, 333 F.3d 393, 402-04 (2d Cir. 2003). The Government has not disputed these principles. Govt. Br. 9-10.

We then explained that the Government's allegations and arguments regarding the content of Cambodian law fell well short of establishing the "clear and unequivocal" declaration of ownership that due process requires. Opening Br. 12-17; Reply Br. 4-10. None of the four rulings and decrees cited in the original complaint,[3] nor any of the more than thirty legal documents cited in the 49-page report submitted by the Government's expert witness, Matthew Rendall, in opposing Claimants' motion to dismiss, came anywhere close to constituting a "clear and unequivocal" declaration of state ownership pertaining to the Statue. *See id.*

Far from remedying the defects in the original complaint that Claimants identified, the PAC falls even further short of the applicable standards. The PAC adds *no new written laws* beyond those cited in the original complaint or relied upon at length in the Government's opposition to Claimants' motion to dismiss and in Mr. Rendall's report.[4] In an apparent concession that the decrees and orders on which it had staked its case do not sufficiently *establish* Cambodia's ownership, the Government now says only that they "*confirm*" Cambodia's ownership. PAC ¶46 ("State ownership . . . is confirmed by . . . laws . . . from the French colonial period."); *id.* ¶51 ("[T]he classification . . . process further confirmed the state's ownership[.]").

As for the basis that the later laws supposedly "confirm[]," the Government has retreated to relying on ancient, *unwritten* laws under which, it says, Cambodia owns the Statue. It alleges:

---

[3] The complaint cited an 1884 ruling by a French Governor (Compl. ¶36), a 1900 French colonial decree (Compl. ¶37), a May 16, 1925 classification decree (Compl. ¶38), and a July 1925 decree (Compl. ¶38).
[4] A red-lined version comparing the PAC to the original complaint is attached as Exhibit 11 to the Neiman Affidavit.

> 7. The[] structures [at Koh Ker], including the Prasat Chen temple described below, were built by the Cambodian state under Jayavarman IV and were the property of the Cambodian state. The Cambodian state has never transferred Koh Ker or the Prasat Chen temple to any private owner, whether by sale, gift or otherwise.
>
> . . .
>
> 15. The Cambodian state has never transferred the Duryodhana to any private owner, whether by sale, gift or otherwise.
>
> . . .
>
> 45. [T]he Defendant in rem was a fixed monument built as part of the construction of Prasat Chen temple in Koh Ker. Both Prasat Chen, and the Defendant in rem as a component part of the temple, were the property of the Cambodian state which constructed them. Neither Koh Ker, Prasat Chen, nor the Defendant in rem was ever transferred by the state to private ownership. Accordingly, the Defendant in rem remained the property of the Cambodian state in 1972, when it was stolen.

In other words, the Government's new position is that some unspecified, unwritten law from the 10th century entitles it to jump from its assertion that the Prasat Chen temple was "built by the Cambodian state under Jayavarman IV" to its conclusion that the temple itself, and any statues erected therein, were "the property of the Cambodian state" when built. And some equally unspecified, unwritten law, in the Government's view, establishes that ownership by Cambodia persisted uninterrupted for a thousand years —during which the temple was abandoned to the jungle and, for long stretches of time, ceased even to be in Cambodia. *See* Neiman Aff. Ex. 5.

No court has ever forfeited private property on such a far-fetched theory. To accept that it solves the due process problem with the Government's case would require an extraordinary departure from the well-settled principles of *McClain* and *Schultz*. Whereas *McClain II* established that "the National Stolen Property Act ... cannot properly be applied to items deemed stolen only on the basis of unclear pronouncements by a foreign legislature," 593 F.2d at 671, the Government would have this Court apply the Act to items it deems stolen on the basis of *non-*

*existent* pronouncements by a foreign legislature—on ancient, *unwritten* laws. It almost goes without saying that such unwritten laws could never provide the "clear and unambiguous" or "clear and unequivocal" notice that *Schultz*, 333 F.3d at 402, and *McClain II*, 593 F.2d at 670, hold that due process requires.

The Government attempts to obscure its failure to meet the due process test by alleging that the Statue was "never transferred by the state to private ownership." But that begs the whole question, for the absence of a "transfer" would be relevant only if one assumes that the Statue was the state's to transfer both when made and throughout the thousand years after it was abandoned to the jungle—that is, only if one assumes that the state is the owner of the Statue absent such a transfer.[5] But under settled due process principles, forfeiture cannot be grounded in an assumption: due process requires a clear and unequivocal law giving potential art market participants fair notice of the foreign government's claim. There is no such clear and unequivocal law here.

