UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

        -against-                             MEMORANDUM DECISION
                                                         AND ORDER
A 10th CENTURY CAMBODIAN SANDSTONE           12 Civ. 2600 (GBD)
SCULPTURE, CURRENTLY LOCATED AT
SOTHEBY'S IN NEW YORK, NEW YORK,

                Defendant in rem.
------------------------------------X

GEORGE B. DANIELS, District Judge:

        The United States of America brings this action seeking civil forfeiture of a sandstone statue, circa 10th Century A.D., removed from the Prasat Chen Temple at Koh Ker, Preah Vihear Province, Cambodia (the "Statue"), which is currently located at Sotheby's in New York City. The Government alleges that the Cambodian Statue is subject to forfeiture pursuant to 19 U.S.C. § 1595a(c) and 18 U.S.C. §§ 545 and 981(a)(1)(C) because there is probable cause to believe that (1) it is stolen property introduced into the United States contrary to law; (2) it is merchandise which was knowingly brought into the United States contrary to law; and (3) it is property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 2314 and/or 2315.

        Claimants Sotheby's Inc. and Ms. Ruspoli Di Poggio Suasa move pursuant to Fed. R. Civ. P. 12(b)(6) and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules") to dismiss the Verified Complaint. Claimants argue that the Government (1) fails to adequately allege that the Statue was stolen; (2) fails to adequately allege that the Statue remained stolen when it was imported into the U.S.; and (3) fails to adequately allege that Claimants knew the Statue was stolen at the time of its import into

the United States. Based on these inadequacies, Claimants argue that the Government has failed to state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial, and therefore the Verified Complaint must be dismissed.

The Government filed an Opposition to Claimants' Motion to Dismiss based upon the allegations in the Verified Complaint, but also subsequently moved pursuant to Fed. R. Civ. P. 15 for leave to file an amended complaint. The Proposed Amended Complaint ("PAC") adds new factual allegations regarding the theft of the Statue from the Prasat Chen Temple in 1972 and Sotheby's knowledge that the Statue was stolen. Claimants filed an opposition to the Government's Motion to Amend, arguing that amendment is futile because the PAC fails to cure the defects in the Verified Complaint and that Claimants have been unduly prejudiced by the Government's delay in moving to amend.

The Government's Motion to Amend is granted. Claimants' Motion to Dismiss is denied.

## Background[1]

Koh Ker is located in the Kulen district of northern Cambodia. PAC ¶ 5. The Koh Ker site is a vast complex of sacred monuments made of brick, laterite, or sandstone, including among other things, dozens of temples and sanctuaries, a huge terraced pyramid-temple, and towers. Id. ¶ 6. These structures, which include a three peaked structure made of laterite and sandstone called Prasat Chen, were built by the Cambodian state under Jayavarman IV. Id. ¶¶ 7, 9. Two statues, the Duryodhana, which is the defendant in rem in this case, and the Bhima, once stood near the entry to the Western Pavilion of Prasat Chen on fixed pedestals. Id. ¶ 10. The

---

[1] The facts in this section are taken from the PAC and assumed to be true for the purposes of deciding the parties' motions.

2

Cambodian state has never transferred Koh Ker or the Prasat Chen temple to any private owner whether by gift or otherwise. Id.

Cambodian state ownership of art, archeological objects and other immovable objects is confirmed by the national ownership laws of Cambodia. Id. ¶ 46. A 1900 decree established a baseline level of protection for art and archaeology in French Indochina, including Cambodia, and explicitly recognized that such items, including statues that "exist on or in the soil" of immoveable properties that were part of the "national domain," were similarly part of the national domain. Id. ¶ 49. As Prasat Chan was a part of the national domain, its artifacts were therefore automatically part of the national domain under the 1900 decree. Id. Subsequent legislation in 1913 and a decree issued in 1925 reaffirmed the protections set forth in the 1900 decree. Id. ¶ 50.

In or about 1925, the classification of French Indochina's objects and sites as historical monuments and objects began in earnest. Id. ¶ 51. A May 6, 1925 decree reaffirmed that ownership of statues found on property belonging to the Cambodian state, now referred to as the "colonial" rather than the "national" domain, was retained by the state. Id. On May 16, 1925, another decree classified Koh Ker and the Prasat Chen temple as historical monuments of French Indochina, confirming their status as a part of the colonial domain. Id. Subsequently, a July 1925 decree, among other things, reiterated the earlier protection regarding classification and expanded upon it. Id. The July 1925 decree also criminalized violations of the law related to historical monuments and objects. Id.

