```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
UNITED STATES OF AMERICA,                     )
                                              )
                        Plaintiff,            )
            - v. -                            )  12 Civ. 2600 (GBD)
                                              )
A 10th CENTURY CAMBODIAN SANDSTONE            )
SCULPTURE, CURRENTLY LOCATED AT               )
SOTHEBY'S IN NEW YORK, NEW YORK,              )
                                              )
                        Defendant in rem.     )
------------------------------------------------------------------ X
```

**CLAIMANTS' REPLY IN SUPPORT OF THEIR LETTER DATED MAY 10, 2013 REQUESTING A PRETRIAL CONFERENCE PURSUANT TO F.R.C.P. 16**

Sotheby's, Inc. ("Sotheby's") and Ms. Ruspoli di Poggio Suasa ("Ms. Ruspoli" and together with Sotheby's, the "Claimants") respectfully submit this reply to the Government's submission of May 21 and in further support of our May 10 request for a pretrial conference, pursuant to Fed. R. Civ. P. 16, to discuss early resolution of the critical and potentially dispositive issue in this case: whether the French Colonial decrees on which the Amended Complaint relies declared Cambodia to be the owner of the statue in dispute (the "Statue") with the clarity due process requires.

In opposing such a hearing, the Government proceeds precisely as it has done each time we have challenged its legal theory of Cambodia's ownership—it invents a new theory designed to avoid our objection. All these theories have two things in common: they are made up for this litigation, and neither Sotheby's nor Ms. Ruspoli had the sort of fair notice of them that due process requires before the Government can seize private property.

The Government alleges the Statue was taken in the early 1970s from a jungle ruin where a temple known as Prasat Chen stood a thousand years ago, rather than from a museum, public or private collection, or store-room. Settled law in this circumstance requires the Government to

identify a clear and unambiguous law making this Statue the property of Cambodia at the time it was taken out of that country.  The Government points to decrees that (on the Government's interpretation) make Cambodia the owner of statues found on sites forming part of the "national" or "colonial" domain.  But it has identified no decree establishing with the requisite clarity that the ruins of the Prasat Chen temple were part of either domain.

- The original Complaint tried to solve this problem by relying on an 1884 ruling of the French governor, which the Government interpreted as defining  "structures […] assigned to a public service" to be part of the "public domain."  Complaint, Dkt. 1, ¶ 36.  We pointed out in our motion to dismiss that it was hardly "clear" or "unambiguous" that the long-abandoned jungle ruin of what was once the Prasat Chen temple was "assigned to a public service."  Mem. in Support of Mot. to Dismiss ("Mem."), Dkt. 17, at 16-17.

- In opposition to our motion to dismiss, the Government then offered an expert declaration that did not even *mention* this 1884 decision.  *See* Dkt. 29-1.  Based on this declaration, the Government argued that a May 16, 1925 decree (the "May 16 Decree") established that the Prasat Chen ruin was part of the "national or colonial domain."  Gov't Br., Dkt. 29, at 12-13.  The expert declaration, however, does *not* say that.  Nor do the words "national or colonial domain" appear in the May 16 Decree.  Instead, the decree says only that "Pr. Chen" was "classified" among the historical monuments "of" French Indochina —phrasing naturally understood to mean the ruin is classed as a historical monument *located in*, rather than *owned by*, French Indochina.  *See* Reply, Dkt. 30, at 7-8.[1]

- After the Court expressed skepticism about the May 16 Decree theory during oral argument on the motion to dismiss, *see* Sept. 27, 2012 Tr., Dkt. 34, at 45, the Government introduced yet another theory.  In moving for leave to amend the Complaint, the Government contended that the Statue belonged to Cambodia in the 1970s because it was built by an ancient king a thousand years earlier.  Gov't Reply Br., Dkt. 43, at 5-6.

- In opposing leave to amend, we pointed out the lack of any clear law establishing either the ancient king's ownership of the Statue a thousand years ago, or the modern Cambodian government's ownership in the early 1970s of everything once owned by such a king.  Opp'n, Dkt. 41, at 6-8.  In its reply papers, the Government—unable to point to any such law—asserted instead that ownership claims based on the inherent right of kings were exempt from the ordinary due process requirement of a clear and unambiguous legal basis.  Gov't Reply Br., Dkt. 43, at 6.  The Court's ruling did not even mention this new theory in identifying grounds for concluding that the case could go forward.  Order, Dkt. 46, at 13-15.