This new ownership theory, like the Government's two prior theories, is made up for this litigation. The Government has identified no evidence that the Cambodian government has ever before articulated or attempted to enforce this new theory, under which it owns *everything* ever constructed by ancient regimes located in what is now Cambodia.[6] Plainly the Cambodian

---

[5] Moreover, the Government's bare allegation that no transfer occurred over a thousand-year period is far too sweeping and conclusory to carry the day. *See United States v. Mask of Ka-Nefer-Nefer*, No. 4:11CV504, 2012 WL 1094652, at *3 (E.D. Mo. Mar. 31, 2012) (dismissing as "conclusory" far more specific allegation that there was no record over a seven-year period of a sale or gift of Egyptian mask in the registry of the storeroom where the mask was kept).

[6] The only enforcement evidence in the PAC is a 1924 criminal prosecution of a person caught in the act of removing antiquities from a different temple. PAC ¶55. The PAC does not identify the law being enforced in this prosecution, nor allege that it would apply to the Statue. Moreover, the Government's expert affidavit had described the same episode, and when the Government referred to it at oral argument, the Court described it as "only of limited utility" because it was "not a situation where they asserted a right to a piece of antiquity and sought the assistance from a foreign government to retrieve that piece. That is what I am more interested in." 9/27 Tr. at 58. The Court further noted that it did "not see any indication that you are saying that you are aware of any other time that Cambodia either sought the assistance of the United States to do this and did so based on the arguments that the United States is making now in support of forfeiture." *Id.* The PAC identifies no such instance. In *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12 Civ. 4760 (PKC), 2012 WL 5834899, at *10 (S.D.N.Y. Nov. 14, 2012), Judge Castel confirmed that evidence of "active enforcement . . . or lack thereof" could be "probative," but

8

government did not have this theory in mind when it acknowledged that the Companion Statue—which comes from the very same temple as the Statue and has an essentially identical known provenance—"belongs to" the Los Angeles museum. *See* Neiman Aff. Ex. 6.

When the Government at oral argument on our motion to dismiss invoked the ancient king's role in building the Prasat Chen temple, the Court aptly responded: "but every archeological site is built by the king, or the queen. I mean, how is that different than any other archeological site? . . . [M]ost of the antiquities in the Louvre came from an archeological site. And it is still sitting there, and the question is whether or not at the time some government official asserted some authority over that, and that they should have known when they took it that it was in violation of law." 9/27 Tr. at 87. The Court's question correctly focuses on whether there was a declaration of ownership at the time of removal, and the Government has failed to answer that question. It cannot identify any clear law that would give fair notice to potential purchasers either that an ancient Cambodian king owned the Statue when it was created or that the modern Cambodian state owned the Statue one thousand years after it was abandoned to the jungle.

This Court has full authority to rule on this dispositive legal issue now. As Judge Castel recently explained in *United States v. One Tyrannosaurus Bataar Skeleton,* a forfeiture case involving a dinosaur skeleton allegedly stolen from Mongolia, the threshold question of whether Mongolia had a clear and unambiguous ownership law making "fossils the property of the state" was a legal question "that the Court could decide on a motion to dismiss." No. 12 Civ. 4760 (PKC), 2012 WL 5834899, at *9 (S.D.N.Y. Nov. 14, 2012). Judge Castel chose not to do so in

---

ruled that the Government "need not plead active enforcement where . . . the foreign statutes pleaded in the complaint appear on their face to vest title in the Defendant Property in a foreign state." For the reasons laid out in our motion to dismiss, we submit that Judge Castel's assessment of the pleading burdens is mistaken. In any event, even on Judge Castel's analysis, no law the government identifies appears on its face to vest title, and the absence of any allegation that these laws have been enforced is quite telling.

9

that case, but only because the Government's complaint had identified two different laws that squarely declared objects like the dinosaur skeleton to be "owned by Mongolia" and "state property." Because those laws "appear on their face to vest title in the Defendant Property in a foreign state," the Court found the complaint facially sufficient, and deferred consideration of the claimant's challenge to the law's clarity. 2012 WL 5834899, at *10.