Between the mid-late 1960s and 1979, Cambodia suffered a period of political upheaval and civil war. Id. ¶ 16. During this time of unrest, the PAC alleges that the Koh Ker site suffered widespread looting by an organized looting network. Id. The looting was widely

3

publicized and well-known to participants in the international art market. Id. The looting network involved local teams of looters who would remove statues from their original location at Koh Ker and transport them to dealers in Khmer artifacts located in Thailand. Id. ¶ 17.

In or around 1972, the Statue was allegedly stolen from Prasat Chen via an organized looting network. Id. ¶ 17. The head of the Statue was removed and transported first, followed by the torso, and ultimately delivered to a Thai dealer based in Bangkok (the "Thai Dealer"). Id. ¶ 18. The Statue was then obtained by a well-known collector of Khmer antiquities (the "Collector"). Id. At the time of purchase, the Collector knew that the Statue had been looted from Koh Ker. Id.

The PAC further alleges that upon obtaining the Statue, the Collector attempted to sell it on the international art market. Id. ¶ 19. He consigned it to an auction house based in the United Kingdom (the "Auction House"), which was aware that it had been looted from Koh Ker. Id. In or around 1974, representatives of the Auction House conspired with the Collector and the Thai Dealer to fraudulently obtain export licenses for the Statue and other antiquities to be shipped to the Auction house in the future. Id. Many prospective buyers were unwilling to purchase the Statue because of its lack of legitimate provenance and missing feet. Id. ¶ 20. The Auction House ultimately sold the Statue in 1975 with the torso and head reattached, to a Belgian businessman. Id. Upon the death of the businessman, the Statue was transferred to his wife, Claimant Ruspoli in 2000. Id.

In or about March 2010, Sotheby's entered discussions with Ruspoli about selling the Statue. Id. ¶ 24. In its proposal for sale of the Statue, Sotheby's represented that it was "uniquely qualified to maximize the value of the [Statue], and that Sotheby's has "unparalleled experience in the field of Indian and Southeast Asian Art." Id. ¶ 24. In or about late March

4

2010, Ruspoli entered into a consignment agreement under which Ruspoli consigned the Statue to Sotheby's for sale at an auction in New York. Id. ¶ 25.

Sotheby's then made arrangements to import the Statue from Belgium to the United States. Id. ¶ 26. Prior to importing the Statue, Sotheby's obtained an invoice showing the sale of the Statue in 1975 by the Auction House, which stated that the figure is "Koh Ker style," and is from the 10th Century. Id. At that time Sotheby's was aware that the Statue had originally been located at Koh Ker, and that the temples of Koh Ker had been built by the Cambodian state under Jayvarman IV. Id. It is alleged that leading up to the importation of the Statue, Sotheby's consulted regularly with the Collector, knowing him to be the original seller. Id. ¶ 29. In April 2010, Sotheby's imported the Statue into the United States. Id. ¶ 27.

Upon the recommendation of the Collector, Sotheby's selected a scholar of Khmer art closely associated with the Collector (the "Scholar") to write a catalogue entry for the Statue's sale, and give a lecture about it. Id. ¶ 30. In an email around June 1, 2010, the Scholar informed Sotheby's that:

> Cambodians in Phnom Penh now have clear evidence that [the Statue] was clearly stolen from Prasat Chen at Koh Ker, as the feet are still in *situ* . . . I think it would be hugely unwise to offer [the Statue] publicly, and I would not really feel comfortable writing it up. It is also quite possible that the Cambodians might block the sale and ask for the piece back.

Id. ¶ 31. The Scholar later informed Sotheby's that he believed that Sotheby's could go ahead and sell the Statue because it did not appear as if Cambodia, as a general practice, was requesting the return of looted Cambodian art and artifacts. Id. ¶ 33.