---

[1] Although the May 16 Decree includes "Pr. Chen" in the list of historical monuments, it does not include the Statue. *See* May 16, 1925 Decree (English translation), Dkt. 31-3, at SOTHE-007975.  Indeed, while entries for other sites list "sculptures" among the items designated in the classification, *see, e.g.*, *id.* (entries numbered 266, 274), the "Pr. Chen" entry lists only "three sanctuaries, annexes, all of laterite; inscribed pillars," *id.*

- Now that we have requested a prompt hearing on the only allegation of "ownership" the Court identified as sufficient to survive a motion to dismiss, *see* Order, Dkt. 46, at 13-15—the Government's claim that "of" in the May 16 Decree clearly and unambiguously means "belongs to"—the Government has come up with yet another theory. It now contends that if the Court finds that the May 16 Decree does *not* establish as a matter of law that the Prasat Chen ruin was part of the colonial or national domain, then it should be permitted to take unspecified discovery from unidentified sources to explore whether there is some other basis to argue that the Prasat Chen ruin was part of the national or colonial domain. *See* Gov't submission, Dkt. 50, at 4.

Enough is enough.

The Government has had two years to come up with a legal theory sufficient to warrant depriving Ms. Ruspoli, without compensation, of the Statue her husband bought in good faith, for fair value, from a reputable dealer nearly forty years ago. The Court has identified only *one* theory of Cambodian national ownership as sufficient to survive our motion to dismiss—the theory that "of" might clearly and unambiguously mean "belongs to." *See* Order, Dkt. 46, at 13-15. If decided in our favor, that issue is dispositive, as the Government must establish that Cambodia has an ownership claim superior to Ms. Ruspoli's in order to prevail. *See United States v. Schultz*, 333 F.3d 393, 403-04 (2d Cir. 2003). No broad fact discovery is required on this theory, because the meaning and clarity of the decrees is an objective question. *See United States v. McClain*, 593 F.2d 658, 669 (5th Cir. 1979) (*McClain II*). It is therefore ripe for early resolution following a hearing pursuant to Fed. R. Civ. P. 44.1, at which the Court could accept expert testimony on the meaning of the French Colonial decrees on which the Government relies. Rejection of the May 16 theory would end the case.

The Government opposes this approach, claiming that an early hearing would not be dispositive because it has two other theories on which the case could proceed, and that in any event discovery into Sotheby's state of mind is necessary before the Court can rule on the clarity of the May 16 Decree. Both arguments are wrong.

*First*, neither of the Government's alternative theories has any legal basis. The

Government's "inherent right of kings" theory, unveiled in the Amended Complaint, explicitly depends on the Court inventing a special exemption from the due process test of *Schultz* and *McClain*. But there is neither precedent nor justification for exempting from ordinary due process requirements a claim that anything built by a king a thousand years ago belongs to the state today. The Government's other alternative theory—that something *other* than the May 16 Decree might establish that the Prasat Chen ruin was part of the national or colonial domain—is unsupported by even a *hint* at what facts or law this theory might be premised on. There is no reason to delay an early hearing on the theory the Government pled to permit it to engage in unspecified discovery, simply because it hopes it might someday come up with another theory.

*Second*, there is no need for discovery into Sotheby's mental state before the Court rules on the clarity of the May 16 Decree, for *McClain II* puts beyond doubt that the due process inquiry is an objective one. *See* 593 F.2d at 671 (even "willful conduct cannot make definite that which is undefined" (quoting *Screws v. United States*, 325 U.S. 91, 105 (1945))). Rather, the issue will be ripe for decision after the Court hears from the relevant experts.