Here, by contrast, the laws pleaded in the Complaint and the PAC do *not* "appear on their face to vest title in the Defendant Property in a foreign state." *Id.* The Government has therefore *failed*—in its third effort to articulate its legal theory—to "state a plausible claim for relief." *Id.* There is no reason to defer consideration of this issue. Hearing what dueling experts have to say about what they think the law means cannot create the *facial* clarity that due process requires. Dismissal with prejudice is appropriate.

### B. The proposed amended complaint, like the original, fails adequately to allege that the Statue remained stolen

In our motion to dismiss, we showed that the Government bore the burden of establishing that the Statue remained stolen at the time of import. Under the English law applicable to the 1975 purchase, even if the Statue were stolen and the seller complicit in the theft, Ms. Ruspoli and her husband acquired good title (and any contrary claim by Cambodia was extinguished) when Cambodia failed to assert a claim to the Statue within the six years allotted by English law, so long as Ms. Ruspoli's husband acted in good faith in purchasing the Statue. Because there was no allegation that Ms. Ruspoli's husband lacked good faith at the time of the purchase, we argued in our motion that the Government had failed to allege sufficient facts to establish a reasonable basis to believe the Statue remained stolen at the time of import.

The PAC likewise includes no allegation that Ms. Ruspoli or her husband lacked good faith. The central new allegation regarding their supposed state of mind is that in 2008, "[a]gents

for [Ms.] Ruspoli informed potential purchasers that the Collector was the original seller of the Defendant in rem in the 1970s, and that he/she had imported both the Defendant in rem and the Museum Statue to the United Kingdom. Accordingly, Ruspoli was aware of these facts no later than 2008." PAC ¶21. The Government does not explain how it gets from its allegation about what these supposed agents said in 2008 to its conclusion that Ms. Ruspoli also knew these things in 2008. And the Government does not even allege that Ms. Ruspoli or her husband (who died a decade earlier) knew those same things when he bought the Statue in 1975, or in 1981, when any claim Cambodia might have had expired. Nor does the Government allege that these facts (which are on their face innocuous, because they do not imply that the Collector had obtained the Statue from an illicit source) somehow cast doubt on Ms. Ruspoli's good faith in 2008, decades after title had irrevocably vested, much less on her (or her husband's) good faith in 1975.[7]

Because the PAC casts no doubt on the good faith of either Ms. Ruspoli or her husband, the PAC provides no basis to believe the Government will be able to meet its burden of proving the Statue remained stolen at the time of import. For this reason as well, dismissal is required.

C. **The proposed amended complaint, like the original, fails adequately to allege that Sotheby's knew the Statue was and remained stolen**

We showed in our briefing on the motion to dismiss—based on the documents cited in the Government's original complaint—that Sotheby's acted transparently and in good faith, disclosing both to the world at large in its auction catalogue, and to the Cambodian government in a letter well in advance of the sale, the very details the Government claimed revealed the Statue was stolen—the Statue's Koh Ker origin, when it appeared in the auction market, and that

---

[7] The PAC also alleges that Sotheby's "consulted" with Ms. Ruspoli in 2010 before switching the scientist selected to test the Statue. PAC ¶37. Because nobody could perform scientific tests on the Statue without the owner's permission, such consultation is hardly surprising, and does not begin to cast doubt on Ms. Ruspoli's good faith in 2010, much less on the good faith of her husband in 1975 or 1981.

11

its feet were missing. Such disclosures thoroughly undermined any inference that Sotheby's somehow *knew* the Statue was stolen.

In the PAC, the Government has added new allegations challenging other aspects of Sotheby's behavior regarding the Statue. As noted above, these new allegations unfairly distort the documentary record. But even accepting these new allegations as true for purposes of assessing whether the proposed amendment is futile, the new allegations do not address the key issues relevant to Sotheby's mental state, much less establish a reasonable basis to believe the Government will meet its burden of proof at trial on these issues.