In September 2010, Sotheby's retained a professional art scientist (the "Scientist") to prepare a report on the authenticity of the head of the Statue and the condition of the work done prior to the 1975 sale to rejoin it to the torso. Id. ¶ 37. The Scientist shared his theory with

Sotheby's that "the sculpture was either forcibly broken for ease of transport from the find site and then put back together later or that the head and torso do not belong together." Id. Sotheby's did not allow the Scientist to perform further tests to determine which theory was correct. Id. Instead, after consulting with both the Collector and Ruspoli, Sotheby's terminated the Scientist's engagement and retained a replacement who the Collector told Sotheby's was "the only person [he] would go to for testing." Id.

Subsequently, the Scholar told Sotheby's that, while the Statue could be legally sold, that it would not be a good idea to share the Scholar's write up on the Statue with the Cambodian Minister of Culture. Id. ¶ 35. The Scholar warned that the Minister might be forced to do something, and that it would be like "waving a red flag in front of a bull." Id. Sotheby's ultimately decided that it would send a communication to the Minister of Culture, but that the communication should not come from a senior Sotheby's officer because he "did not want to raise this to important or 'pay attention' levels." Id. ¶ 38. On November 8, 2010, Sotheby's sent an email to the Minister of Culture in which it stated that it was offering the Statue for sale. Id. ¶ 39. Sotheby's did not receive a reply to that email, and thus proceeded toward selling the Statue. Id. ¶ 40.

The PAC alleges that Sotheby's provided inaccurate information regarding the Statue's provenance to numerous parties, including potential buyers, the Kingdom of Cambodia, and United States law enforcement, specifically that the Statue was seen in the United Kingdom in the late 1960s. Id. ¶ 43. Sotheby's also failed to disclose that the Collector was the original seller of the Statue and knowingly omitted the Collector's acquisition of the Statue from the provenance information it provided in published sales materials, public statements, and

communications with potential buyers, the Kingdom of Cambodia, and United States law enforcement. Id. ¶ 44.

In a letter dated March 24, 2011, the Secretary General of the Cambodia National Commission informed the Director of Sotheby's that she believed that the Statue was illegally removed from Prasat Chen. Id. ¶ 42. She requested that Sotheby's pull the Statue from the auction and facilitate its return to Cambodia. Id. Sotheby's withdrew the Statue from the auction, but has retained possession of the Statue to date. Id.

### Legal Standard

Pleading requirements in a civil forfeiture action are governed by the Supplemental Rules. Fed. R. Civ. P. Supp. R. A(1)(B). Specifically, Rule G "governs a forfeiture action in rem arising from a federal statute," and Rules C and E apply "[t]o the extent that [Rule G] does not address an issue." Fed. R. Civ. P. Supp. R. G(1). The Federal Rules of Civil Procedure also apply, "except to the extent that they are inconsistent with these Supplemental Rules." Fed. R. Civ. P. Supp. R. A(2).

Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend should be "freely give[n] . . . when justice so requires." Under most circumstances, a court should not deny the right to amend unless plaintiff has acted in bad faith or the amendment would unduly prejudice [claimants]. Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008). However, a court should not grant a plaintiff right to amend when such amendment would be futile. Oneida Indian Nation v. City of Sherill, 337 F.3d 139, 168 (2d Cir. 2003), (rev'd on other grounds, 544 U.S. 197 (2005)). An amendment is futile when "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Id. In a civil forfeiture action, a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is governed by the pleading requirements of Fed.

7

R. Civ. P. 8(a), in addition to the enhanced requirements of the Supplemental Rules. United States v. One Tyrannosaurus Bataar Skeleton, No. 12 Civ. 4760, 2012 WL 5834899, at *3 (S.D.N.Y. Nov. 14, 2012).

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Legal conclusions, however, are not entitled to any presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678. The court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Comms. Inc.v. Shaar Fund, Ltd., 693 F.3d 87, 99 (2d Cir. 2007).

Pursuant to the Supplemental Rules, the Government must set forth its claims in the complaint "with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. R. E(2)(a).[2] The complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(f). These standards are regarded as "more

---

[2] Rule G also provides that "[i]n an action governed by 18 U.S.C. § 983(a)(3)(D) the complaint may not be dismissed on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property. The sufficiency of the complaint is governed by Rule G(2)." Fed. R. Civ. P. Supp. R. G(8)(b)(ii).

stringent than the general pleading requirements set forth in the Federal Rules of Civil Procedure, . . . an implicit accommodation to the drastic nature of the civil forfeiture remedy." United States v. Daccarett, 6 F.3d 37, 47 (2d Cir. 1993) (internal citations omitted).