I.  **The Government's Alternative Theories Provide No Basis For Deferring a Prompt Hearing**

    A.  **The "Inherent Right of Kings" Theory Depends On Inventing An Unprecedented And Unwarranted Exemption From The Due Process Test**

To be stolen within the meaning of the federal laws at issue in this case, property must be taken from an owner, without the owner's permission. *See United States v. Turley*, 352 U.S. 407, 408-09 (1957); *Schultz*, 333 F.3d at 399. *McClain* stated that a modern state may be the "owner" of an antiquity either by making a declaration of national ownership, or by acquiring the antiquity in the "general manner by which private persons come to own property." *United States v. McClain*, 545 F.2d 988, 1002 (5th Cir. 1977) (*McClain I*). An item in "a museum or a private

4

collection," *Schultz*, 333 F.3d at 399, would be owned in the general manner.[2]

*Schultz* and *McClain* protect those seeking to buy and sell ancient objects by imposing a due process test: where a country claims ownership of an object on some theory other than that it acquired ownership "in the general manner," due process requires that the ownership claim be based on "clear" and "unambiguous" law. *Schultz* and *McClain* do not address whether a similar due process test applies to claims of ownership of objects obtained in the "general manner."

The Government does not contend that there is a "clear" or "unambiguous" *law* supporting its "inherent right of kings" theory. Instead, it claims this theory fits within the "general manner" that private persons obtain property, and argues that it should therefore be exempt from the due process test.

No court has ever accepted such an argument. No court has ever found that a foreign state acquires an antiquity in the "general manner by which private persons come to own property" when it does not take the antiquity into its possession, and then, long after the antiquity has left the country, asserts a broad claim of ownership over all antiquities commissioned by an ancient sovereign within its territory.

Such a means of acquisition is in fact the antithesis of the "general manner" by which private persons come to own property. Private persons come to own property though some law-based means of gaining possession or the right of possession. Private persons do not own any object that they claim their ancestor owned fifty generations ago, unless they can identify some law supporting that entitlement. Conversely, distant ancestors who have left objects in the jungle

---

[2] In *Schultz*, the defendant sought to distinguish between an object possessed in violation of a national patrimony law and an object "'stolen' in the commonly used sense of the word, for instance, where an object is taken from a museum or a private collection." 333 F.3d at 399. The Government appears to argue from this that the *manner* in which an item is alleged to be taken from its place of origin could be enough to make it "stolen" for purposes of federal law. *See* Gov't submission, Dkt. 50, at 3-4 (reciting allegations that Statue was taken by "organized looting network," and that head was transported separately from body). But that is not so—an object is only "stolen" if it is taken without the permission of the owner. *See Turley*, 352 U.S. at 408-09; *Schultz*, 333 F.3d at 399.

5

for periods far shorter than a thousand years are typically thought to have lost any property interest in the object. *See, e.g.*, *Texaco Inc. v. Short*, 454 U.S. 516, 530 (1982) ("[A]fter abandonment, the former owner retains no interest for which he may claim compensation. It is the owner's failure to make any use of the property—and not the actions of the State—that causes the lapse of the property right; there is no taking that requires compensation."). There is no general practice of private persons obtaining ownership of an object on the theory that it was commissioned a thousand years ago by a long-dead relative who then left it in the jungle. That is particularly so where (as here) they have never possessed the property, and their ownership claim is first advanced decades *after* the property was sold to another in a public, arms-length sale. *See Nippon Shosen Kaisha, K.K. v. United States*, 238 F. Supp. 55, 59 (N.D. Cal. 1964) ("Once abandoned property has been appropriated by another, the former owner who relinquished such property cannot reclaim it.").

Nor would it make any sense to exempt this kind of ownership claim from the due process test established in *Schultz* and *McClain*. Those cases both subjected to careful scrutiny ownership claims based on written, broadly disseminated legislation duly enacted by a modern state's elected leaders. It is hard to see why there would be *less* due process scrutiny for claims based neither on written laws nor on traditional, easily understood and verified standards like actual possession, but instead on unwritten principles purportedly vesting the modern Cambodian state with all objects commissioned for long-dead kings.[3]