First, there is no fact alleged from which one could infer that Sotheby's believed there was a clear and unambiguous law declaring the Statue to be state property. Indeed, the Government's failure—in three separate attempts—to identify such a law, establishes that the Government will never be able to prove, as it must, that Sotheby's knew of one. At oral argument, the Court pressed the Government to explain how Sotheby's could "know it was stole[n] unless there was a clear and unambiguous law that Sotheby's should have been able to reference immediately to tell them that Cambodia owned it." 9/27 Tr. at 86. The PAC does not answer that question.[8]

Second, there is no fact alleged from which one could infer that Sotheby's had any reason to believe that Ms. Ruspoli or her husband knew the Statue was stolen when he bought it in 1975. Again, the Government in its two complaints has been unable even to allege the premise of such knowledge—that Ms. Ruspoli or her husband acted in bad faith in 1975. Accordingly, it

---

[8] In contrast, in *One Tyrannosaurus Bataar Skeleton*, the Government identified two different laws that appeared, on their face, to vest title to dinosaur skeletons in Mongolia. In light of that facial clarity, the Court found allegations that the claimant had (a) previously excavated skeletons in Mongolia, and (b) had attempted to hide the fact that the skeleton in question had come from Mongolia were sufficient to "raise[] a reasonable inference that [claimant] knew the Defendant Property was stolen from the Mongolian state." 2012 WL 5834899, at *10. Here there is no law vesting title in Cambodia, and—far from hiding the Statue's place of origin—Sotheby's squarely disclosed it directly both to a senior official in Cambodia's Culture Ministry well before the sale and to US Customs in the import documents. The stark contrast with the facts in *One Tyrannosaurus Bataar Skeleton* further reinforces the propriety of dismissal here.

cannot possibly have shown a reasonable basis to conclude that it will be able to prove, at trial, that Sotheby's believed they acted in bad faith.

Finally, while we do not ask the Court to rely on materials outside the PAC in ruling on this motion to amend, we do want to assure the Court that when viewed with the benefit of context—instead of through the Government's guilt-presuming prism—none of Sotheby's alleged conduct is even suspicious, much less evidence from which one could reasonably infer that the Government is likely to meet its burden of proof at trial as to Sotheby's knowledge.

- The PAC accuses Sotheby's of an "inaccurate" statement about the date the Statue was seen in London and of "omitting" the Collector's alleged prior ownership of the piece. PAC ¶¶43, 44. But both the statement and the omission accurately reflected the written representations Sotheby's received. Neiman Aff. Exs. 1, 3.[9]

- The PAC notes that after one scientist mentioned a preliminary "theory" that the Statue might have been "forcibly broken for ease of transport from the find site and then put back together later," Sotheby's hired a different scientist to conduct testing on the Statue. PAC ¶37. What the Government omits is that the testing under consideration by *both* scientists was designed to determine whether the head and body came from the same stone. Neiman Aff. Ex. 8. Neither scientist proposed any test to determine *why* the Statue broke at the neck, and to our knowledge no such test exists. But even if it were somehow possible to determine through scientific testing *why* the neck was broken, answering that question would not reveal anything about *when* the Statue was broken, or *whether* the removal constituted theft at that time. Ease of transport is just as relevant for abandoned property removed by a finder as it is for owned property removed by a thief.

- The PAC seeks to blunt the force of Sotheby's pre-auction disclosures to Cambodia by quoting a Sotheby's officer's desire to have a more junior employee sign the letter to Cambodian officials so that the letter would not be unduly alarming. PAC ¶38. That choice was sensible, as Sotheby's, believing Cambodia had no legitimate legal claim to the Statue, was appropriately wary of doing anything that might lead Cambodia to assert an illegitimate one. At the same time, Sotheby's made sure the letter's *recipient*, *content*, and *format* all would convey that the matter was important and warranted attention. To ensure it did not get lost in the shuffle, Sotheby's sent the letter directly to the email address it had for the senior Cambodian official (the same email address that the official used in subsequent emails to Sotheby's about the Statue). Neiman Aff. Ex. 12. And the letter notified the Cambodian official of Sotheby's plan to sell the Statue, when the Statue had appeared on the auction market, its Koh Ker origin, and the fact that it was cut off at the ankles – precisely what Sotheby's had been told by someone in close

---

[9] The PAC also notes that Sotheby's "consulted" with the Collector about various issues related to the Statue's sale. PAC ¶¶29, 37. Given the Collector's prominence in the field, such consultation was sensible, not suspicious.

13

contact with the senior Cambodian official would be so likely to catch his attention that it would be "like waving a red flag in front of a bull." Neiman Aff. Ex. 10. Sotheby's gave full and fair notice; it was not required to urge the Cambodian official to take action.