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the burden of proof is on the government to establish, by a preponderance of the evidence, that the property is subject to forfeiture. 18 U.S.C. § 983(c). CAFRA applies to 18 U.S.C. §§ 981(a)(1)(C) and 545, which the Government invokes here. However, CAFRA does not apply to 19 U.S.C. § 1595a(c) because it is subject to a "customs carve out." 18 U.S.C. § 983(i)(2)(A); see United States v. Davis, 648 F. 3d 84, 94 (2d Cir. 2011). Instead, under the pre-CAFRA burden-shifting approach of 19 U.S.C. § 1615, the government must establish probable cause as to its §1595(a)(c) claim for forfeiture, and if it does so, the burden shifts to the claimant to establish a defense. Davis, 648 F.3d at 95-96.

## I. The PAC Sufficiently States a Claim for Forfeiture of the Statue and Thus is Not Futile

### A. Statutory Bases for Forfeiture

The Government alleges that the Statue is subject to forfeiture pursuant to three federal statutes. First, pursuant to 18 U.S.C. § 981(a)(1)(C), the government alleges that the Statue "constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity.'" The Government alleges that the specified unlawful activity is a violation of 18 U.S.C. §§2314 and 2315, which together constitute the National Stolen Property Act ("NSPA"). See Davis, 648 F.3d at 83. Section 2314 prohibits the transport "in interstate or foreign commerce any goods ... of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud..." 18 U.S.C. §2314; see One Tyrannosaurus Bataar

Skeleton, 2012 WL 5834899, at *4. Section 2315 prohibits the receipt or possession of "any goods . . . of the value of $5,000 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted or taken …"

The government also alleges that the Statue is subject to forfeiture pursuant to 18 U.S.C. § 545. Pursuant to Section 545, the government alleges that the Statue is merchandise knowingly imported into the United States contrary to law. See 18 U.S.C. § 545. The government alleges that the import of the Statue was contrary to law pursuant to the NSPA, 18 U.S.C. § 2314, because it was transported in interstate commerce with Sotheby's knowledge that it was stolen.

Finally, the government alleges that the Statue is subject to forfeiture pursuant to 19 U.S.C. § 1595a(c) which provides that "[m]erchandise which is introduced or attempted to be introduced into the United States contrary to law shall be . . . seized and forfeited if it . . . is stolen, smuggled, or clandestinely imported or introduced." 19 U.S.C. § 1595a(c). The government again alleges that import of the Statue was contrary to law pursuant to the NSPA, 18 U.S.C. § 2314, because it was transported in interstate commerce with Sotheby's knowledge that it was stolen.

The requirements of 19 U.S.C. § 1595a(c) that the property be (1) introduced "contrary to law" and (2) stolen, smuggled, or clandestinely imported or introduced" are separate and must each be satisfied. See United States v. Broadening-Info Enters, Inc., 462 Fed. App'x 93, 97 (2d Cir. 2012) (summary order). While "contrary to law" is not defined, the requirement can be satisfied by proving a violation of another statute including the NSPA. See Davis, 648 F.3d at 90 (holding that an NSPA violation may serve as a predicate for "contrary to law" requirement in

Section 1595a(c)). "Although the 'contrary to law' and 'stolen, smuggled, or clandestinely imported or introduced' prongs are separate, the statutory language suggests that the same statutory predicate may satisfy both prongs in some instances, for example where property is introduced 'contrary to law' in that it is stolen property or was introduced clandestinely in violation of a statute required disclosure. One Tyrannosaurus Bataar Skeleton, 2012 WL 5834899, at *6.