Immunizing such ownership claims from due process scrutiny would not just be

---

[3] The Government has suggested that Cambodia owns this Statue in the same way that the United States owns the Moynihan Courthouse. Gov't Reply Br., Dkt. 43, at 5. But that analogy fails for multiple reasons. First, the Statue was not built by the modern state of Cambodia—a country that won independence from France only in 1949—but by an individual king who ruled over some of the same territory a thousand years ago. *See* Am. Compl., Dkt. 47, ¶ 6. Second, the Statue has not been in continuous use since its creation, but instead was abandoned to the jungle within a few years of construction. *See* Am. Compl. ¶ 5. Third, the territory now denominated Cambodia has, at various times in the last thousand years, been controlled by Thailand, France, and Japan. *See, e.g.*, Rendall Decl., Dkt. 29-1, at ¶¶ 35-36; Neiman Decl., Dkts. 42-6, 42-7, 42-8, at Ex. 5.

6

unprecedented; it would be destabilizing. Most ancient objects were at one time owned by someone, in many cases by an ancient king or queen, as the Court noted during oral argument on the motion to dismiss. *See* Sept. 27, 2012 Tr., Dkt. 34, at 87. Accepting those antiquated ownership claims automatically without *any* due process scrutiny or *any* basis in modern law would brand as stolen countless antiquities acquired in good faith and long held openly by museums and collectors. If *Schultz* and *McClain* stand for anything, it is that if a foreign state wishes American courts to recognize it as the owner of an object lost to the jungle for a thousand years, it must have declared its ownership clearly and unambiguously before the object was removed from its territory.[4]

Exempting from this settled due process test all objects commissioned by ancient rulers is unsupported by precedent or common sense. If the Government wishes to proceed on the theory that the modern Cambodian state owns whatever the ancient kings left behind, it must identify clear and ambiguous law declaring each constituent piece of that ownership theory. Absent such law, this theory provides no basis for divesting Ms. Ruspoli of her Statue, and therefore no basis for deferring a hearing on the real issue here: whether the French Colonial decrees the Government has identified declare the Statue to be state property with the requisite clarity.

> B. The Government's Request For Unspecified Discovery From Unspecified Sources To Support A New Legal Theory It Hopes To Develop Provides No Basis For Deferring A Hearing On The Legal Theory Pled In The Amended Complaint

As a second basis for avoiding a hearing on the May 16 Decree, the Government urges that rejection of its theory would simply open the door to factual discovery aimed at developing *other bases* to argue that the Prasat Chen ruin was part of the national or colonial domain. *See* Gov't submission, Dkt. 50, at 5. But the status of the Prasat Chen ruin is a *legal* question—as

---

[4] In addition, the Government would need to show that Cambodia has actually *enforced* its claimed title to everything ever commissioned by ancient kings. *See Gov't of Peru v. Johnson*, 720 F. Supp. 810, 814 (C.D. Cal. 1989), *aff'd*, 933 F.2d 1013 (9th Cir. 1991).

7

the Government itself recognized when it posited that the May 16 Decree answered the question. It does not magically turn into a *factual* question if the Government is mistaken in its interpretation of that decree. There either is a decree establishing that the Prasat Chen ruin is part of the national or colonial domain, or there is not.

The Government has not explained why fact discovery is necessary on this legal question, what discovery it would seek, from whom, why it has a good faith basis to believe that such discovery would be fruitful, or why (given that it is bringing this case on behalf of the *Cambodian* government, which surely is in the best position to identify such evidence if it exists) it has not already obtained the material in the two years it has been conducting its investigation.

The pleading standard in forfeiture cases requires the Government—before pursuing discovery—to identify a sufficient basis to believe it is reasonably likely to meet its burden of proof at trial. *See* Mem., Dkt. 17, at 9. If the bases pled in the Amended Complaint are rejected, then the appropriate course would be to grant summary judgment to Claimants, not permit the Government to keep the case alive in the hope that discovery—or one more rummage in its legal grab-bag—will lead it to some new, previously unidentified legal theory. *See Bridgewater v. Taylor*, 745 F. Supp. 2d 355, 358 (S.D.N.Y. 2010) ("Discovery is unwarranted where it would function as a fishing expedition for evidence in search of a theory that has yet to be asserted." (internal quotation marks omitted)); *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981) ("speculation about what discovery might uncover" and "mere hope that further evidence may develop prior to trial" cannot defeat summary judgment motion).