Because the PAC fails to allege any basis to believe the Government will be able to establish the two facts regarding Sotheby's mental state that it must in order to show Sotheby's knew the Statue was and remained stolen—that Sotheby's knew Cambodia had a clear and unambiguous law declaring ownership of the Statue, and that it knew the 1975 purchase was not in good faith—the PAC is futile. For this reason as well, leave to amend should be denied.

### III. The Government's Delay In Filing For Leave To Amend Has Unduly Prejudiced Claimants and Squandered Judicial Resources

When it "appears that leave to amend is sought in anticipation of an adverse ruling on the original claims," the court "is free to deny leave to amend." *PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 764 (S.D.N.Y. 1995). Denial of leave to amend is particularly appropriate when the plaintiff had the information supporting the amendment *before* briefing and argument on the motion to dismiss is completed, but waited until after that briefing and argument to seek leave. *Id.* at 764-65. Plaintiffs are not permitted to "'hedge their bets' by holding such evidence back in the hopes of having another bite of the proverbial apple." *In re Nokia OYJ (Nokia Corp.) Secs. Litig.*, 423 F. Supp. 2d 364, 409 (S.D.N.Y. 2006). That is because withholding amendments until after the "motion to dismiss was fully briefed and argued" unfairly imposes "considerable additional expense on all parties." *PI, Inc.*, 907 F. Supp. at 764-65.

That is what happened here. At oral argument on September 27, the Court asked the Government tough questions to which it had (and has) no responses. With the date by which the Court had forecasted reaching a decision on the motion fast approaching, the Government filed the PAC. The Government had the information on which the PAC is based no later than July 13 of this year. Neiman Aff. ¶ 3. That was more than a month before the Government filed its brief

14

in opposition to our motion to dismiss, more than two months before we filed our reply brief and the Government sought permission to file a sur-reply, and nearly ten weeks prior to oral argument on that motion. Instead of promptly moving to amend, the Government made the tactical choice to drop hints that it had compiled additional evidence,[10] and to "wait[] to see how [it] would fare on the prior motion to dismiss." *Vine v. Beneficial Fin. Co.*, 374 F.2d 627, 637 (2d Cir. 1967) (affirming trial court's denial of motion to amend under grounds of "undue delay, bad faith, or dilatory motive"); *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 375 n.52 (S.D.N.Y. 2003) ("inappropriate" to hint at new evidence in opposition brief while "hold[ing] such 'evidence' back in the hopes of having yet a third bite of the proverbial apple."), *aff'd in part & rev'd in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). That choice imposed an unfair financial burden on Claimants and should not be rewarded. *See Volunteer Fire Ass'n of Tappan, Inc. v. County of Rockland*, No. 09 Civ. 4622, 2010 WL 4968247, at *6 (S.D.N.Y. Nov. 24, 2010) (denying motion to amend where delay in filing forced defendant to "needlessly incur[] legal fees, in drafting motions to dismiss the original Complaint," and explaining that "[t]he Court will not reward Plaintiff's conduct—whether the result of laziness, disregard, or gamesmanship—by permitting such prejudice to Defendants.") The delay also broadcasts the Government's own assessment of its new evidence: if it truly believed that the allegations it now seeks to add materially improved its case, it would have moved promptly to amend in July. Denial of leave to amend is within the Court's discretion, and appropriate on these facts.

---

[10] *See, e.g.*, Govt. Br. 24 n.6.

## CONCLUSION

The Government has now had three full opportunities to state its case: in its opening complaint, in its brief in opposition to our motion to dismiss, and in its proposed amended complaint. The Government has failed all three times to identify a clear and unambiguous law granting Cambodia ownership of the Statue. It has instead responded with three different legal theories, each of which was constructed for this litigation but has—so far as one can tell from the Government's pleadings and the affidavit of its expert—never been applied before to any similarly situated object. None of these theories comes close to meeting the due process test. Nor has the Government been able to identify facts challenging the good faith of Ms. Ruspoli or her husband, or a reasonable basis to believe that Sotheby's knew the Statue was and remained stolen. There is no reason to give the Government yet another chance. Leave to amend should be denied, and the Complaint dismissed with prejudice.

Dated: New York, New York
       December 3, 2012

Respectfully submitted,

_____
Peter G. Neiman
Janet R. Carter
Joseph Yu
Pablo G. Kapusta
WILMER CUTLER PICKERING HALE AND
   DORR LLP
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

*Counsel for Claimants Sotheby's, Inc. and Ms. Ruspoli di Poggio Suasa*