Each of the federal statutes under which the Government has brought this forfeiture action requires an underlying violation of the NSPA. Thus, to establish that the property is subject to forfeiture, the Government must allege that (1) the Statue was stolen, (2) the Statue remained stolen at the time of import into the United States, and (3) Claimants knew the Statue was stolen.[3] With respect to the Government's claims under 18 U.S.C. §§ 981(a)(1)(C) and 545, the government must plead facts to support a reasonable belief that the government can establish, by a preponderance of the evidence, that each of these elements is met. With respect to the Government's claims under 18 U.S.C. 1595a(c), the Government must plead facts to support a reasonable belief that the government can establish probable cause to meet each of these elements.[4] Claimants' original motion to dismiss argued that the Verified Complaint did not state a claim because the Government did not alleged facts that demonstrate that they can meet these elements. Claimants now also argue that the PAC is futile because the new allegations still fail to meet these elements.

---

[3] To establish a reasonable basis for their claim under Section 545 pursuant to 18 U.S.C. §2315, the Government needs only to plead facts that Claimants knew the Statue was stolen when Sotheby's possessed it in the United States.

[4] Claimants will then have the burden to establish that the Statue is not subject to forfeiture.

### 1. The PAC Adequately Pleads that the Statue Was Stolen[5]

Claimants argue the government has not adequately pled that the Statue was stolen in either the Verified complaint or the PAC. Claimants contend that in order to allege that the Statue was stolen from Cambodia, the Government must point to "clear and unambiguous" foreign ownership law "drafted with sufficient clarity to survive translation into terms understandable by and binding upon American citizens." Claimants' Memo. of Law in Support of their Mot. to Dismiss ("Claimants' Memo") at 12. (citing United States v. McClain, 593 F.2d 658, 670 (5th Cir. 1979); United States v. Schulz, 333 F.3d 393, 402 (2d Cir. 2003). Claimants argue that the Colonial Decrees cited by the Government in the Verified Complaint and PAC do not contain such clear and unambiguous language. As a result, Claimants contend that as a matter of law, which is appropriately addressed on a motion to dismiss, the removal of the Statue from the Prasat Chen temple did not render the Statue stolen property within the meaning of 18 U.S.C. §§ 2314 and 2315.

Claimants also argue that the Government's allegations that the Statue was stolen are insufficient because the Government has alleged no facts demonstrating that Cambodia has ever enforced the colonial decrees relied upon by the Government. In support of this argument, Claimants cite Peru v. Johnson, in which a post trial determination that "[t]here [was] no indication in the record that Peru ever sought to exercise its ownership rights in such property,"

---

[5] Claimants originally also argued that the Verified Complaint was insufficient because "the Complaint alleges no facts establishing a reasonable belief that the Statue was removed without Cambodia's permission… [or] that the Statue was still in Cambodia when the Decrees were issued." Claimant's Memo. at 11. To the extent Claimants retain that argument against the PAC, it fails. The Government alleges in the PAC that "[i]n or around 1972, the Defendant in rem and the Museum Statue were stolen from Prasat Chen via [an organized] looting network . . . and ultimately delivered to a Thai dealer based in Bangkok." Assuming these facts as true, the Government has made sufficient allegations to support a reasonable belief that the Government will be able to meet its burden of proof at trial to demonstrate that the Statue was removed after the Cambodian decrees were issued and without Cambodia's permission.

12

supported that court's decision that Peru's claim of ownership as a part of its domestic law was uncertain. See Gov't of Peru v. Johnson, 720 F. Supp. 810, (C.D. Cal. 1989). Claimants also claim that Schultz supports this argument because the Second Circuit Court of Appeals stressed the foreign government's "active enforcement" of its laws in concluding that those laws vested title in the state. See Schulz, 333 F.3d at 402.

The Government's allegations in the PAC support a reasonable belief that the Government will be able to demonstrate by a preponderance of the evidence that the Statue was stolen. In Schultz, the Second Circuit Court of Appeals explicitly adopted the reasoning of the Fifth Circuit that "a declaration of national ownership is necessary before illegal exportation of an article can be considered theft, and the exported article considered 'stolen,' within the meaning of the National Stolen Property Act." Id.; United States v. McClain, 545 F.2d 988, 1000-01 (5th Cir. 1977). The PAC sets out a number of provisions of Cambodian law in support the allegation that the Statue has been declared state property. Specifically, the Government alleges that a May 16, 1925 Decree translated from French states:

> The real estate and tangible moveable items located within the territorial limits of the Indochinese Union, as they are listed in the tables attached to this decree, are classified among the monuments and historic objects of French Indochina.