## II. The Theory That "Of" Clearly And Unambiguously Means "Belongs To" Will Be Ripe For Resolution Following A Hearing

There is no reason to postpone a hearing on whether the May 16 Decree meets the due process test to permit full discovery regarding whether Sotheby's *believed* the decrees declared

8

Cambodia to be the owner of the Statue. Contrary to the Government's contention (Gov't submission, Dkt. 50, at 5 n.3), Sotheby's subjective belief is not "relevant" to the due process question. The due process test is an objective one; the clarity of the decrees depends on what the decrees say and how they have been enforced, not on what Sotheby's lawyers (or the Government's, for that matter) thought. The Government cites no case to support its claim that Sotheby's subjective views are relevant to the due process test. The case we cited in our May 10 letter (at 2)—*McClain II*—is squarely to the contrary. The Government fails to mention *McClain II*, much less attempt to distinguish it. There is thus no need for burdensome fact discovery into Sotheby's state of mind prior to a hearing on the objective meaning and clarity of the colonial decrees. *See Schultz*, 178 F. Supp. 2d 445, 447-48 (S.D.N.Y. 2002) (describing pretrial hearing on Egyptian law), *aff'd*, 333 F.3d 393 (2d Cir. 2003).

The Government suggests that deferral of discovery is our true goal in seeking this hearing. Claimants' actions show that is not true. Sotheby's voluntarily produced more than a thousand pages of discovery *before* this action was brought, and Claimants together have since produced in discovery more than five thousand additional pages of documents.[5] We remain open to discussing with the Government whether there is further discovery that would be efficient to conduct in advance of the hearing. But it is in all parties' interest to proceed in the fashion most likely to produce a prompt resolution that avoids wasteful discovery. For that reason, we seek an early hearing on the core due process issue. *See* Fed. R. Civ. P. 16(a)(1) & (3) (pretrial

---

[5] Sotheby's has not refused on privilege grounds to produce "any discovery relating to its understanding" of Cambodia's possible ownership claim. Gov't submission, Dkt. 50, at 5 n.3. Sotheby's asserted privilege where appropriate, but Sotheby's has produced multiple non-privileged documents on point. One such set of documents shows that Sotheby's in June 2010 sought information about "Cambodia's cultural heritage laws" from an individual who we understand has since become one of the Government's experts in this case. She explained to Sotheby's that for the "last few years," she had been "leading a project to collect, analyze, and publish Cambodian laws affecting cultural property" and as a result was "fairly familiar" with them, "as much as one can be anyway, given the country's lack of legal publication." She then sent Sotheby's various laws relating to cultural property dating back only to the 1980s—long *after* the consignor's husband bought the Statue in London.

9

conferences should "expedit[e] disposition of the action" and "discourag[e] wasteful pretrial activities"). The Government's resistance to that common-sense approach is hard to understand, unless it believes (mistakenly) that if it can make the litigation more expensive than the Statue is worth, Claimants will be forced to surrender.

## CONCLUSION

The Government has only one potentially viable legal theory of ownership. That theory turns on an objective question about the meaning and clarity of the French Colonial decrees that the Court can resolve after hearing from the relevant experts. The fair and efficient course is to schedule such a hearing promptly. The resulting ruling will either dispose of the case entirely, or narrow the issues considerably, allowing the parties to streamline the remainder of the case.

Date:  May 28, 2013                                    Respectfully submitted,

/s/  Peter G. Neiman
Peter G. Neiman
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

*Counsel for Claimants Sotheby's, Inc. and Ms. Ruspoli di Poggio Suasa*

**CERTIFICATE OF SERVICE**

      I, Peter G. Neiman, one of the attorneys for claimants Sotheby's, Inc. and Ms. Ruspoli di Poggio Suasa, hereby certify that on May 28, 2013, I caused a copy of the Claimants' Reply In Support Of Their Letter Dated May 10, 2013 Requesting A Pretrial Conference Pursuant To F.R.C.P. 16 to be served on plaintiff's counsel through Electronic Case Filing, pursuant to Civil Rule 5.2 of the Local Rules of the United States District Court for the Southern District of New York.

      /s/  Peter G. Neiman
Peter G. Neiman
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888