PAC ¶ 51; Reply Memo of Law in Support of Claimants' Mot. to Dismiss, Ex. 1. The Statue was included on the referenced list. The Government contends that the language "of French Indochina" as translated from French indicates that such items "belong to" French Indochina, and therefore now, to Cambodia. PAC ¶ 51. The Government also cites a March 19, 1900 decree for the proposition that the Cambodia has claimed title to the Statue. It states:

ownership of art or archeological objects, buildings, bas-reliefs, statues, medals, vases, columns, or inscriptions which may exist on or in the soil of immovable properties constituting a part of

the national domain in Indochina, or granted by the Government to private individuals shall be reserved for the domain.

PAC ¶ 50; Decl. of Matthew Rendall in Support of the Government's Opposition to Claimant's Motion to Dismiss ¶ 19.

Claimants argue that these proclamations are not clear and unambiguous, and thus cannot provide a basis for a finding that Cambodia owns the Statue. Claimants however, provide no case law support for their argument that the Court must, on a motion to dismiss, examine the translation of foreign law at issue without the aid of expert testimony or any other evidence to determine whether it is clear and unambiguous. In fact, the decisions which Claimants cite for this proposition are all at the post-trial stage. Further, each of those courts explicitly considered expert testimony in evaluating the relevant foreign nation's patrimony laws at trial. See United States v. Schultz, 333 F.3d 393 (2d Cir.2003) (In affirming a conviction by a jury trial, the court noted that "the district court evaluated the language of [the relevant] law [and] . . . heard testimony from one academic expert and two Egyptian government officials. This evidence was sufficient to inform the court of the nature of Egypt's interest in the antiquities that were the subject of the conspiracy"); see also United States v. McClain ("McClain II"), 593 F.2d 658 (5th Cir. 1979) ; United States v. McClain ("McClain I), 545 F.2d 988 (5th Cir. 1977).

Here, where the subject law is in a foreign language and the parties argue that its literal translation is subject to more than one interpretation, further evidence is necessary to determine whether the law at issue unequivocally vests ownership in the Cambodian State. At this stage, assuming all of the Government's facts as true, and drawing the reasonable inferences in the Government's favor, including that "of" as translated from the decree in French connotates "ownership," the Government has demonstrated a reasonable basis to believe that it will be able

14

to demonstrate by a preponderance of the evidence that Cambodian laws vested ownership of the Statue in Cambodia, and thus it is stolen property pursuant to § 2314 and/or 18 U.S.C. § 2315.

Claimants' argument that the PAC is deficient because it does not contain factual allegations that Cambodia ever enforced the Colonial Decrees also fails. Neither of Claimant's cited cases stand for the proposition that the Government must allege that Cambodia actively enforced its laws to state a claim for forfeiture. The determination in Johnson was made post trial and offers no guidance on whether the Government needs to plead in its complaint that Cambodia's laws were actively enforced. Further, while "Schulz states that enforcement is probative of the intent behind a foreign law, [] the opinion fall short of making active enforcement a pleading requirement." One Tyrannosaurus Bataar Skeleton, 2012 WL 5834899, at *11.

## 2. The PAC Adequately Pleads that the Statue Remained Stolen at Import into the United States

Claimants argue that the Government has not adequately alleged that the Statue remained stolen at the time of import into the United States. Claimants contend that under the English law applicable to the 1975 purchase of the Statue, even if the Statue were stolen and the seller complicit in the theft, Claimant Ruspoli and her husband acquired good title extinguishing any claim of Cambodian ownership.

The Government's allegations in the PAC support a reasonable belief that the Government will be able to demonstrate by a preponderance of the evidence that the Statue remained stolen at the time of import into the United States. As discussed above, the government has alleged sufficient facts to support a reasonable belief that the Statue was the property of Cambodia and thus constitutes stolen property. As conceded by Claimants' expert, a

party seeking to invoke the law of limitations to demonstrate that his good faith purchase extinguished the right of an original owner, such that the Statue was not stolen, has the burden to demonstrate that his acquisition is not related to the theft. See Decl. of Brian Doctor QC ¶¶ 36, 39.4 n. 13; Second Decl.of Brian Doctor QC ¶8. The presumption is thus that the Statue remains stolen until that burden is met. Accordingly, the Government need not plead facts to demonstrate that Claimants were not good faith purchasers of the Statue to show that the Statue remained stolen at the time of export.

Claimants cite United States v. Portait of Wally, for the proposition that the Government must allege Claimant's lack of good faith to sufficiently demonstrate that the Statue remained stolen. United States v. Portait of Wally) ("Wally II"), No. 99 Civ. 9940, 2002 WL 553532 (S.D.N.Y. Apr. 12, 2002); United States v. Portrait of Wally ("Wally IV"), 663 F. Supp. 2d 232 (S.D.N.Y. 2009). That case is distinguishable however, because Austrian law governed the underlying question of ownership status, and contained a presumption that a purchaser who acquired ownership of property did so in good faith. Wally II, 2002 WL 553532 at *17. Because such a presumption existed there, the Government needed to allege facts demonstrating that ownership of the defendant in rem did not pass to that purchaser. No such presumption exists under British law,[6] and, as discussed, a claimant has the burden to demonstrate that he is a good faith purchaser in order to extinguish the ownership status of the original owner.

### 3. The PAC Adequately Pleads that Sotheby's Knew the Statue Was Stolen at the Time of Import into the United States and Thereafter

Claimants argue that the Government has not adequately alleged that Sotheby's knew the Statue was stolen at the time of import into the United States. In support of this argument,

---

[6] In any event, although Claimants cite British authority and a British expert, they have not necessarily demonstrated that British law would apply here.

16

Claimants contend that Sotheby's actions leading up and subsequent to the Statue's import into the United States demonstrate that it acted transparently and in good faith. Specifically, Claimants argue that Sotheby's disclosure of its pending sale of the Statue both to the world at large and to the Cambodian government in a letter, demonstrate that Sotheby's did not know that the Statue was stolen. Claimants also argue that the Government's failure to allege any facts in the PAC from which one could infer that (1) Sotheby's believed there was a clear and unambiguous law declaring the Statue to be state property; and (2) Sotheby's had any reason to believe that Ms. Ruspoli or her husband knew that the Statue was stolen when he purchased it in 1975, compel a finding that the Government cannot possibly demonstrate a reasonable basis to conclude that it will be able to meet its burden at trial to prove that Sotheby's had knowledge that the Statue was stolen.

The Government has sufficiently pled facts regarding Sotheby's knowledge that the Statue was stolen at the time of import into the United States. According to the PAC, Sotheby's was aware of the origin of the Statue, that it had been broken off at the ankles, and it first appeared on the international art market during a period of rampant looting of antiquities from Koh Ker. Sotheby's has a particular expertise in works from India and Southeast Asia, including extensive experience in the sale of Khmer artifacts. Sotheby's consulted regularly with the Collector and knew him to be the original seller of the Statue in 1975. The Collector knew that the Statue had been looted from Koh Ker, and had trouble selling it in 1975 because many prospective buyers were unwilling to purchase it due to its lack of legitimate provenance and missing feet. Subsequent to import, Sotheby's was expressly advised that the Cambodians had clear evidence that the Statue was definitely stolen. Sotheby's is alleged to have provided inaccurate provenance information and omitted information about the Collector who acquired the

Statue in Sotheby's communications with potential buyers, the Kingdom of Cambodia, and United States law enforcement. Accepting all of these fact as true for the purposes of the parties' motions gives rise to a reasonable inference that Sotheby's knew that the Statue was stolen at the time of import and thereafter. The Government need not provide unassailable proof to demonstrate Sotheby's knowledge at this stage in the case. Claimants have also not offered any legal support for their argument that the Government need plead facts demonstrating Claimant's actual knowledge of foreign patrimony law for the complaint to survive a motion to dismiss.

## II. Claimants Are Not Unduly Not Prejudiced by the Filing of the Amended Complaint

Claimants have demonstrated no basis on which they have been prejudiced by the Government's motion to amend. This is the Government's first request to amend its complaint with facts collected pursuant to its ongoing investigation. It is well within the discretion of the Court to grant leave to amend under these circumstances, where amendment would not be futile.

## CONCLUSION

The Government's Motion to Amend is GRANTED. Claimants' Motion to Dismiss is DENIED.

Dated: March 28, 2013
  New York, New York

SO ORDERED

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

18                        MAR 28 2013